John P. Perkins, III
SHULTS, BROWN & PERKINS, LLP
200 W. Capitol Avenue, Suite 1600
Little Rock, Arkansas 72201-3637
(501) 375-2301
Cal. Bar No. 262757

Steven Shults
SHULTS, BROWN & PERKINS, LLP
200 W. Capitol Avenue, Suite 1600
Little Rock, Arkansas 72201-3637
(501) 375-2301

Leonard A. Sclafani
LEONARD A. SCLAFANI, P.C.
2 Wall Street -- 5th Floor
New York, New York 10005
(212) 696-9880

FILED

APR 15 2010

CLERK, U S
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

2:10-mc-0041 FCD DAD

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE; SHREEKANTH CHERUKU; ANJAN PATEL; AMBER MILWARD; and JUSTIN T. HARNEY          Plaintiffs, | **MOTION TO COMPEL COMPLIANCE WITH SUBPOENA PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 45 AND BRIEF IN SUPPORT** |
| v. | **CASE NUMBER:** |
| THE MEDICAL BOARD OF CALIFORNIA          Defendant. | |

American University of Antigua College of Medicine ("AUA"), Shreekanth Cheruku, Anjan Patel, Amber Milward, and Justin T. Harney, plaintiffs in the underlying action, move the Court to compel the Medical Board of California, a non-party in the underlying litigation, to comply with plaintiffs' document subpoena. Plaintiffs have negotiated in good faith with the Medical Board of California regarding its compliance

with the subpoena for several months, but have reached an impasse on two categories of documents requested in the subpoena. Namely, the documents the Medical Board of California used to include certain schools on its lists of "approved" and "disapproved" foreign medical schools. The Medical Board of California objects to the production of these documents based on undue burden. The Medical Board of California, however, has failed to demonstrate any such burden. Further, these documents are highly relevant to plaintiffs' underlying claims that the Arkansas State Medical Board, in adopting the Medical Board of California's lists of "approved" and "disapproved" foreign medical schools, was a violation of plaintiffs' substantive and procedural due process rights and violated their equal protection rights of as citizens of the United States of America. Given the central importance of these documents to plaintiffs' underlying litigation, and the Medical Board of California's failure to demonstrate an undue burden, plaintiffs request that this Court compel the Medical Board of California to comply with the document subpoena in accordance with Federal Rule of Civil Procedure 45.

## I. FACTUAL BACKGROUND

Plaintiffs initiated the underlying litigation against the Arkansas State Medical Board in the United States District Court for the Eastern District of Arkansas for its inclusion of AUA on its list of "disapproved" foreign medical schools. *See* Exhibit A, Plaintiffs' First Amended Complaint; Exhibit B, Arkansas State Medical Board Disapproved List. The Arkansas State Medical Board amended its regulation regarding the licensure of graduates from foreign medical schools in June 2008 to bar graduates of schools it determined were "disapproved" from obtaining a license to practice medicine in the State of Arkansas. *See* Exhibit A at 2, 9-10; Exhibit C, Arkansas State Medical

Board Regulation No. 3. The Arkansas State Medical Board included AUA on its list of "disapproved" foreign medical schools based solely on the fact that AUA was not included on the Medical Board of California's list of "approved" schools, which meant AUA's graduates were not recognized for licensure in California. *See* Exhibit A at 2, 10, 16-17; Exhibit D, Minutes of the Arkansas State Medical Board, June 5-6, 2008, at ASMB 1959. AUA has neither been approved nor disapproved by the Medical Board of California, but in the absence of actual approval, graduates of "unrecognized" foreign medical schools are denied licensure in California and in those states that rely upon the Medical Board of California's lists. *See* Exhibit A at 16-18.

The Medical Board of California's regulation regarding the licensure of foreign medical graduates, CAL. CODE REGS. Tit. 16, § 1314.1, and the practices of the Medical Board of California in the interpretation and application of that regulation, intentionally discriminate against citizens of the United States of America. *See* Exhibit A at 16-18. The Medical Board of California subjects foreign medical schools located in the Caribbean and Central American region to intense, time-consuming, arbitrary, non-objective, and costly evaluation before approving these foreign medical schools and awarding licenses to their graduates. *See* Exhibit A at 17; Exhibit E, Medical Board of California January 4, 2010 Memorandum at CALIFORNIA 13, 18-19; Exhibit F, Medical Board of California May 9, 2003 Initial Statement of Reasons at CALIFORNIA 225, 227. The student bodies of foreign medical schools located in the Caribbean region, like AUA, are predominantly citizens of the United States. *See* Exhibit A at 14; Exhibit G, Mary B. McAvinue, et al., *U.S. Citizens Who Graduated from Medical Schools Outside the United States and Canada and Received Certification from the Educational Commission for*

*Foreign Medical Graduates, 1983-2002*, ACADEMIC MEDICINE, May 2005, at 473.

Contrary to the perceived belief of state medical boards around the country, including Arkansas, the Medical Board of California does not subject all foreign medical schools regardless of geographic location to similar scrutiny. In fact, the Medical Board of California provides little to no review of foreign medical schools located outside the Caribbean or Central American region. *See* Exhibits E and F. Foreign medical schools whose student bodies are predominantly not citizens of the United States, for example foreign medical schools located in India or Pakistan, are not scrutinized in any way before they are added to the Medical Board of California's list of "approved" foreign medical schools. *See* Exhibit A at 17; Exhibits E-G. This is done even though medical schools located in these countries provide the greatest number of foreign medical graduates that seek licensure in the United States. *See* Exhibit H, Marta van Zanten, et al., *Flexner's Global Influence: Medical Education Accreditation in Countries that Train Physicians Who Pursue Residency in the United States*, ACADEMIC MEDICINE, February 2010, at 324. Medical schools in India train 26.2% of all graduates of foreign medical schools who seek licensure in the United States, a resounding first place ranking. *Id.*

As alleged in plaintiffs' first amended complaint, the disparity in review between Caribbean medical schools and other foreign medical schools is done to unreasonably restrict the competition of graduates of Caribbean medical schools, whose graduates are predominantly United States citizens, with graduates of United States medical schools. *See* Exhibit A at 2-3, 14-16. This unreasonable scrutiny of Caribbean medical schools is being carried out during a time of severe physician shortage in the United States, and while the number of medical schools permitted to exist in the United States and the

number of students who are granted places in those schools has remained stagnant. *See* Exhibit A at 3, 15; Exhibit I, AAMC Statement on Physician Workforce, June 2006 at AAMC 632, 634.

Plaintiffs brought a 42 U.S.C. § 1983 claim, among others, against the Arkansas State Medical Board for its listing of AUA as a "disapproved" medical school and for its reliance on the Medical Board of California for the determination of what foreign medical schools to include on its "disapproved" list. *See* Exhibit A at 19-22. Plaintiffs allege that the Arkansas State Medical Board's reliance on the Medical Board of California denied plaintiffs the equal protection of the law given the Medical Board of California's disparate review of foreign medical schools whose student bodies are predominantly United States citizens. *Id.* Plaintiffs seek injunctive and declaratory relief, attorney's fees, and compensatory damages. *Id.* at 23-27.[1]

On January 7, 2010, plaintiffs subpoenaed the Medical Board of California for relevant documents. *See* Exhibit J, Subpoena and Declaration of Service. Included in the categories of requested documents were all documents reviewed or considered by the Medical Board of California in determining which foreign medical schools to include on its lists of "approved" and "disapproved" foreign medical schools. *Id.* at Schedule "A" ¶ 5-6. The Medical Board of California responded on January 19, 2010, with various objections. *See* Exhibit K. The parties conferred, and agreements were reached to

---

[1] On April 8, 2010, the Arkansas State Medical Board voluntarily amended its Regulation No. 3 doing away with its "disapproved" list of foreign medical schools. The issue of whether this rendered plaintiffs' claims for injunctive and declaratory relief moot has not been raised or decided in the underlying litigation. What is clear is that the voluntary amendment does not moot plaintiffs' claims for compensatory damages for violations of their constitutional rights (*see Keup v. Hopkins*, 596 F.3d 899, 904 (8th Cir. 2010)), and the Arkansas State Medical Board's reliance on the Medical Board of California to include AUA on its list of "disapproved" foreign medical schools for two years is still a central allegation in the underlying litigation.

provide a rolling production of documents responsive to the subpoena. *See* Exhibits L and M.

While compliance with paragraphs 5 and 6 of Schedule "A" to the subpoena would presumably be daunting given the number of schools on the "approved" and "disapproved" lists (*see* Exhibit N, "Disapproved" List; Exhibit O, "Approved" List), the Medical Board of California located only twenty-three boxes of responsive documents (*see* Exhibit P). The Medical Board of California objected to the production of these discovered, hard-copy documents on undue burden grounds. *See* Exhibit P.

In an effort to compromise, plaintiffs offered to limit the scope of these requests and forego production of documents regarding five of the schools listed on the "disapproved" list that were involved in fraudulent activity or were closed. *See* Exhibit Q. On March 25, 2010, the Medical Board of California stated that the offered compromise was not enough, and the review and copying of those documents was still too burdensome. *See* Exhibit R. In a final effort to compromise, plaintiffs offered to pay a copying service to perform all of the required duplication work, and offered to ease any time pressure of the privilege review process by allowing the Medical Board of California to "claw-back" any privileged documents that would be inadvertently produced. *See* Exhibit S. The Medical Board of California rejected the offer, stating the review of these documents for privilege was still too burdensome to undertake, and instead offered to provide documents on only two schools on its list of "approved" or "disapproved" foreign medical schools. *See* Exhibit T.

## II. ARGUMENT

Federal Rule of Civil Procedure 45 authorizes issuance of a subpoena to command a nonparty to produce designated documents, electronically stored information, or tangible things in its possession, custody or control. FED. R. CIV. P. 45(a)(1)(A)(iii). "The law [of discovery] begins with the presumption that the public is entitled to every person's evidence." *Richards of Rockford, Inc. v. Pacific Gas & Elec. Co.,* 71 F.R.D. 388, 389 (N.D. Cal. 1976). A nonparty commanded to produce documents and tangible things may serve objections to the documents or materials sought. FED. R. CIV. P. 45(c)(2)(B). If the nonparty objects, "the serving party may move the issuing court for an order compelling production." FED. R. CIV. P. 45(c)(2)(B)(i).

"[T]he scope of discovery through subpoena is the same as that applicable to Rule 34 and the other discovery rules." FED. R. CIV. P. 45, advisory committee notes (1970). Rule 34 states that "[a] party may serve on any other party a request within the scope of Rule 26(b)." FED. R. CIV. P. 34(a). Rule 26(b) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). "Although not unlimited, relevance, for purposes of discovery, is an extremely broad concept." *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351 (1978). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1). A "relevant matter" under Rule 26(b)(1) is any matter that "bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc.,* 437 U.S. at 351. Relevancy should be "construed 'liberally and with common sense' and discovery should be allowed unless the

information sought has no conceivable bearing on the case." *Soto v. City of Concord,* 162 F.R.D. 603, 610 (N.D. Cal. 1995); *see also Moon v. SCP Pool Corp.,* 232 F.R.D. 633, 635-36 (C.D. Cal. 2005).

Once relevance has been shown, it is up to the responding party to justify curtailing discovery. *Cohen v. City of New York,* 255 F.R.D. 110, 117 (S.D.N.Y. 2008). A court must limit the extent or frequency of discovery if it finds that "the burden or expense of the discovery sought outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake, and the importance of the discovery in resolving those issues. FED. R. CIV. P. 26(b)(2)(C)(iii). Additionally, a court must quash or modify a subpoena that "subjects a person to undue burden." FED. R. CIV. P. 45(c)(3)(A)(iv).

A court determines the propriety of a nonparty's refusal to comply with a subpoena for undue burden by balancing "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Gonzales v. Google,* 234 F.R.D. 674, 680 (N.D. Cal. 2006); *see also Travelers Indemnity Co. v. Metropolitan Life Insurance Co.,* 228 F.R.D. 111, 113 (D. Conn. 2005); *Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.,* 211 F.R.D. 658, 662-63 (D. Kan. 2003); *Cohen,* 255 F.R.D. at 117-18.

A party that objects to a subpoena as overbroad or burdensome bears the burden of proving overbreadth or undue burden. *F.D.I.C. v. Garner,* 126 F.3d 1138, 1146 (9th Cir. 1997); *see also Goodman v. U.S.,* 369 F.2d 166, 169 (9th Cir. 1966); *In re Yassai,* 225 B.R. 478, 484 (Bankr. C.D. Cal. 1998). "The burden is a heavy one." *Yassai,* 225 B.R. at 484. "The party who resists discovery has the burden to show that

8

discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998); *see also Meeks v. Parsons*, 2009 WL 3003718, *8 (E.D. Cal. 2009).

## A. *Relevance and Need*

The documents the Medical Board of California reviewed or considered when determining which schools to include on its lists of "approved" and "disapproved" foreign medical schools are highly relevant and necessary to establish plaintiffs' claims. Those documents are certainly calculated to lead to the discovery of admissible evidence, and they bear on, or reasonably could lead to other matters that could bear on, an issue in this case. *See* FED. R. CIV. P. 26(b)(1); *Oppenheimer Fund, Inc.,* 437 U.S. at 351.

As detailed above, plaintiffs contend that the Arkansas State Medical Board determined who should be included on its list of "disapproved" foreign medical schools based solely on whether the Medical Board of California had approved that particular school. AUA, a medical school located in the Caribbean region, has not yet been recognized by the Medical Board of California, and, thus, was "disapproved" by the Arkansas State Medical Board.

As thoroughly detailed in the first amended complaint, plaintiffs allege that the Medical Board of California undertakes its review of foreign medical schools in an arbitrary, capricious and discriminatory manner against United States citizens. The Medical Board of California does this by subjecting Caribbean medical schools, whose students are predominantly United States citizens, to an extensive, costly and onerous review process which typically involves detailed questionnaires and on-site inspections. Foreign medical schools whose students are typically not United States citizens, for

9

example Indian medical schools, are not reviewed in any manner, much less subjected to time consuming questionnaires or on-site inspections. This disparity in review is evidenced by the relatively small number of foreign medical schools represented as responsive to paragraphs 5 and 6 of Schedule "A" to the subpoena. Of the approximately 1500 foreign medical schools on either the "approved" or "disapproved" lists, only a fraction are represented in the twenty-three file boxes.

The relevance of these documents to the underlying litigation is clear. Further, if there were any doubt as to their relevancy, this Court should err on the side of production. "A district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder. Where relevance is in doubt ... The court should be permissive." *Gonzales,* 234 F.R.D. at 681; *see also Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 163 F.R.D. 329, 335 (N.D. Cal. 1995).

In addition, plaintiffs' need for these documents is readily apparent. In order to establish that the Medical Board of California's disparity in treatment of Caribbean medical schools exists, plaintiffs will need to show what hurdles the Medical Board of California required of Caribbean medical schools, but did not require of other foreign medical schools. The documents that best establish this are the documents responsive to Paragraphs 5 and 6 of Schedule "A" to the subpoena. The Medical Board of California's offer to provide documents on only two such schools would be insufficient to prove this disparity in treatment.

B. *Undue Burden and Costs*

The Medical Board of California has failed to establish that the production of

these documents would be unduly burdensome. The burden rests with the Medical Board of California, and the only assertions made thus far, fall short. The Medical Board of California bases its burden objection on the time and costs of duplicating these records, and on the privilege review it would be required to undertake. Neither basis has merit.

First, there is no burden to duplicate these records because plaintiffs have offered to pay a copying service to perform all of the required duplication work. *See Gonzales*, 234 F.R.D. at 683 (holding that technical burden to production did not excuse nonparty production where it would require eight full days of engineering time to recover documents where party agreed to pay for reasonable costs of production); *Cohen*, 225 F.R.D. at 121.

Second, the Medical Board of California has not shown that the privilege review process would be unduly cumbersome. We are not dealing with the massive amounts of information that can sometimes be encountered with electronically stored information. *See Viacom Intern., Inc. v. YouTube, Inc.*, 2009 WL 102808, *5 (N.D. Cal. Jan. 14, 2009) (granting motion to compel compliance with subpoena which would necessarily involve privilege review of approximately five million pages of electronically stored information). In this case, we are dealing with hard copy documents with known whereabouts in the thousands, not millions. Also, plaintiffs agreed to limit the scope of the subpoena by foregoing production on five "disapproved" foreign medical schools. Further, as offered by plaintiffs, a "clawback" provision for privileged documents, which would ease the time pressure of a privilege review, is an option. In addition, the Medical Board of California has not demonstrated with any level of estimation, what it expects a privilege review would cost in terms of time or money. When a nonparty fails to provide

evidence on the time, cost or inconvenience entailed in responding, it has failed to meet its burden in demonstrating an undue burden. *See, e.g., In re Yassai,* 225 B.R. at 484.

Finally, while plaintiffs have agreed to pay for all duplication costs, this is not the type of nonparty subpoena that would require the requesting party to shoulder the entire cost of production, including privilege review costs. A determination of discovery costs involving nonparties is subject to Federal Rule of Civil Procedure 45, which states in pertinent part that an order to compel "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." FED. R. CIV. P. 45(c)(2)(B)(ii); *see also U.S. v. Columbia Broadcasting System, Inc.,* 666 F.2d 364, 368-69 (9th Cir. 1982). What constitutes a "significant" cost is at the discretion of the district court. *See Sound Security, Inc. v. Sonitrol Corp.,* 2009 WL 1835653, *1 (W.D. Wash. June 26, 2009). If a cost is "significant," however, it does not mean that the requesting party must necessarily bear the entire cost of compliance. *See Linder v. Calero-Portocarrero,* 251 F.3d 178, 182 (D.C. Cir. 2001). In fact, a nonparty may still be required to bear some or all of its discovery costs under Rule 45:

> While the drafters of new Rule 45 clearly intended to expand the protection for non-parties such as disinterested expert witnesses, *see* Advisory Committee Note to 1991 Amendment, there is no indication that they also intended to overrule prior Rule 45 case law, under which a non-party can be required to bear some or all of its expenses where the equities of a particular case demand it.

*In Re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C. 1992).

The case law indicates several non-exhaustive, equitable factors to be considered in nonparty cost-shifting disputes: "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the

requesting party; and (3) whether the litigation is of public importance." *Linder,* 251 F.3d at 182; *see also In Re Exxon,* 142 F.R.D. at 383; *Sound Security, Inc.,* 2009 WL 1835653, *1-2.

"It has been recognized by other courts that a nonparty cannot shift its discovery costs if it has a substantial interest in the outcome of the case." *See Sound Security, Inc.,* 2009 WL 1835653, *3. In a decision involving the Exxon Oil Company, for example, the D.C. District Court noted that the outcome of the case would be of great concern to the petroleum industry generally and that the nonparty trade association, American Petroleum Institute ("API"), had an inherent interest in its outcome. *In Re Exxon,* 142 F.R.D. at 384. Accordingly, the Court held that API was not a "pure non-party witness" necessarily protected from significant discovery expense under Rule 45. *Id.* In this case, the Medical Board of California's policies, procedures and conduct in evaluating foreign medical schools are directly in question in the underlying lawsuit. The Medical Board of California is not disinterested in the outcome of the case and should more readily bear the costs of the production.

Likewise, the public importance of the litigation militates in favor of the Medical Board of California's shouldering of some of the expense. This case seeks to ensure the Constitutional rights of United States citizens who graduate from foreign medical schools to pursue their chosen profession without arbitrary, capricious, and discriminatory hurdles put in place by the Medical Board of California. The public importance of this case warrants a conclusion that the Medical Board of California should bear a portion of the costs. *See In re First American Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998).

# III. CONCLUSION

The documents reviewed or considered by the Medical Board of California in making its determination of which schools to include on its list of "approved" and "disapproved" foreign medical schools are highly relevant to the underlying litigation. Plaintiffs contend that the Arkansas State Medical Board relied on the Medical Board of California when it listed AUA as a "disapproved" foreign medical school. Plaintiffs further contend that this reliance violated their Constitutional rights because the Medical Board of California subjects Caribbean medical schools, which have student bodies that are predominantly composed of United States citizens, to onerous, arbitrary, and extensive review, while approving foreign medical schools whose student bodies are not predominately citizens of the Unites States to little or no review. These documents are relevant to plaintiffs' claims, and are needed to prove those allegations.

Further, the Medical Board of California has not demonstrated that compliance with the subpoena would subject them to undue burden. Plaintiffs have agreed to pay a copying service for the reasonable expenses to perform all of the required duplication work. In addition, plaintiffs have reduced the burden of any privilege review by limiting the scope of the request, and have offered to ease the time pressures with a "clawback" provision. Finally, this is not the type of case where the requesting party should bear the entire cost of production. The Medical Board of California has an interest in the underlying litigation because it calls the Board's conduct into direct question. In addition, this litigation involves matters of public importance. Namely, issues of United States citizens' Constitutional rights and their ability to practice their chosen profession.

Therefore, plaintiffs request that this Court order the following:

14

a. Compel the Medical Board of California to produce documents responsive to paragraphs 5 and 6 of Schedule "A" to the subpoena, excluding documents on the following medical schools included on the "disapproved" list:

    i. CETEC University, Santo Domingo;

    ii. CIFAS University, Santo Domingo;

    iii. UTESA University, Santo Domingo;

    iv. Spartan Health Sciences, St. Lucia; and

    v. Kigezi International School of Medicine, Cambridge, England and Uganda.

b. Require plaintiffs to pay for the reasonable costs of duplicating these documents; and

c. Require the Medical Board of California to pay its own expenses to review these documents for privilege.

DATED: April 14, 2010.

Leonard A. Sclafani
LEONARD A. SCLAFANI, P.C.
2 Wall Street – 5th Floor
New York, New York 10005
(212) 696-9880

SHULTS, BROWN & PERKINS, LLP
200 West Capitol Avenue, Suite 1600
Little Rock, AR 72201-3637
(501) 375-2301

By

John P. Perkins, III
Cal. Bar No. 262757
Ark. Bar No. 2005252

AO 72
(Rev. 8/82)

Debra K. Brown
Ark. Bar No. 80068

Steven Shults
Ark. Bar No. 78139

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on April 14, 2010, I directed a process service company to serve by personal service this Motion to Compel Compliance with Subpoena Pursuant to Federal Rule of Civil Procedure 45 on the following:

Linda Whitney
Interim Executive Director
The Medical Board of California
2005 Evergreen Street, Suite 1200
Sacramento, CA 95815

Further, this Motion to Compel Compliance with Subpoena Pursuant to Federal Rule of Civil Procedure 45 was served on the following counsel of record in the underlying litigation, *American University of Antigua College of Medicine, et al. v. Arkansas State Medical Board, et al.,* United States District Court - Eastern District of Arkansas, Case No. 4:09-CV-00306SW, by first class U.S. Mail:

Mark N. Ohrenberger
Arkansas Office of Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201-2610
Mark.ohrenberger@arkansasag.gov

By: _____
        John P. Perkins, III

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

**AMERICAN UNIVERSITY OF ANTIGUA**                                 **PLAINTIFFS**
**COLLEGE OF MEDICINE;**
**SHREEKANTH CHERUKU;**
**ANJAN PATEL;**
**AMBER MILWARD; and**
**JUSTIN T. HARNEY**

**v.**                              **No. 4:09-CV-306 (SWW)**

**ARKANSAS STATE MEDICAL BOARD;**                                 **DEFENDANTS**
**TRENT P. PIERCE, M.D.;**
**JOSEPH M. BECK, II, M.D.;**
**BOBBY E. COGBURN, M.D.;**
**ANNE BRITTON;**
**OMAR T. ATIQ, M.D.;**
**JIM C. CITTY, M.D.;**
**WILLIAM F. DUDDING, M.D.;**
**ROGER HARMON, P.D.;**
**PATTY K. PETTWAY, D.O.;**
**DOUGLAS F. SMART, M.D.;**
**JOHN B. WEISS, M.D.; and**
**HAROLD B. BETTON, M.D.**

# FIRST AMENDED COMPLAINT

Plaintiffs, American University of Antigua College of Medicine ("AUA"), individually and on behalf of current and former students, and Shreekanth Cheruku, Anjan Patel, Amber Milward, and Justin T. Harney complaining of defendants, the Arkansas State Medical Board ("ASMB"), Trent P. Pierce, M.D., Joseph M. Beck, II, M.D., Bobby E. Cogburn, M.D., Anne Britton, Omar T. Atiq, M.D., Jim C. Citty, M.D., William F. Dudding, M.D., Roger Harmon, P.D., Patty K. Pettway, D.O., Douglas F. Smart, M.D., John B. Weiss, M.D., and Harold B. Betton, M.D. (collectively, the "Individual Board Members"), both in their individual and official capacities, allege as follows:

## I. **INTRODUCTION**

1.      Defendants are charged under the Arkansas Medical Practices Act, ARK. CODE ANN. §§ 17-95-201 to -412, with determining who shall be awarded a license to practice medicine in the State of Arkansas, and with establishing rules and regulations supplemental to the Arkansas Medical Practices Act in furtherance of those responsibilities.

2.      Defendants enacted "Regulation No. 3"-"Unrestricted Licensure for Graduates of Foreign Medical Schools" ("Regulation No. 3"), which purports to set forth both the requirements and criteria that a graduate of a foreign medical school must meet for licensure, and the criteria upon which a foreign medical school will be included on the defendants' list of "disapproved medical schools." A graduate of a foreign medical school on defendants' "disapproved medical school" list "will not be considered for licensure by the Arkansas State Medical Board."

3.      Defendants, ASMB and the Individual Board Members, have failed in their duties under the Arkansas Medical Practices Act in that, in collusion with the Liaison Committee on Medical Education ("LCME") and its two sponsoring bodies, the American Medical Association ("AMA") and the American Association of Medical Colleges ("AAMC"), they have engaged in a course of conduct of unlawfully, willfully and intentionally ignoring the applicable law and their own rules in favor of damaging and discriminating against AUA and other medical schools located in the Caribbean region because the student bodies of those schools are predominantly American, and therefore, provide the source of the greatest economic competition to graduates of United States medical schools.

4.      The LCME is sponsored by, and is essentially controlled by, the AAMC and the AMA.

2

5.    The LCME, through the AAMC and the AMA, has a history that spans several decades of wrongfully limiting and restricting the number of medical schools in the United States and the number of seats for students in those schools in order to create and maintain an ever growing critical shortage of medical doctors in the United States, thereby driving up the cost of medical care and services so as to enrich the fortunate few doctors who graduate from schools under the LCME's aegis.

6.    Plaintiff AUA was founded in reaction to these practices and policies of the LCME, the AAMC, and the AMA, so that qualified Americans would be able to pursue their dreams of becoming doctors and of practicing their chosen professions in their home country, and in the process, competing for those positions and opportunities that have historically been reserved for graduates of United States medical schools.

7.    Defendants have included AUA on their list of "disapproved medical schools" since 2008, in direct contravention of their own Regulation No. 3 and in furtherance of their collusive efforts to arbitrarily exclude graduates of medical schools located in the Caribbean region, and AUA in particular, from becoming licensed to practice medicine in Arkansas and to discriminate against the Americans who attend and graduate from those schools.

8.    AUA does not and has never met any of the criteria for inclusion on the list of "disapproved medical schools."

9.    Further, defendants have no other information that would lead a state medical board to include AUA on its list of "disapproved medical schools." Indeed, defendants have not conducted any investigation, nor relied on any investigation by a sister state medical board, of the credentials, facilities, or faculty of AUA or the competence and fitness of its students.

10.    The results of defendants' actions are the preclusion of all AUA graduates from

3

obtaining licenses to practice medicine in Arkansas and the deprivation of plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney, and AUA's other current and former students' property and liberty interests in the right to practice the profession of their choice and in the right to apply for and to obtain a license to practice medicine in Arkansas without due process of law and without equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

11. In addition, defendants have determined that they will ignore the mandate of Regulation No. 3 and make determinations on whether a foreign medical school is a "disapproved medical school" based essentially on whether a particular school has been approved by the California State Medical Board.

12. Defendants have done so in direct contravention of their own rules and regulations and in derogation of their duty pursuant to Arkansas statute to determine the qualifications for licensure in Arkansas.

13. California's criteria and qualifications for including a medical school located outside the United States on its list of "approved medical schools" include regulations that provide for the approval of foreign schools whose students are predominantly not American with little or no scrutiny, while subjecting schools outside the United States whose students and graduates are predominantly American to rigorous scrutiny and significantly more onerous standards for approval.

14. The result of defendants' list of "disapproved medical schools" and its reliance on the California State Medical Board is to deprive plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney, and AUA's other current and former students of the right to practice the professions of their choice and in the right to apply for and to obtain a license to

4

practice medicine in Arkansas without due process of law and without equal protection of the laws, based on their national origin as Americans, in violation of the Fourteenth Amendment to the United States Constitution.

15.   Plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney, and AUA on behalf of its current and former students bring this action under 42 U.S.C. § 1983 for defendants' willful, intentional, continuing, and ongoing violations of the Fourteenth Amendment to the United States Constitution under color of state law.

16.   In addition, by their conduct in including AUA on their published list of "disapproved medical schools," and other statements regarding disapproved medical schools, defendants have defamed AUA and plaintiffs Shreekanth Cheruku and Anjan Patel in order to impede AUA's successful operation, to discourage qualified Americans from applying to and enrolling in AUA's medical doctorate program, and in order to reduce plaintiffs Cheruku and Patel's ability to obtain employment as medical doctors in the United States and in Arkansas.

17.   By these claims, as more fully set forth below, plaintiffs seek injunctive relief, a declaratory judgment, compensatory damages, attorneys' fees, expenses, and costs.

## II.  PARTIES, JURISDICTION, AND VENUE

18.   AUA is an institution of higher education chartered by the government of Antigua to own and operate a medical school and a school of nursing. AUA is authorized under its charter to award medical doctorate ("M.D.") degrees.

19.   AUA maintains its principal campus and principal offices at West Campus, Friar's Hill Road, St. John's, Antigua, W.I.

20.   Plaintiff Shreekanth Cheruku is a citizen of the United States and a resident of the State of New York, maintaining his principal residence at 3-37 Cresthaven Lane, Whitestone,

5

New York.

21.     Plaintiff Anjan Patel is a citizen of the United States and a resident of the State of New Jersey, maintaining his principal residence at 591 Norfolk Avenue, Pennsville, New Jersey.

22.     Plaintiff Amber Milward is a citizen of the United States and a resident of the State of Arkansas, maintaining her principal residence at 2710 Pleasant Lane, Bentonville, Arkansas.

23.     Plaintiff Justin T. Harney is a citizen of the United States and a resident of the State of Arkansas, maintaining his principal residence at 106 Woodbury Court, Crossett, Arkansas.

24.     Plaintiffs Shreekanth Cheruku on October 24, 2008, and Anjan Patel on April 15, 2009, successfully completed their course of studies at AUA, and were awarded M.D. degrees by AUA.

25.     Plaintiffs Amber Milward and Justin T. Harney are currently enrolled students in the medical doctorate program at AUA, who intend, upon graduation, to return to Arkansas to practice medicine.

26.     Defendant Arkansas State Medical Board was established by the General Assembly of the State of Arkansas as a regulatory board authorized and empowered to license persons to practice medicine in the State of Arkansas.

27.     Defendant ASMB maintains its principal offices at 2100 Riverfront Drive, Little Rock, Arkansas, and can be served with service of process through its chairman, Trent P. Pierce, M.D.

28.     Plaintiffs are suing each and every Individual Board Member in both his or her individual and official capacities.

29.     This court has subject matter jurisdiction under 28 U.S.C. § 1331 because plaintiffs' claims arise under the United States Constitution and/or the laws of the United States,

6

including the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

30.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(3) and (4) because plaintiffs seek redress for deprivation of rights, privileges and immunities secured to them by the Fourteenth Amendment to the United States Constitution and by 42 U.S.C. §§ 1983 and 1988, occasioned under color of State law, namely the Arkansas Medical Practices Act, ARK. CODE ANN. §§ 17-95-201 to -412, and the regulations promulgated under the Act.

31.    In addition, this Court has supplemental jurisdiction over plaintiffs' defamation claim and defendants' improper delegation of its duties under the Arkansas Medical Practices Act, which arise under the laws of the State of Arkansas, under 28 U.S.C. § 1367 because those claims arise out of a common nucleus of operative facts with plaintiffs' federal constitutional claims and are so related to plaintiffs' federal constitutional claims that they form a part of the same case or controversy within the meaning of Article III of the United States Constitution.

32.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1)-(2) because defendants reside within the district and a substantial part of the events or omissions giving rise to plaintiffs' claims occurred in this district.

## III. FACTUAL BACKGROUND

### Introduction

33.    AUA was founded in 2004 by world-class American physicians and professionals in the field of medical education. The University was subsequently acquired by Manipal University, a highly respected, privately owned university chartered by the government of India.

34.    AUA provides a comprehensive, modern education for students who aspire to become highly skilled, compassionate physicians and nurses.

35. AUA is numbered among only a handful of international medical schools that have been approved by the State of New York for clinical clerkships and residencies at New York state-approved hospitals.

36. While primarily dedicated to teaching medicine and nursing, AUA directs significant resources to continuing research in areas that directly impact human health. In concert with the Ministry of Health of Antigua and Barbuda, faculty and students of AUA have conducted, and are conducting, research aimed at helping the local population to improve its standards of health and living conditions.

37. AUA's Center for Tropical Diseases has conducted numerous research projects that have contributed significantly to the improvement of health of the local citizens and of the Caribbean region in general.

38. AUA is listed among those medical schools recognized by the World Health Organization.

39. The vast majority of AUA's students are American citizens who plan to practice medicine and/or nursing in the United States.

40. Plaintiffs Shreekanth Cheruku and Anjan Patel are American citizens and residents who plan to practice, and/or who are currently practicing, medicine in resident training programs in the United States.

41. AUA's program of education is designed to insure that its students meet the necessary requirements for medical and nursing licensure in the United States. Its curriculum provides for an education similar to the education offered at the finest medical and nursing schools in the United States. AUA prepares its students to achieve passing scores on the United States Medical Licensing Examination ("USMLE") and provides clinical clerkship opportunities

8

for its students at some of the finest teaching hospitals in the United States.

42.     Plaintiffs Shreekanth Cheruku and Anjan Patel sat for and passed all "steps" of the USMLE.

43.     The USMLE is an examination that graduates of medical schools, regardless of their location, must pass in order to obtain licensure in any of the fifty States of the Union.

44.     The test is designed to determine whether a medical school graduate has the fund of knowledge and information necessary to practice medicine.

45.     In addition, plaintiffs Shreekanth Cheruku and Anjan Patel are otherwise qualified for a license to practice medicine in Arkansas.

46.     However, plaintiffs Shreekanth Cheruku, and Anjan Patel were denied the opportunity for a residency position at the University of Arkansas Hospital. In order to perform the duties of a resident physician in Arkansas, plaintiffs were required to possess a license to practice medicine in this State.

47.     Plaintiffs Shreekanth Cheruku and Anjan Patel were informed by the hospital that they would not be considered for a position solely because they had earned their M.D. degrees from a "Disapproved Medical School" and, therefore, would be denied the requisite license by defendants.

48.     Plaintiffs Amber Milward and Justin T. Harney are current students enrolled in AUA's medical doctorate program, who intend, upon graduation, to return to Arkansas to practice medicine. They will be prevented from doing so by defendants' actions.

### ASMB's Failure to Follow Its Own Regulations for Graduates of Foreign Medical Schools

49.     The Arkansas Medical Practices Act, ARK. CODE ANN § 17-95-303(1), imposes upon defendants the power and duty to make, adopt, enact, and publish all rules and regulations

9

not inconsistent with the laws of the State of Arkansas or of the United States and necessary or convenient to perform the duties and to transact the business required of them by law.

50.    Defendant ASMB has been charged by the State of Arkansas with determining who shall be awarded a license to practice medicine in this State and also with establishing and publishing rules and regulations supplemental to the Arkansas Medical Practices Act consistent with the United States Constitution and other laws which set forth the criteria and qualifications for the award of such licenses.

51.    Among the duties of the ASMB is the duty to examine, "as is provided for by law," all applicants for license to practice medicine in this State.

52.    The Arkansas Medical Practices Act, ARK. CODE ANN. § 17-95-403(3)(A)(iii)(a), also provides that a graduate from, "A foreign medical school whose entrance requirements and course of instruction have been approved by the board" may be licensed to practice medicine in Arkansas.

53.    Defendants did make, adopt, enact and publish Regulation No. 3 under which defendants purported to set forth the requirements, criteria and qualifications that a graduate of a foreign medical school must satisfy in order to be granted an unrestricted license to practice medicine in the State of Arkansas.

54.    Regulation No. 3 provides, in pertinent part, that a graduate of a foreign medical school may obtain an unrestricted medical license, provided the applicant did not graduate from a "disapproved" school, "that is medical schools that the Board deems is [sic] unacceptable and, thus, students graduating from those schools will not be considered for licensure by the Arkansas State Medical Board."

55.    Pursuant to Regulation No. 3, a "disapproved medical school" is one that a majority

10

of Individual Board Member defendants deem "unacceptable" based upon, but not limited to, the following:

a)  Information compiled by the staff of defendant Arkansas State Medical Board concerning the foreign medical school, its curriculum and facilities.

b)  Information compiled by other medical boards of the various States based on site visits to the foreign medical school.

c)  Information from at least two (2) sister State Medical Licensure Boards that reflects that a Foreign Medical School has not been approved or recognized as a medical school needed for a licensure of physicians or for other requirements of that Board.

d)  Those foreign medical schools whose curriculum and primary requirements are Internet Based and/or Distance Learning shall further be considered as disapproved.

56.  Based upon defendants' own Regulation No. 3, the Arkansas Medical Practices Act and other applicable law, before placing any foreign medical school on their published list of "Disapproved Medical Schools," defendants are required to make due investigation, examination and determination that the foreign medical school does not satisfy the above criteria, or other criteria, provided that such criteria would not result in an unreasonable restraint or violation of a foreign medical school graduate's constitutional right to practice his or her chosen profession within this State.

57.  In 2008, defendants published a list of "Disapproved Medical Schools," which included AUA.

58.  Individual Board Member Joseph M. Beck, M.D. was quoted in the *Arkansas*

11

*Democrat-Gazette* describing the list of disapproved schools as helping the board "weed out" inadequate doctors and prevent them from practicing in Arkansas. *See* Carolyne Park, *State to List "Disapproved" Caribbean Medical Schools*, ARK. DEMOCRAT-GAZETTE, June 7, 2008, at A1.

59.    Similarly, Individual Board Member Anne Britton was quoted in the *Arkansas Democrat-Gazette* as saying, with regard to describing questionable foreign medical schools, "I just think that there are some schools out there that are sucking these kids in and taking their money, [a]nd they're being deceived as far as I'm concerned." *See* Nell Smith, *UAMS Residents' State Medical Licenses on Hold*, ARK. DEMOCRAT-GAZETTE, November 12, 2007, at A4.

60.    Defendants have continued to publish that list ever since.

61.    At no time have defendants had any rational, reasonable, good faith or lawful basis for including AUA on their published list of "Disapproved Medical Schools."

62.    Defendants have included AUA on their published list of "Disapproved Medical Schools" notwithstanding that none of the staff of ASMB, or any of the defendants, has compiled any information concerning AUA, its curriculum, its faculty, its facilities or its students' competence and fitness to practice medicine other than: (a) AUA is privately owned; (b) its principal campus is located in the Caribbean; and (c) its student body consists primarily of Americans who plan to practice medicine in the United States upon graduation.

63.    Also, defendants included AUA on their published list of "Disapproved Medical Schools" notwithstanding that they have considered no information compiled by any other medical board of any state, based on site visits to AUA, and/or concerning AUA, as their own Regulation No. 3 requires.

12

64. The only state that has conducted a site visit to AUA is the State of New York, which did so in connection with AUA's application to that state seeking authority for its students to participate in clinical rotations at hospitals, clinics and other medical teaching facilities in that state.

65. After a thorough and detailed investigation into AUA, its curriculum, its faculty, its facilities and the quality of the medical education that it offers, the State of New York granted AUA's application.

66. In their determination to include AUA on the list of "Disapproved Medical Schools," defendants should have been aware that the State of New York had granted AUA's application for its students to participate in clinical rotations in that state upon its exhaustive investigation and site visits to AUA.

67. In addition, defendants included AUA on their list of "Disapproved Medical Schools" notwithstanding that they have no information from any "sister State Medical Licensure Board that reflects that AUA has not been approved or recognized as a medical school needed for licensure of physicians...," as their own Regulations No. 3 requires.

68. At no time has any sister state ever denied an application made by AUA seeking recognition of AUA as an approved medical school.

69. At no time has any state ever made a determination, based upon a site visit or consideration of any other aspect of AUA, its curriculum, its faculty, its facilities, its students, the quality of the medical education that it provides its students, or the competence or ability of its students to practice medicine, that AUA's graduates are unqualified to receive, or should be barred from receiving, licenses to practice medicine.

70. Further, no part of AUA's curriculum or primary requirements is internet based

13

and/or involves distance learning.

71. In its determination to include AUA on the published list of "Disapproved Medical Schools," defendants have no other information that would lead a state medical board, acting reasonably and in good faith, and free from undue prejudice or ill intent, to make a determination to include AUA on a published list of "Disapproved Medical Schools" or to bar graduates of AUA who otherwise satisfy their criteria for obtaining licenses to practice medicine from obtaining such licenses because their medical doctorate degrees were issued by AUA.

72. Plaintiff AUA has made demand on defendants to remove AUA's name from defendants' list of "Disapproved Medical Schools;" however, defendants have affirmatively refused that demand.

## Defendants Collusion with the LCME, AMA and AAMC

73. There are several thousand medical schools located in countries outside the United States and Canada.

74. However, only a miniscule percentage of those schools draw their students predominantly from the United States and have student bodies and graduates who are predominantly of American origin.

75. AUA's student body, at any given time, has been overwhelmingly from the United States and of American origin.

76. As for the small percentage of foreign medical schools whose student bodies and graduates are predominantly of American origin, most, like AUA, are located in the Caribbean region principally because of the proximity to the United States.

77. Moreover, none of the medical schools located outside of the United States with the exception of AUA and other Caribbean based schools, offers any real challenge and competition

14

for positions, opportunities, and patients to doctors in America who have graduated from schools in the United States.

78.    Medical schools in the United States are under the oversight of the LCME and its two sponsoring bodies, the AMA and the AAMC.

79.    All of the Individual Board Members who are doctors are members of the AMA.

80.    The AMA and the AAMC, through their exercise of dominion and control over the LCME, sanction and govern the very existence of medical schools located in the United States and how many places are available for students in those schools.

81.    The AMA and the AAMC, acting through the LCME, for decades, have restricted the number of medical schools permitted to exist in the United States and the number of students who are granted places in those schools, even as the population of the United States and the need for medical doctors to service that population have, over those decades, increased tremendously.

82.    These organizations do so under the guise of protecting the quality of the practice of medicine in the United States; however, their real purpose in doing so is to preserve and protect their monopolistic power base in the world medical community; to preclude or limit competition from Americans who do not graduate from schools under their aegis; and to preserve the critical shortage of medical professionals in the United States so as to drive up the price for medical services for those doctors who are graduates of schools under the LCME's (and, therefore, the AMA's and the AAMC's) aegis.

83.    Consistent with the LCME, the AAMC, and the AMA's described policies and practices, and in collusion with those entities and policies, defendants' published list of "Disapproved Medical Schools" contains medical schools whose principal campuses are located in the Caribbean region and/or whose student bodies and graduates are predominantly from the

15

United States.

84.    The purposes, policies, motives and intent of defendants in naming and publishing their list of "Disapproved Medical Schools" whose student bodies and graduates are primarily Americans, and in particular AUA, were:

a)    To impede the success of AUA and of its graduates;

b)    To discourage Americans who wish and plan to become medical doctors and to practice medicine in the United States, but have not been successful in securing one of the limited number of places in the limited number of medical schools located in the United States, from enrolling in Caribbean based medical schools, and in AUA in particular; and

c)    To ensure that those Americans who, nevertheless, obtain an M.D. degree from a school other than one located in the United States and under the aegis of the LCME, and from AUA in particular, are prevented from practicing their chosen profession in the United States, in general, and the State of Arkansas in particular, and from competing with graduates of medical schools located in the United States, and in Arkansas in particular, for medical professional positions and patients.

85.    By their described policies and practices, defendants are engaging in a pattern, practice and course of conduct of intentionally damaging and injuring AUA and of discriminating against AUA's graduates, the majority of whom are Americans.

**Improper Delegation of Duty and Reliance on the California State Medical Board**

86.    Some time in the summer of 2008, defendants decided that, for the purpose of determining whether medical schools were "disapproved," they would ignore the mandates and

16

requirements of "Regulation No. 3" and, instead, would make such determinations based solely upon whether the school had been approved by the California State Medical Board.

87.   In an *Arkansas Democrat-Gazette* article regarding the ASMB's decision to follow the California State Medical Board's list of "approved" schools in making the ASMB's "disapproved" list, chairman and Individual Board Member Trent P. Pierce, M.D., stated, "We don't need to reinvent the wheel." *See* Carolyne Park, *State to List "Disapproved" Caribbean Medical Schools*, ARK. DEMOCRAT-GAZETTE, June 7, 2008, at A1.

88.   Pursuant to CAL. CODE REGS. tit. 16, § 1314.1, medical schools located outside the United States or Canada, whose student bodies are predominantly not American, are deemed to be automatically "approved" for the purposes of the grant of licenses to practice medicine in California.

89.   However, under the same regulations, medical schools located outside the United States, whose student bodies are primarily comprised of Americans, including AUA, must submit to intense, time consuming and costly evaluation and investigation, and must satisfy numerous, difficult, arbitrary and non-objective requirements before the California State Medical Board will deem such schools "approved" for the purposes of awarding licenses to their graduates.

90.   There is no rational or legitimate basis for the California State Medical Board's regulation.

91.   The actual purpose, policy, plan and intent of the regulation is in furtherance of the LCME, the AAMC, and the AMA's policies described above and to permit the grant of licenses to graduates of schools who will provide little competition to California doctors who graduate from LCME-controlled schools.

17

92.    AUA has been neither "approved" nor "disapproved" by the California State Medical Board.

93.    The ASMB has listed AUA as a "disapproved" medical school in violation of its own regulations, in derogation of its statutory responsibilities under the Arkansas Medical Practices Act, and in deprivation of AUA's students' and plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward and Justin T. Harney's constitutional rights to practice their professions free from unreasonable restraint or interference.

## Failure to Provide Approval Process

94.    Pursuant to the Arkansas Medical Practices Act, ARK. CODE ANN. §§ 17-95-201 to -412, only medical schools whose principal campuses are located outside of the United States or Canada require approval by defendant ASMB in order for their graduates to obtain licenses to practice medicine in Arkansas. Medical schools whose campuses are located in the United States or Canada require no approval by ASMB in order for their graduates to receive Arkansas medical licenses.

95.    Notwithstanding the foregoing, neither the Arkansas Medical Practices Act nor defendants, through the powers and duties invested and imposed upon them under the Act, have developed, enacted, published or authorized a means or procedure for any foreign medical school, or for AUA, to make application to defendant ASMB for its "approval."

96.    This failure is in contravention and in deprivation of AUA's students' and plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward and Justin T. Harney's, constitutional rights.

## IV. ASSOCIATIONAL STANDING OF AUA

97.    AUA has standing to assert the constitutional rights of its students that are not present in this lawsuit.

18

98. First, the students themselves have standing to assert their own constitutional rights.

99. Second, the interests AUA seeks to protect are germane to the organization's purpose. Indeed, the school's survival, its successful operation, and its ability to obtain qualified Americans to attend and enroll in its medical doctorate program depend on protecting its students' constitutional rights.

100. Finally, neither the claim asserted nor the relief requested, requires the participation of the individual students in this lawsuit. AUA seeks only declaratory and injunctive relief regarding the deprivation of its students' constitutional rights, and therefore, the participation of the individual students is not needed where those claims and relief are requested.

101. Therefore, AUA has standing to assert the constitutional rights of its students who are not present in this lawsuit.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (42 U.S.C. § 1983)

102. By their conduct described above, defendants have unlawfully deprived plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney and AUA's other current and former students of property and liberty interests without due process of law and denied plaintiffs equal protection under color of state law in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

103. Defendants have acted in listing AUA as a "disapproved" medical school under color of State law, namely the Arkansas Medical Practices Act, ARK. CODE ANN. §§ 17-95-201 to -412, and the regulations promulgated under the Act.

104. The conduct of defendants, as described above, has deprived plaintiffs Shreekanth

19

Cheruku, Anjan Patel, Amber Milward, and Justin T. Harney and AUA's other current and former students of property and liberty interests in the right to practice the profession of their choice and in the right to apply for and obtain a license to practice medicine in Arkansas. The deprivation of these property and liberty interests is a violation of the Fourteenth Amendment to the United States Constitution in the following separate ways:

a.  The inclusion of AUA on defendants' list of "disapproved" medical schools is in direct contravention of defendants' own regulations; is an improper reliance on the California State Medical Board; has no rational basis; bars applicants for a license to practice medicine, who are otherwise qualified, based on arbitrary and capricious decisions of the ASMB; and is a deprivation of plaintiffs' property and liberty interests without due process of law.

b.  The inclusion of AUA on defendants' list of "disapproved" medical schools is a violation of plaintiffs' property and liberty interests without due process. The defendants' have failed to perform any investigation, examination or determination regarding whether AUA satisfies the criteria set forth in the defendants' own regulation.  Instead, defendants have listed AUA as a "disapproved" school without any investigation, in reliance solely on the California State Medical Board, and in direct contravention of defendants' own regulations.  In addition, defendants have failed to provide a mechanism for a medical school to be taken off the "disapproved" list.  The failure to follow their own regulations and the failure to provide a mechanism to become an approved school is a violation of plaintiffs' procedural due process rights, given the nature of plaintiffs' interests, the severe risk of erroneous deprivation of that interest, and

20

the slight burden on defendants to follow their own regulation and/or to enact an approval process.

c.   The actions of defendants also unlawfully deprive plaintiffs of equal protection under the laws and discriminate against plaintiffs on the basis of national origin. Plaintiffs are citizens of the United States and are discriminated against based on that national origin, in that defendants treat similarly situated graduates of medical schools differently, based on whether they are United States or non-United States citizens. Graduates of foreign medical schools with predominately non-United States citizens as their student bodies are not covered by defendants' list of "disapproved" medical schools, and are thus permitted to apply for and obtain licenses to practice medicine in Arkansas. Plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney, and AUA's other current and former students, as United States citizens, who graduated, or will graduate, from a foreign medical school with predominantly United States citizens as its student body, are covered by defendants' list of "disapproved" medical schools and are denied the ability to obtain a medical license in Arkansas. Further, defendants rely on the California State Medical Board regarding which schools to "disapprove." The State of California's rules and regulations provide for approval of foreign schools whose students predominantly have national origins other than American with little or no scrutiny involved, while subjecting schools outside of the United States whose students and graduates are predominantly American to rigorous scrutiny and significantly more onerous standards for approval.

105. By their actions and failures to act, defendants, ASMB and its Individual Board

21

Members, have willfully and intentionally discriminated against plaintiffs and violated their constitutional rights secured by the Fourteenth Amendment to the United States Constitution.

106. By this action, as more fully set forth below, plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney, and AUA on behalf of other current and former students, seek redress from defendants' wrongful actions in the form of a declaratory judgment, injunctive relief, attorneys' fees, expenses, and costs, and on behalf of plaintiffs Shreekanth Cheruku and Anjan Patel, compensatory damages for the reduction in their ability to obtain employment as medical doctors in the United States and in Arkansas..

## SECOND CLAIM FOR RELIEF
### (Defamation)

107. By their conduct described above, defendants have defamed AUA and plaintiffs Shreekanth Cheruku and Anjan Patel.

108. In particular, by including AUA as a "Disapproved Medical School," defendants listed and published that AUA did not meet the requirements of Regulation No. 3 of the ASMB, which is false, and made statements regarding "disapproved" medical schools on ASMB's list which were false.

109. In addition, Individual Board Member Joseph M. Beck, M.D.'s statement published in the *Arkansas Democrat-Gazette* describing the list of disapproved schools as helping the board "weed out" inadequate doctors was false.

110. Similarly, Individual Board Member Anne Britton's statement published in the *Arkansas Democrat-Gazette* describing questionable foreign medical schools as "sucking these kids in and taking their money, [a]nd they're being deceived as far as I'm concerned" was false and necessarily identified AUA, a school the ASMB found to be "disapproved."

111. Those statements were defamatory.

22

112. Defendants acted with negligence in failing to determine the truth of those statements prior to their publication and/or with knowledge that the statements were false.

113. Further, defendants did not act without malice and in the reasonable belief that their actions were warranted by the facts known to them after a reasonable effort was made to obtain the facts. As previously described, defendants made no investigation, did not rely on any investigation, and had no reasonable or good faith basis to list AUA as a "disapproved medical school" or to make their statements regarding "disapproved medical schools."

114. The publications of these statements were a proximate cause of damages to AUA by decreasing its ability to obtain qualified Americans to attend and enroll in its medical doctorate program, and thus threatened the school's survival and its successful operation. Further, the publications were a proximate cause of damages to plaintiffs Shreekanth Cheruku and Anjan Patel by reducing their ability to obtain employment as medical doctors in the United States and in Arkansas.

## THIRD CLAIM FOR RELIEF
### (Injunction)

115. From the conduct of defendants described above, for the violation of plaintiffs' constitutional rights, and for the improper delegation of their statutory duty, plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney and AUA's other current and former students are entitled to injunctive relief.

116. By including AUA as a "disapproved" medical school, defendants have caused, and continue to cause, plaintiffs to suffer irreparable harm.

117. Further, plaintiffs have no adequate remedy at law.

118. Therefore, plaintiffs are entitled to a permanent injunction against defendants:

a.       enjoining and restraining defendants from listing AUA as a
"disapproved" medical school without proper investigation under, or adherence
to, Regulation No. 3 of the Arkansas State Medical Board;

b.       enjoining and restraining defendants from listing AUA as a
"disapproved" medical school on an irrational, capricious or arbitrary basis;

c.       enjoining and restraining defendants from listing AUA as a
"disapproved" medical school based on the national origin of its student body;

d.       enjoining and restraining defendants from listing AUA as a
"disapproved" medical school without providing a mechanism for AUA to be
taken off the "disapproved" list, or providing AUA's graduates with a mechanism
to become licensed;

e.       enjoining and restraining defendants from delegating their statutory
duty under the Arkansas Medical Practices Act to determine who shall be
awarded a license to practice medicine in this State; and

f.       enjoining and restraining defendants from denying plaintiffs
Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney and AUA's
other current and former students licenses to practice medicine in the State of
Arkansas based solely on the listing of AUA as a "disapproved" medical school.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Judgment under 28 U.S.C. § 2201)

119. From the conduct of defendants described above, plaintiffs Shreekanth Cheruku,
Anjan Patel, Amber Milward, Justin T. Harney and AUA's other current and former students are
entitled to a declaratory judgment.

24

120. This matter is an actual controversy within the jurisdiction of this Court. Under 28 U.S.C. § 2201, plaintiffs are entitled to a declaratory judgment that:

a.      AUA is not a "disapproved" medical school based on a proper investigation under or adherence to Regulation No. 3 of the Arkansas State Medical Board;

b.      AUA is not a "disapproved" medical school based on a rational or reasoned basis;

c.      AUA is listed as a "disapproved" medical school unlawfully based on the national origin of its student body;

d.      the AMSB must provide a mechanism for AUA to be taken off the "disapproved" medical school list, or provide a mechanism for its graduates to become licensed;

e.      defendants cannot delegate their statutory duty under the Arkansas Medical Practices Act to determine who shall be awarded a license to practice medicine in this State; and

f.      defendants may not deny plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney and AUA's other current and former students licenses to practice medicine in the State of Arkansas based solely on the listing of AUA as a "disapproved" medical school.

## FIFTH CLAIM FOR RELIEF
### (42 U.S.C. § 1988)

121. Based on defendants' violations of plaintiffs' constitutionally protected rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, plaintiffs are entitled to their reasonable attorneys' fees and expenses as part of their costs.

25

## VI. PRAYER FOR RELIEF

WHEREFORE, plaintiffs American University of Antigua College of Medicine, Shreekanth Cheruku, Anjan Patel, Amber Milward, and Justin T. Harney pray that the Court:

1. Grant judgment in favor of plaintiffs against defendants;

2. Enter a permanent injunction against defendants, enjoining and restraining them from listing AUA as a "disapproved" medical school without proper investigation under, or adherence to, Regulation No. 3 of the Arkansas State Medical Board, enjoining and restraining defendants from listing AUA as a "disapproved" medical school on an irrational, capricious or arbitrary basis, enjoining and restraining defendants from listing AUA as a "disapproved" medical school based on the national origin of its student body, enjoining and restraining defendants from listing AUA as a "disapproved" medical school without providing a mechanism for AUA to be taken off the "disapproved" list or providing AUA's graduates with a mechanism to become licensed, enjoining and restraining defendants from delegating their statutory duty under the Arkansas Medical Practices Act to determine who shall be awarded a license to practice medicine in this State, and enjoining and restraining defendants from denying plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney and AUA's other current and former students licenses to practice medicine in the State of Arkansas based solely on the listing of AUA as a "disapproved" medical school;

3. Enter a declaratory judgment that AUA is not a "disapproved" medical school based on a proper investigation under, or adherence to, Regulation No. 3 of the Arkansas State Medical Board, declaring that AUA is not a "disapproved" medical school based on a rational or reasoned basis, declaring that AUA is listed as a "disapproved" medical school unlawfully, based on the national origin of its student body, declaring that the AMSB must provide a mechanism for AUA

26

to be taken off the "disapproved" medical school list or provide a mechanism for its graduates to become licensed, declaring that defendants cannot delegate their statutory duty under the Arkansas Medical Practices Act to determine who shall be awarded a license to practice medicine in this State, and declaring that defendants cannot deny plaintiffs Shreekanth Cheruku, Anjan Patel, Amber Milward, Justin T. Harney and AUA's other current and former students licenses to practice medicine in the State of Arkansas based solely on the listing of AUA as a "disapproved" medical school.

4. Award plaintiffs all compensatory damages to which they are entitled, including but not limited to:

   a. Plaintiff AUA's lost profits from the decrease in its ability to obtain qualified Americans to attend and enroll in its medical doctorate program; and

   b. Plaintiffs Shreekanth Cheruku and Anjan Patel lost profits and loss of earning capacity suffered by the reduction in their ability to obtain employment as medical doctors in the United States and in Arkansas;

5. Award plaintiffs their attorneys' fees, expenses, and costs; and

6. Grant plaintiffs all other proper relief.

DATED: March 18, 2010.

LEONARD A. SCLAFANI, P.C.
2 Wall Street – 5th Floor
New York, New York 10005
(212) 696-9880

By: /s/ Leonard A. Sclafani
        Leonard A. Sclafani

27



SHULTS, BROWN & PERKINS, LLP
200 West Capitol Avenue, Suite 1600
Little Rock, AR 72201-3637
(501) 375-2301

By: __/s/ John Perkins_____
     John Perkins
     Ark. Bar No. 2005252

     Debra K. Brown
     Ark. Bar No. 80068

     Steven Shults
     Ark. Bar No. 78139

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 18, 2010, I electronically filed the First Amended Complaint with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Mark N. Ohrenberger
Arkansas Office of Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201-2610
Mark.ohrenberger@arkansasag.gov

By: __/s/ John Perkins_____
     John Perkins

# EXHIBIT B

| Country | Name of School |
|---|---|
| Antigua & Barbuda | University of Health Sciences |
| Antigua & Barbuda | American University of Antigua |
| Aruba | All Saints University of Medicine |
| Aruba | Xavier University School of Medicine |
| Belize | St. Matthew's University |
| Belize | Grace University |
| Belize | Central America Health Sciences University |
| Belize | Medical University of the Americas |
| Belize | St. Luke's University |
| Belize | Interamerican Medical University |
| Belize | Hope University School of Medicine |
| Belize | American Global University School of Medicine |
| Cayman Islands | St. Matthew's University (Grand Cayman) |
| Costa Rica | Universidad de Iberomerica (UNIBE) |
| Costa Rica | Universidad Hispanoamericana |
| Costa Rica | Colegio Universitario San Judas Tadeo |
| Costa Rica | Universidad Latina de Costa Rica |
| Costa Rica | Universidad Autonoma de Centro America |
| Costa Rica | Universidad Internacional de las Americas |
| Dominica | All Saints University of Medicine |
| Dominican Republic | Universidad Tecnologica de Santiago, Santiago Campus (UTESA) |
| Dominican Republic | Universidad Tecnologica de Santiago, Santa Domingo Campus (UTESA) |
| Dominican Republic | Universidad C.I.F.A.S. |
| Dominican Republic | Universidad Internacional Eugenio Maria de Hostos |
| Dominican Republic | Universidad Eugenio Maria de Hostos |
| Dominican Republic | Universidad C.E.T.E.C. |
| Dominican Republic | Universidad Mundial Dominican |
| Dominican Republic | Universidad Federico Henriquez y Carvajal (UFHEC) |
| Dominican Republic | Universidad Nacional Pedro Henriquez Urena (UNPHU) |
| Dominican Republic | Pontificia Universidad Catolica Madre Y Maestra (PUCMM) |
| Dominican Republic | Universidad Iberomericana, Santo Domingo |
| Dominican Republic | Universidad Catolica Tecnologica Del Ciabo (UCTECI) |
| Mexico | Universidad Mexico American Del Norte |
| Montserrat | Seoul Central College of Medicine |
| Montserrat | University of Science, Arts & Technology (USAT) |
| Netherlands Antilles | University of Sint Eustatius |
| Netherlands Antilles | St. James School of Medicine |
| Netherlands Antilles | St. Martinus University Faculty of Medicine |
| Netherlands Antilles | Xavier University School of Medicine |
| Saint Kitts & Nevis | International University of the Health Sciences (IUHS) |
| Saint Kitts & Nevis | Medical University of the Americas |
| Saint Kitts & Nevis | Windsor University |
| Saint Kitts & Nevis | Milik University |
| Saint Kitts & Nevis | Saint Theresa's Medical University |
| Saint Kitts & Nevis | Grace University |
| Saint Lucia | Spartan Health Sciences University |
| Saint Lucia | College of Medicine and Health Sciences |
| Saint Lucia | St. Mary's School of Medicine |
| Saint Lucia | International American University |
| Saint Lucia | American International Medical University |
| Saint Vincent and the Grenadines | Kingstown Medical College |
| Senegal | St. Christopher Iba Mar Diop College of Medicine |
| Uganda | Kigezi International School of Medicine |

Rev. 6/26/2008
Approved 6/6/2008

7/3/08

**ASMB 88**

# EXHIBIT C

## REGULATION NO. 3
## UNRESTRICTED LICENSURE FOR
## GRADUATES OF
## FOREIGN MEDICAL SCHOOLS

Unrestricted license may now be applied for by graduates of foreign medical schools provided they can comply with the following requirements and meet the approval of the Board of Medical Examiners;

1. Be twenty-one years of age.
2. Be of good moral character.
3. Demonstrate in personal interview the ability to read, write, and speak English fluently; and also demonstrate adequate training and ability sufficient to permit the practice of medicine in accordance with accepted medical practice in the State of Arkansas.
4. Present documented evidence that he or she served three years as in intern or resident in an accredited post-graduate medical education program in the United States; or, completed one year as in intern or resident in an accredited post-graduate medical program in the United States and be currently enrolled in an accredited post-graduate medical program in Arkansas.
5. Provide indisputable identification.
6. Present a Standard ECFMG Certificate.
7. ACA § 17-95-403(b)(3)iii(a) provides that an Applicant for licensure must submit to the Board that he is a graduate of "a foreign medical school whose entrance requirements and course of instruction have been approved by the Board." The Arkansas State Medical Board will, by June 15th of each year provide to the public a list of medical schools which will be considered as "disapproved," that is medical schools that the Board deems as unacceptable and, thus, students graduating from those schools will not be considered for licensure by the Arkansas State Medical Board. Inclusion on the list of "disapproved medical schools" will be made by a majority vote of the Board. Criteria for inclusion on the list of "disapproved medical schools" will be based on but not limited to the following:
   a. Information compiled by the staff of the Arkansas State Medical Board concerning the foreign medical school, its curriculum and facilities.
   b. Information compiled by other medical boards of the various states based on site visits to the foreign medical school.
   c. Information from at least two (2) sister State Medical Licensure Boards that reflects that a Foreign Medical School has not been

approved or recognized as a medical school needed for licensure of physicians or for other requirements of that Board.

d. Those foreign medical schools whose curriculum and primary requirements are Internet based and/or distance learning, shall further be considered as disapproved.

8. If an applicant, however, is a graduate of a medical school that has been designated by the Arkansas State Medical Board as a "disapproved medical school," and the applicant has been enrolled in a UAMS residency program prior to1 August 2008, he will be granted a license to practice medicine in the State of Arkansas, only after he or she has successfully completed a three year residency program at the University of Arkansas for Medical Sciences and met all other requirements of the Board, to include: 1) successful completion of step one of the USMLE exam within three attempts 2) successful completion of step two of the USMLE exam within seven years from the date of graduation from medical school and 3) successful completion of step three of the USMLE exam within nine years from completing medical school. Any applicant who has not been enrolled in a UAMS residency program prior to 1 August 2008 will not be granted a license if he is a graduate of a "disapproved medical school."

History: Amended June 17, 1982; June 16, 1983; April 13, 1984; September 7, 1995; August 4, 2005; June 5, 2008



# EXHIBIT D

The June 5-6, 2008 meeting of the Arkansas State Medical Board was held in the Boardroom and called to order by Chairman Trent P. Pierce, M.D. at 8:00 a.m.

Members present were:

Trent P. Pierce, M.D., Chairman
Joseph M. Beck, II, M.D., Vice-Chairman
Bob E. Cogburn, M.D., Secretary
Mrs. Anne Britton, Treasurer
Omar T. Atiq, M.D.
Jim C. Citty, M.D.
William F. Dudding, M.D.
Roger Harmon, P.D.
Patty K. Pettway, D.O.
Douglas F. Smart, M.D.
C. E. Tommey, M.D.
John B. Weiss, M.D.

Alonzo D. Williams, Sr., M.D. was not present on this date.

Also in attendance on this date were Peggy Pryor Cryer, Executive Secretary, and William H. Trice, III, attorney representing the Board.

Upon a motion by Dr. J. Beck, seconded by Dr. P. Pettway, the Board unanimously approved the April 2008 minutes with one correction noted by Dr. Atiq.

Upon a motion by Dr. P. Pettway, seconded by Dr. B. Cogburn, the Board unanimously voted to renew the temporary permits for the following physicians:

Wissam Abouzgheib, M.D.
Charles Edward Boyd, Jr., M.D.
Michael Ethan Katz, M.D.
Raquel Nahra, M.D.
Gresham T. Richter, M.D.

Upon a motion by Dr. J. Weiss, seconded by Dr. D. Smart, the Board voted unanimously to grant licensure to the following applicants not required to make a Board appearance:

Timothy Leslie Alder, M.D.
Scott Alan Alexander, M.D.

1

**ASMB 1949**

Harold Bradford Allen, M.D.
Annette Nicole Anderson, M.D.
Brian Dean Badgwell, M.D.
Donna B. Beallis, D.O.
Randall S. Beallis, D.O.
Daryl Ryan Burrows, M.D.
Karen Stark Caldemeyer, M.D.
Justin Ezekwem Chinwah, M.D.
David Campbell Culver, D.O.
Kimberly Angelia Curseen, M.D.
Jamie Lee Elliott, M.D.
Amir Ali Fassihi, M.D.
Thomas Warren Freeman, M.D.
Theodore Marcus Friedman, M.D.
Fred Hadley Hamilton, III, M.D.
Michael David Huber, M.D.
Jeffrey Aaron Jednacz, M.D.
Perry Purshottam Kaneriya, M.D.
Andrew B. Kanik, M.D.
Philip J. Kenney, M.D.
Megan Laniewicz, M.D.
Charles Eliot Lyon, M.D.
Kristin Lynn Markell, M.D.
Kelley Woodruff Marshall, M.D.
Mark Bradley Mengel, M.D.
Rodger Eugene Moler, D.O.
Adam Kenneth Olmsted, M.D.
Christopher Lacye Pittman, M.D.
Chad Brian Rabinowitz, M.D.
Anand Velliyur-Nott Rao, M.D.
Spender Justin Sands, M.D.
Jared Justin Seale, M.D.
Samir Sunil Shah, M.D.
Richard Randall Sukman, M.D.
John Anthony Szafranski, M.D.
Dylan Paul Thaxton, M.D.
Tobias Jay Vancil, M.D.
Christopher Guy Webb, M.D.
Adam Brian Woodruff, M.D.

Upon a motion by Dr. C. E. Tommey, seconded by Dr. B. Cogburn, the Board unanimously approved the licenses for the following occupational therapists and occupational therapy assistants:

Tiffany Talbert, OTR
Miranda Jo Walker, OTR

2

Michael H. Bender, OTR
Heather Jeanne Williamson, OTR

Vandala Lacefield, OTA

Upon a motion by Dr. C. E. Tommey, seconded by Dr. B. Cogburn, the Board unanimously approved the licenses for the following respiratory therapists:

Yong Ko, LRCP
Jennifer Michele Locke, LRCP
Vicki Ann Roper, LRCP
Stephanie Helen Hall, LRCP
Rebecca Rose Johnson, LRCP
Linda Lewis Richard, LRCP
Christine Marie Porter, LRCP
Wei An, LRCP
Kathryn Beth Riddle, LRCP
Sommer Elaine Watson, LRCP
Heather Louise Rees, LRCP
Lisa Michelle Logan, LRCP
Kayla Mae Killian, LRCP
Robert B. Yetter, LRCP
Teresa A. Lee, LRCP
Lori D. Erkler, LRCP
Tennille LaVette Merritt, LRCP

Upon a motion by Dr. C. E. Tommey, seconded by Dr. J. Beck, the Board unanimously approved the licenses for the following physician assistants:

Andrea C. Green, PA
Matthew H. Moore, PA
Frank Jay Smith, PA

Upon a motion by Dr. W. Dudding, seconded by Mr. R. Harmon, the Board unanimously voted to accept the report from the Chairman regarding his activities since the last Board meeting for information only.

Upon a motion by Dr. J. Beck, seconded by Dr. C. E. Tommey, the Board unanimously voted to ask the staff to contact the members of the Pain Management Review Committee and request their recommendations to fill the vacancies since no response has been received from the other societies and associations.

Upon a motion by Dr. D. Smart, seconded by Dr. B. Cogburn, the Board unanimously voted to accept Mrs. Britton's report on her recent attendance at the Federation of State Medical Boards annual meeting for information only.

3

WORKMAN, Wylie Wayne, M.D. requested to appear before the Board to discuss his thoughts and concerns regarding the subject of advanced nurse practitioners being trained to become doctor/nurses. He discussed an article in the New York Times addressing this issue. Upon a motion by Dr. J. Beck, seconded by Dr. W. Dudding, the Board voted unanimously to accept Dr. Workman's appearance for information only.

PUBLIC HEARING: Proposed Amendment to Regulation #3 Governing International Medical Graduates and Disapproved International Medical Schools. After discussion and upon a motion by Mrs. A. Britton, seconded by Dr. J. Beck, the Board voted unanimously to adopt the amendment to Regulation #3 as presented.

### Regulation #3

Unrestricted license may now be applied for by graduates of foreign medical schools provided they can comply with the following requirements and meet the approval of the Board of Medical Examiners;

1. Be twenty-one years of age.
2. Be of good moral character.
3. Demonstrate in personal interview the ability to read, write, and speak English fluently; and also demonstrate adequate training and ability sufficient to permit the practice of medicine in accordance with accepted medical practice in the State of Arkansas.
4. Present documented evidence that he or she served three years as in intern or resident in an accredited post-graduate medical education program in the United States; or, completed one year as in intern or resident in an accredited post-graduate medical program in the United States and be currently enrolled in an accredited post-graduate medical program in Arkansas.
5. Provide indisputable identification.
6. Present a Standard ECFMG Certificate.
7. ACA § 17-95-403(b)(3)(0)(a) provides that an Applicant for licensure must submit to the Board that he is a graduate of "a foreign medical school whose entrance requirements and course of instruction have been approved by the Board." The Arkansas State Medical Board will, by June 15th of each year provide to the public a list of medical schools which will be considered as "disapproved," that is medical schools that the Board deems is unacceptable and, thus, students graduating from those schools will not be considered for licensure by the Arkansas State Medical Board. Inclusion on the list of "disapproved medical schools" will be made by a majority vote of the Board. Criteria for inclusion on the list of "disapproved medical schools" will be based on but not limited to the following:
    a. Information compiled by the staff of the Arkansas State Medical Board concerning the foreign medical school, its curriculum and facilities.
    b. Information compiled by other medical boards of the various states based on site visits to the foreign medical school.
    c. Information from at least two (2) sister State Medical Licensure Boards that reflects that a Foreign Medical School has not been approved or recognized as a medical school needed for licensure of physicians or for other requirements of that Board.
    d. Those foreign medical schools whose curriculum and primary requirements are interact based and/or distance learning, shall further be considered as disapproved.
8. If an applicant, however, is a graduate of a medical school that has been designated by the Arkansas State Medical Board as a "disapproved medical school," and the applicant has been enrolled in a UAMS residency program prior to1 August 2008, he will be granted a license to practice medicine in the State of Arkansas, only after he or she has successfully completed a three year residency program at the University of Arkansas for Medical Sciences and met all other requirements of the Board, to include: 1) successful completion of step one of the USMLE exam within three attempts 2) successful completion of step two of the USMLE exam within seven years from the date of graduation from medical school and 3) successful completion of step three of the USMLE exam within nine years from completing medical school. Any applicant who has not been enrolled in a UAMS residency program prior to 1 August 2008 will not be granted a license if he is a graduate of a "disapproved medical school."

4

**PUBLIC HEARING:** Proposed Amendment to Regulation #24 Governing Physician Assistants. After discussion and upon a motion by Dr. O. Atiq, the Board unanimously voted to adopt the amendment to Section 5A of Regulation #24 as presented.

**Regulation #24**

5a. A physician assistant must be authorized by his supervising physician to prescribe legend drugs and scheduled medicine for patients. Said authorization must be stated in the protocol submitted by the physician assistant to the Board and approved by the Board. A supervising physician may only authorize a physician assistant to prescribe schedule medication that the physician is authorized to prescribe. A physician assistant may only be authorized to prescribe schedule III through V medications. Prescriptions written by a physician assistant must contain the name of the supervising physician on the prescription.

ALETI, Sumith Chander Reddy, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. C. E. Tommey, seconded by Mrs. A. Britton, the Board unanimously voted to grant Dr. Aleti's licensure request. Act 498 of 2005 changed the licensing requirement of U.S. Postgraduate Training for international medical graduates from one year to three years. Dr. Aleti is currently enrolled in a training program with the University of Arkansas for Medical Sciences, and is scheduled to complete his residency June 30, 2008. Upon completion of his third year of residency the Program Director will notify the Board.

FREGO, Jonathan Leon, M.D., an international medical graduate, appeared requesting a permanent license and waiver for the Board's requirement regarding acceptance of graduates from St. Matthew's University School of Medicine in Grand Cayman. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Weiss, the Board voted to grant Dr. Frego's requests for the waiver and licensure. Act 498 of 2005 changed the licensing requirement for U.S. Postgraduate Training for international medical graduates, from one year to three years. Dr. Frego is currently enrolled in a training program with the University of Arkansas for Medical Sciences, and is scheduled to complete his residency June 30, 2008. Upon completion of his third year of residency the Program Director will notify the Board. There were two votes opposed to this decision.

WALTERS, William David, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. W. Dudding, seconded by Dr. O. Atiq, the Board unanimously voted to grant Dr. Walters' licensure request.

LARYEA, Jonathan Amarkwei, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to grant Dr. Laryea's request for licensure.

RAZA, Muhammad Saqlain, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Beck, the Board voted unanimously to grant Dr. Raza's request for licensure.

TRIBBLE, John Benjamin, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. D. Smart, seconded by Dr. J. Beck, the Board

voted to table Dr. Tribble's licensure application until he completes his third year of Residency in June 2009. There was one vote opposed to this decision.

FARRAR, Thomas Cromwell, M.D. appeared requesting a permanent license and waivers for verifications from Stone Crest Medical Center/Smyrna Hospital in Smyrna, Tennessee from April through October 1981; Saint Thomas Hospital in Nashville, Tennessee from October 1981 through April 1982; State of Tennessee Department of Corrections, Women's Prison in Nashville, Tennessee from July 1983 through June 1986. Upon a motion by Dr. D. Smart, seconded by Dr. J. Weiss, the Board voted to grant Dr. Farrar's request for licensure. There were two votes opposed to this decision.

SAAD, Ali, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Saad's request for licensure.

BARTON, Katherine Diane, M.D. appeared requesting a permanent license. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to grant Dr. Barton's licensure request.

DALAL, Ajay, M.D., an international medical graduate, appeared requesting a permanent license and waivers for verifications from Southampton University in England as United Kingdom Senior Medical House Officer from August 1992 through July 1994 and Beneden Chest Hospital in England as United Kingdom Senior House Officer from August 1994 through March 1995. Upon a motion Dr. W. Dudding, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Dalal's requests for the waivers and licensure.

ALEXANDER, Jan Elizabeth, M.D. appeared requesting a permanent license and waiver for verification of her employment with the National Taekwondo Federation of America in Jacksonville, Arkansas from September 1992 through July 2002. Upon a motion by Dr. J. Weiss, seconded by Dr. O. Atiq, the Board unanimously voted to grant Dr. Alexander's requests for the waiver and licensure.

MOORE, Merwin Blanchard, III, M.D. appeared requesting a permanent license. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Moore's request for licensure.

DEUTZ, Nicolaas E. P., M.D., an international medical graduate, appeared requesting an education license. Upon a motion by Dr. C. E. Tommey, seconded to Dr. D. Smart, the Board voted unanimously to grant Dr. Deutz's request for an education license. A.C.A. 17-95-412 states that the licensee must be serving as a faculty member or shall be affiliated with and under the supervision of the faculty member at an academic medical program established by and under the control of the University of Arkansas for Medical Sciences. This license will expire one year from the date of issuance and must be renewed annually. He will be required to appear in person before the Board, together with the chairman of the clinical or educational program wherein he will be practicing medicine at UAMS.

6

SULEMAN, M-Irfan, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Mrs. A. Britton, seconded by Dr. J. Beck, the Board voted unanimously to place Dr. Suleman's licensure application on hold until he completes a clean and accurate application and returns to the August 2008 meeting bringing the Chief of Pediatric Anesthesiology at Arkansas Children's Hospital, Dr. Timothy Martin, with him.

HUNJAN, Harjot Singh, M.D. appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Dr. P. Pettway, the Board voted unanimously to grant Dr. Hunjan's licensure request.

MACFERRAN, Kimberly Marie, M.D. appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Dr. P. Pettway, the Board voted unanimously to grant Dr. Macferran's licensure request.

BALMAKUND, Jhablall, M.D., an international medical graduate, appeared requesting a permanent license and waiver for the Board's requirement of completing three years of U.S. Postgraduate Training and instead accept his Pediatric Neurology Fellowship that was complete at Cincinnati Children's Hospital from November 1992 through November 1995. Upon a motion by Dr. W. Dudding, seconded by Dr. P. Pettway, the Board voted to grant Dr. Balmakund's requests for the waiver and licensure with the stipulation that he enter into a one year monitoring contract with the Arkansas Medical Foundation. There were two votes opposed to this decision.

CLINTON, Gilbert Niles, II, M.D. appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. W. Dudding, seconded by Mrs. A. Britton, the Board unanimously voted to allow Dr. Clinton to be monitored by a sister state with reports of his ongoing progress forwarded to our Board on a regular basis.

MARRI, Kavitha, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. C. E. Tommey, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Marri's request for licensure. Act 498 of 2005 changed the licensing requirement of U.S. Postgraduate Training for international medical graduates from one year to three years. Dr. Marri is currently enrolled in a training program with the University of Arkansas for Medical Sciences, and is scheduled to complete her residency June 30, 2008. Upon completion of her third year of residency, the Program Director will notify the Board.

KAUFFMAN, Paul David, M.D. appeared for his Arkansas Medical Foundation update. Dr. Kauffman was unable to bring his sponsor with him due to illness in the sponsor's family. Upon a motion by Mrs. A. Britton, seconded by Dr. J. Weiss, the Board voted unanimously to accept Dr. Kauffman's appearance for information only and requested he return to the August 2008 meeting for his next update. The Board further requested that Dr. Kauffman have his new sponsor forward a letter to the Board confirming that he has agreed to be Dr. Kauffman's sponsor.

7

AHMED, Tamer A., M.D. appeared requesting a permanent license and waiver for the Board's requirement regarding taking and passing all three steps of the USMLE exam within seven years. Upon a motion by Dr. C. E. Tommey, seconded by Dr. P. Pettway, the Board unanimously voted to grant Dr. Ahmed's requests for the waiver and licensure.

SITZES, David Alfred, M.D. appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. O. Atiq, seconded by Dr. P. Pettway, the Board unanimously voted to accept Dr. Sitzes' appearance for information only and requested he return for his next update in six months.

CARUTHERS, Carol Sue, M.D. appeared at the request of the Board to discuss the details of Discussion #08-80. After discussion and upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to accept Dr. Caruthers' appearance for clarification. In addition, Dr. Caruthers agreed to take the Vanderbilt University continuing medical education courses on appropriate prescribing and boundaries and return for an update appearance once she has completed these courses. Since Dr. Caruthers has appeared before the full Board regarding this case and the recommendations of the Pain Management Review Committee are being followed, she does not need to appear before the Pain Management Review Committee.

EVANS, Clifford Lamar, M.D. appeared in response to the request of the Board to discuss the details of Discussion #08-69. After discussion and upon a motion by Mrs. A. Britton, seconded by Dr. W. Dudding, the Board voted unanimously to refer this case to the Pain Management Review Committee and recommend that Dr. Evans appear before the Committee. In addition, the Board requested information as to the resolution regarding the suspension of Dr. Evans' hospital privileges.

GLADIEUX, Kenneth Ross, M.D. appeared to discuss his current situation with the Board. After discussion and upon a motion by Dr. O. Atiq, seconded by Dr. P. Pettway, the Board voted unanimously that Dr. Gladieux should enter into a Consent Order indicating he will remain compliant with his Arkansas Medical Foundation monitoring contract and the recommendations of the treatment facility.

ROWEN, John Patrick Joseph, M.D. appeared at the request of the Board to discuss the details of Discussion #08-82. After discussion and upon a motion by Dr. P. Pettway, seconded by Dr. J. Weiss, the Board voted unanimously to accept Dr. Rowen's appearance for clarification.

GOMEZ, Rafael, M.D. appeared in response to the request of the Board to discuss the details of Discussion #08-75. After discussion and upon a motion by Dr. O. Atiq, seconded by Dr. P. Pettway, the Board voted unanimously to accept Dr. Gomez's appearance for clarification.

ELKINS, James Philip, M.D. appeared in response to the request of the Board to discuss the details of Discussion #07-215. After discussion and upon a motion by Dr. J. Weiss,

8

seconded by Dr. D. Smart, the Board voted unanimously to accept Dr. Elkins' appearance for information only.

TERKEURST, John Simmons, M.D. appeared due to the request of the Board to discuss the details of Discussion #08-56. After discussion and upon a motion by Mrs. A. Britton, seconded by Dr. D. Smart, the Board voted to request information from Baxter Regional Medical Center regarding whether there have been any anger management problems involving this physician. Dr. Terkeurst agrees to undergo a psychiatric evaluation directed by Arkansas Medical Foundation Medical Director, Bradley Diner, M.D. The Board also requested that Dr. Terkeurst return to the August 2008 meeting for an update. Dr. Cogburn recused from this discussion and vote.

MOFFETT, Shirolyn Ruth, M.D. appeared in response to the request of the Board to discuss the details of Discussion #07-261. After discussion and upon a motion by Mrs. A. Britton, seconded by Dr. O. Atiq, the Board voted that an Order and Notice of Hearing be issued to this physician. There were three votes opposed to this decision.

REDMAN, Anna Talley, M.D. and WILLIAMS, Nancy Hixson, M.D. appeared at their request to discuss the details of their tooth whitening advertisement with the Board. After discussion and upon a motion by Dr. J. Beck, seconded by Dr. J. Weiss, the Board voted unanimously to accept the offer of these physicians to eliminate their "MD" degree from the advertisement.

LEVIN, Frederick Richard, M.D. appeared due to the request of the Board to discuss the details of Discussion #08-109. After discussion and upon a motion by Dr. J. Beck, seconded by Dr. P. Pettway, the Board voted unanimously to accept Dr. Levin's offer that he will contact Baptist Medical Center regarding the manner in which this matter has been resolved and he will notify the Board of the resolution in writing.

RYE, Bruce Michael, M.D. notified the Board that he wished to surrender his Arkansas medical license as opposed to continuing with a disciplinary hearing. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to accept the surrender of Dr. Rye's Arkansas medical license. The Board at a previous meeting had authorized an Emergency Order of Suspension of the license to practice medicine in the state of Arkansas belonging to Bruce Michael Rye, M.D., charging him with a violation of the Arkansas Medical Practices Act, A.C.A. 17-95-409(a)(2)(P), that is violating a regulation of the Board, more specifically Regulation 2.7; that is the regulation prohibiting a licensed physician from engaging in sexual contact or sexual relations with a patient.

ARENDALL, Clarence Jay, M.D. appeared in response to an Emergency Order of Suspension and Notice of Hearing. After discussion and upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to suspend further testimony at this time in order to contact other witnesses and gather additional testimony.

DELGADO-CORCORAN, Claudia, M.D., an international medical graduate, appeared requesting a permanent license and waiver for verification of her Observership with Dr.

9

William Hamilton from St. John's Mercy Medical Center in St. Louis, Missouri from June through July 1995. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to grant Dr. Delgado-Corcoran's requests for the waiver and licensure.

SWAMY, Alagiri, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to grant Dr. Swamy's licensure request.

THOMASSON, James David, Jr., M.D. appeared requesting a permanent license. Upon a motion by Mrs. A. Britton, seconded by Dr. J. Beck, the Board voted unanimously to grant Dr. Thomasson's request for licensure.

EL-SHAFEI, Amr G., M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Beck, the Board voted unanimously to grant Dr. El-Shafei's licensure request.

VAN ORE, Stevan Michael, M.D. appeared for his update. Upon a motion by Dr. D. Smart, seconded by Dr. J. Beck, the Board voted to grant Dr. Van Ore's request that he be allowed to reapply for a DEA permit and requested he return to the October 2008 meeting for his next update. There was one vote opposed to this decision.

LANSBERG, Frank B., M.D. failed to appear in response to the request of the Board to discuss the details of Discussion #08-98. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously that a subpoena be issued to this physician requiring his attendance at the August 2008 meeting to discuss the details of this matter.

Issue #08-80. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously not to address the medical director position at the upcoming legislative session.

Issue #08-79. Upon a motion by Dr. D. Smart, seconded by Dr. B. Cogburn, the Board voted unanimously that Dr. Beck and Dr. Pettway will speak with their respective associations to determine if those groups will support a maximum of three terms of service for Board members. The Board will then readdress this matter at a future meeting.

The Board recessed until Friday, June 6, 2008.

The meeting was called to order by Chairman Trent P. Pierce, M.D. at 8:00 a.m. In addition to Dr. Pierce those members present were Joseph M. Beck, II, M.D., Vice-Chairman; Bob E. Cogburn, M.D., Secretary; Mrs. Anne Britton, Treasurer; Omar T. Atiq, M.D.; Jim C. Citty, M.D.; William F. Dudding, M.D.; Roger Harmon, P.D.; Patty K. Pettway, D.O.; Douglas F. Smart, M.D.; C. E. Tommey, M.D. and John B. Weiss, M.D.

Absent on this date was Alonzo D. Williams, Sr., M.D.

10

**ASMB 1958**

In attendance on this date were Peggy Pryor Cryer, Executive Secretary, and William H. Trice, III, Board attorney.

Issue #08-75. After detailed discussion of a recent meeting with the Arkansas Department of Health, Arkansas Medical Society and Arkansas Osteopathic Medical Association and upon a motion by Mrs. A. Britton, seconded by Dr. J. Beck, the Board voted unanimously that the Board attorney will make the recommended changes to proposed Regulation #30 governing collaborative agreements, the new draft will again be distributed to interested parties and a meeting with various individuals will be scheduled. The Board further recommended that the Arkansas Department of Health submit a letter requesting exemption from the 10% chart review portion of the regulation for their advanced practice nurses working in the Health Department family planning clinics.

Issue #08-55. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to utilize the disapproved or unrecognized list of international medical schools from California as our Board's disapproved or unrecognized list of international medical schools. In addition, any other state list of disapproved medical schools will be considered disapproved by the Arkansas State Medical Board as well. The list will be provided to UAMS by June 15 of each year for recruiting purposes.

KUO, Dennis Zane, M.D. appeared requesting a permanent license. Upon a motion by Dr. J. Beck, seconded by Dr. J. Weiss, the Board voted unanimously to grant Dr. Kuo's request for licensure.

SHAH, Chetan Chandulal, M.D., an international medical graduate, appeared requesting a permanent license and waiver for the Board's requirement that international medical graduates must complete three years of Internship or Residency in the United States (as outlined in A.C.A. 17-95-403). Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Shah's licensure request.

DUPREE, Matthew Bryce, M.D., an international medical graduate, appeared requesting a permanent license and waiver for the ECFMG certificate. Upon a motion by Dr. C. E. Tommey, seconded by Dr. J. Citty, the Board voted unanimously to grant Dr. DuPree's requests for the waiver and licensure.

SAGAR, Yeshodra, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Weiss, the Board voted unanimously to grant Dr. Sagar's licensure request.

MIRELES-CABODEVILA, Eduardo, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Beck, the Board voted unanimously to grant Dr. Mireles-Cabodevila's licensure request.

MENON, Kalapurakkal Sunil, M.D., an international medical graduate, appeared with Richard Evans, M.D. requesting an Education License, which authorizes the licensee to practice medicine only within the clinical and educational programs established and

11

administered by the University of Arkansas for Medical Sciences as stated in A.C.A. 17-95-412. Upon a motion by Dr. J. Beck, seconded by Dr. P. Pettway, the Board unanimously voted to grant Dr. Menon's licensure request.

CHEVIREDDY, Prajwal, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. W. Dudding, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Chevireddy's request for licensure.

ELBABAA, Samer Kamal, M.D., an international medical graduate, appeared requesting a permanent license. Upon a motion by Dr. J. Weiss, seconded by Dr. O. Atiq, the Board voted unanimously to grant Dr. Elbabaa's licensure request.

MYERS, Harvey Arlington Patrick, III, M.D. appeared requesting reinstatement of his Arkansas medical license. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted to grant Dr. Myers' request for licensure with the stipulations that he will enter into a one-year monitoring contract with the Arkansas Medical Foundation and return to the June 2009 meeting for an update.

DE BLANCHE, Lorraine E., M.D., an international medical graduate, appeared requesting a permanent license and waivers for Hillsbrow Hospital in Johannesburg, South Africa due to the facility being closed; Rotating Internship from January 1 through December 31, 1988; Medical Officer from January 1 through December 31, 1989 and Radiology Residency from January 1, 1990 through November 18, 1991. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the board voted unanimously to grant Dr. De Blanche's requests for the waivers and licensure. Act 498 of 2005 changed the licensing requirement of U.S. Postgraduate Training for international medical graduates from one year to three years. Dr. De Blanche is currently enrolled in a training program with the University of Arkansas for Medical Sciences, and is scheduled to complete her residency June 30, 2008. Upon completion of her third year of residency the Program Director will notify the Board.

SUMMERHILL, Jeffrey Allen, D.O. appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Weiss, the Board unanimously voted to accept Dr. Summerhill's appearance for information only and requested he return for his next update in six months.

LOOP, Paul Jay, M.D. appeared in response to an Emergency Order of Suspension and Notice of Hearing. After discussion and testimony, upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton the Board voted unanimously there has been a violation of the Arkansas Medical Practices Act, more specifically A.C.A. 17-95-409(a)(2)(E)(H). The official Board Order further reflects the license to practice medicine in the state of Arkansas belonging to Paul J. Loop, M.D. is revoked.

DIAZ, John A., LRCP appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. J. Beck, seconded by Dr. P. Pettway, the Board voted unanimously to accept

ASMB 1960

Mr. Diaz's appearance for information only and requested he return to the October 2008 meeting for his next appearance.

BLUE, Monte Dean, LRCP appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to request that Mr. Blue's employer forward copies of his negative drug screens to our office and requested he return to the August 2008 meeting for his next update.

DEES, Fred Wayne, OT appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Beck, the Board voted unanimously to accept Mr. Dees' appearance for information only and requested he return to the August 2008 meeting for his next update. The Board further voted to request confirmation from Dr. Amick regarding whether the statement indicating when this practitioner last consumed alcohol in his last update report involving Mr. Dees is accurate.

SCOTT, Randal Lee, OT appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. W. Dudding, seconded by Dr. J. Beck, the Board voted unanimously to accept Mr. Scott's appearance for information only and requested he return for his next update in six months.

BURCHARD, Clyde W., OT appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. C. E. Tommey, seconded by Mrs. A. Britton, the Board unanimously voted to accept Mr. Burchard's appearance for information only and requested he return to the August 2008 meeting for his next update.

Issue #08-60. MOHSEN, Aly M., M.D. Upon a motion by Dr. D. Smart, seconded by Dr. A. Britton, the Board voted unanimously to grant Dr. Mohsen's request for reinstatement of his Arkansas medical license. Dr. Mohsen was not required to appear at this meeting.

Issue #08-61. WEGNER, Mary M., M.D. Upon a motion by Dr. W. Dudding, seconded by Dr. B. Cogburn, the Board voted unanimously to grant Dr. Wegner's request for exemption from Regulation #7.

Issue #08-64. Upon a motion by Dr. P. Pettway, seconded by Dr. J. Beck, the Board voted unanimously to accept the correspondence from the UAMS/Arkansas Children's Hospital Medical Staff Health Committee for information only.

Issue #08-65. Upon a motion Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to grant the requests for exemption from Regulation #7 for the following physicians:

Matthew J. Crouch, M.D.
William A. Highsmith, M.D.
William R. Van Scoy, M.D.

13

**ASMB 1961**

The Board requested clarification regarding the exemption application from Michael B. Seay, M.D. before granting his request for exemption. His application will be readdressed at the August 2008 meeting.

Issue#08-66. Upon a motion by Dr. J. Weiss, seconded by Dr. B. Cogburn, the Board voted unanimously to approve the application for exemption from Regulation #17 for retired physician, R. Lee Tackett, Jr., M.D.

ARMSTRONG, Elizabeth Millwee, M.D. previously surrendered her Arkansas medical license therefore she did not appear in response to an Emergency Order of Suspension and Notice of Hearing. After discussion and upon a motion by Dr. D. Smart, seconded by Dr. J. Citty, the Board voted unanimously to accept the surrender of Dr. Armstrong's Arkansas medical license in lieu of continuing with the disciplinary hearing.

FEDOSKY, Scott David, M.D. appeared for his Arkansas Medical Foundation update. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board voted unanimously to accept Dr. Fedosky's appearance for information only and requested he return to the October meeting for his next update.

MARTINEZ, Antonio, M.D., an international medical graduate, appeared requesting a permanent license and waivers for verifications of his hospital/clinic affiliation from the following facilities: Our Lady of Mercy Hospital in Paita, Peru from July 6 through September 30, 1993; Oil Pipeline Division, Petroleos de Peru from October 4, 1993 through October 3, 1994; Health Center of Huarmaca in Huarmaca, Peru from October 15, 1994 through March 31, 1995 and Premier Cruises – SS Sea Breeze and SS Rembrandt from September 1997 through February 1999. Upon a motion by Dr. W. Dudding, seconded by Dr. O. Atiq, the Board voted unanimously to grant Dr. Martinez's requests for the waiver and licensure.

STAUFFER, Robert Carl, M.D. appeared requesting a permanent license. Upon a motion by Dr. C. E. Tommey, seconded by Mrs. A. Britton, the Board voted unanimously to grant Dr. Stauffer's licensure request.

BREWINGTON, Tammy, LRCP appeared requesting a license to practice respiratory therapy in Arkansas. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted to grant Ms. Brewington's licensure request.

JONES, Daniel Ray, M.D. submitted an application requesting permission to dispense medications. However he was unable to personally appear to discuss his request and asked that the Board consider his application anyway. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board unanimously voted to deny Dr. Jones' dispensing request.

PEER, Karl Anthony, LRCP appeared for a licensure update. Upon a motion by Dr. W. Dudding, seconded by Dr. D. Smart, the Board voted unanimously to grant Mr. Peer's licensure request with the stipulation that he enter into a one-year monitoring contract with the Arkansas Medical Foundation.

14

SMITH, Patricia Ann, LRCP appeared requesting reinstatement of her respiratory therapy license. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Beck, the Board voted unanimously to grant Ms. Smith's request for licensure reinstatement.

ASHMORE, Pamela S., LRCP appeared to appeal the previous decision of the Board to deny her request for a license to practice respiratory therapy in Arkansas. Upon a motion by Dr. D. Smart, seconded by Dr. J. Beck, the Board unanimously voted to grant Ms. Ashmore's licensure request. The Board also requested that she return to the October 2008 meeting for an update.

Issue#08-62. Upon a motion by Dr. J. Weiss, seconded by Mr. R. Harmon, the Board voted unanimously to forward a copy of the Uniform Emergency Volunteer Health Practitioners Act to the Arkansas Medical Society and the Arkansas Osteopathic Medical Association and request their input on this matter.

Issue#08-63. Upon a motion by Dr. D. Smart, seconded by Dr. P. Pettway, the Board voted unanimously to accept this correspondence regarding the pharmacological treatment of anxiety for information only.

Issue #08-67. Upon a motion by Dr. J. Beck, seconded by Dr. W. Dudding, the Board voted unanimously to accept for information only this correspondence regarding the need for a dispensing permit to conduct clinical trials.

Issue #08-68. Upon a motion by Dr. W. Dudding, seconded by Mrs. A. Britton, the Board voted unanimously that Drs. Pierce, Beck and Smart would review the lists of pulmonologists and anesthesiologists to choose possible physicians names to be submitted to the Governor's office to fill the vacancies on the Respiratory Therapy Examining Committee.

Issue #08-69. Upon a motion by Dr. D. Smart, seconded by Dr. J. Weiss, the Board voted unanimously to notify these individuals that the Board is not in a position to assist with publishing information concerning a physician's requirement to report suspected child maltreatment, but we will forward the information to the Arkansas Medical Society for printing in their Journal.

Issue #08-70. Upon a motion by Dr. B. Cogburn, seconded by Dr. C. E. Tommey, the Board unanimously voted to notify this individual that the Board can only be supportive of this dental varnish program if the Arkansas Board of Dental Examiners and the Arkansas Dental Association are in support of the program.

Issue #08-71. FITE, Tracy M., M.D. Upon a motion by Dr. D. Smart, seconded by Dr. B. Cogburn, the Board voted unanimously that this physician be invited to the next meeting to discuss the details of this Arkansas Medical Foundation update report.

Issue #08-72. KENNEDY, Robert B., M.D. Upon a motion by Dr. B. Cogburn, seconded by Dr. J. Weiss, the Board unanimously voted that this physician be invited to the next meeting to discuss the details of this Arkansas Medical Foundation update report.

Issue #08-73. Upon a motion by Dr. D. Smart, seconded by Dr. J. Beck, the Board voted unanimously to accept for information only the Arkansas Medical Foundation update reports for those practitioners not required to appear.

Issue #08-74. JAVED, Ali, M.D. Upon a motion by Dr. D. Smart, seconded by Dr. W. Dudding, the Board voted unanimously that his temporary permit will be signed by July 1, 2008.

Issue #08-76. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously approved payment of $50,000.00 to the Arkansas Medical Foundation for this quarter.

Issue #08-78. Upon a motion by Mrs. A. Britton, seconded by Dr. J. Citty, the Board voted unanimously to accept for information only this documentation concerning the lawsuit filed against the Board by Randeep S. Mann, M.D.

Issue #08-81. Upon a motion by Dr. J. Beck, seconded by Dr. D. Smart, the Board voted unanimously that the Board attorney should forward a copy of this correspondence to Chancellor I. Dodd Wilson, M.D. at the University of Arkansas for Medical Sciences to inform him that someone is using the facility's stationery. The Board further voted the attorney should also forward a copy of this correspondence to the Attorney General's office and the Federal Government Office of Homeland Security.

Issue #08-82. Upon a motion by Mrs. A. Britton, seconded by Dr. J. Beck, the Board voted unanimously to advise this organization that in Arkansas physician assistants can request and receive samples.

Issue #08-83. Upon a motion by Dr. J. Beck, seconded by Dr. C. E. Tommey, the Board unanimously voted that the Board attorney should respond to this individual by stating that Regulation 22 governing the use of lasers deals with physicians only.

Upon a motion by Dr. J. Beck, seconded by Dr. D. Smart, the Board voted unanimously the staff has the authority to inform the pending applicants that attended a disapproved medical school that they do not qualify for licensure in Arkansas, since the Board passed the amendment to Regulation 3 at this meeting. The Board further indicated these pending applicants will not be allowed to appear before the Board to plead their case.

OLDENBERG, Denise Thormahlen, M.D. appeared in response to an Order and Notice of Hearing. Dr. Oldenberg was represented by her attorney, Larry Kissee. After discussion and upon a motion by Dr. W. Dudding, seconded by Dr. O. Atiq, the Board unanimously voted to accept Dr. Oldenberg's offer to enter into a Consent Order with the following requirements: she will forward to the Board a monthly report of all controlled substance

16

prescriptions that she authorizes including refills and diagnosis; she will allow the Board to collect corresponding medical records for patients who receive controlled substance prescriptions; she will pay expenses totaling $4,536.00 within two years and will reimburse the Board for any additional expenses incurred related to her monitoring up to $2,500.00. The Health Department investigators will be able to gather pharmacy records to compare with the monthly reports submitted by Dr. Oldenberg.

Discussion #06-242. CHAN, Patrick D., M.D. Information only. Motion by Dr. J. Beck and second by Dr. O. Atiq.

Discussion #07-148. WARD, Thomas M., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted to forward this physician's evaluation report to Dr. Diner and request the Arkansas Medical Foundation's recommendation for how to proceed.

Discussion #07-168. EMERSON, Kimberly J., M.D. Upon a motion by Dr. J. Weiss, seconded by Dr. J. Beck, the Board unanimously approved the documentation regarding the continuing medical education course this physician completed.

Discussion #07-225. JOHNSON, Stacey M., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously to have this case reviewed by an expert in the area of radiation exposure.

Discussion #07-229. MINIRTH, Franklin B., M.D. Information only. Motion by Dr. J. Beck and second by Mrs. A. Britton.

Discussion #07-230. MERHEB, Hicham S., M.D. Upon a motion by Dr. D. Smart, seconded by Dr. J. Beck, the Board voted unanimously to have this case reviewed by another expert reviewer.

Discussion #07-264. EDWARDS, Henry N., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. P. Pettway, the Board voted to inquire with him when he is taking the recommended continuing medical education course and requested he appear at the August 2008 meeting to discuss these prescriptions and provide a report of the continuing medical education course.

Discussion #07-268. DAIDONE, Paul E., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. J. Citty, the Board voted unanimously to accept the apology letter this physician sent to the patient for information only.

Discussion #07-303. COKER, Tom Patrick, M.D. Upon a motion by Dr. J. Weiss, seconded by Mrs. A. Britton, the Board voted unanimously to have this case reviewed by an expert reviewer.

Discussion #07-307. COWHERD, Robert M. and Kristy C., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously approved the recommendations

17

**ASMB 1965**

of the Pain Management Review Committee and the documentation regarding the continuing medical education course completed by these physicians.

Discussion #07-335. BOSTWICK LABORATORIES. Upon a motion by Dr. J. Beck, seconded by Mr. R. Harmon, the Board unanimously voted to accept for information only this update regarding the physicians employed by this company who have applied for an Arkansas medical license.

Discussion #08-19. BROWN, Verona T., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. O. Atiq, the Board unanimously voted that Dr. Brown is excused from appearing and accepted her explanation regarding this matter for information only.

Discussion #08-51. WOOD, Gregory D., M.D. Upon a motion by Dr. J. Weiss, seconded by Dr. O. Atiq, the Board unanimously voted that this physician be invited to the next meeting to discuss the details of this matter.

Discussion #08-57. VILLAGE NUTRITION, INC. Upon a motion by Dr. J. Weiss, seconded by Dr. J. Beck, the Board voted unanimously that these individuals can continue doing the footbaths. This is not considered the practice of medicine.

Discussion #08-63. TATE, Sidney W., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted that this physician should submit to a hair sample drug screen and appear before the Board at the next meeting to discuss the results.

Discussion #08-64. ORANGE, Betty L., D.O. Information only. Motion by Dr. P. Pettway and second by Dr. J. Beck.

Discussion #08-89. HUBBARD, William S., M.D. Information only. Motion by Dr. J. Beck and second by Mrs. A. Britton.

Discussion #08-99. HOUSTON, Samuel T., M.D. Upon a motion by Dr. J. Weiss, seconded by Dr. J. Beck, the Board unanimously voted that this physician be invited to the next meeting to discuss the details of this matter, specifically regarding the sanction of his hospital privileges and why did he have a surgical case involving a colon when he is a urologist.

Discussion #08-100. LIGGETT, Charles L., Jr., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. B. Cogburn, the Board voted unanimously to accept this Order from the Texas Medical Board involving this physician for information only.

Discussion #08-101. KOEHN, Martin A., M.D. Information only. Motion by Dr. J. Beck and second by Mrs. A. Britton.

Discussion #08-102. DEL RIO, Eddy M., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted that this physician be invited to the next meeting to discuss the details of this matter, specifically to discuss the doctor's reasoning

18

**ASMB 1966**

for giving the patient medicine for Attention Deficit Disorder, which was contra-indicated because the patient has a heart murmur.

Discussion #08-103. BAILEY, Dominique R., M.D. Information only. Motion by Dr. J. Beck and second by Mrs. A. Britton.

Discussion #08-104. MURPHY, Fred Y., M.D. Information only. Motion by Dr. J. Beck and second by Dr. J. Weiss.

Discussion #08-105. DOWNS, Michael R., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. D. Smart, the Board voted unanimously to thank this physician for self-reporting and ask him to authorize his monitoring program to notify our Board if he has any problems.

Discussion #08-106. BRANDT, Jason C., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. P. Pettway, the Board voted unanimously that this physician be invited to the next meeting to discuss the details of this matter, specifically regarding the dispensing of Retin-A cream and the use of the product, Age Intervention Eyelash.

Discussion #08-107. SAIN, Mary K., M.D. Information only. Motion by Dr. J. Beck and second by Dr. O. Atiq.

Discussion #08-108. KRIESEL, Benny J., M.D. Information only. Motion by Dr. J. Beck and second by Dr. Weiss.

Discussion #08-110. SELBY, Michael L., M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart.

Discussion #08-111. LASE MED, INC. Upon a motion by Mrs. A. Britton, seconded by Dr. W. Dudding, the Board unanimously voted that the Board attorney should correspond with this business and request that they cease and desist their operation or have their Arkansas licensed physician contact the Board.

Discussion #08-112. LUTTRELL, Rex E., M.D. Upon a motion by Dr. D. Smart, seconded by Dr. J. Weiss, the Board voted unanimously to have these surgical cases reviewed by a expert to determine whether his complications and problems are reasonable within the timeframe they occurred and are his explanations reasonable.

Discussion #08-113. ADADA, Badih, M.D. Information only. Motion by Dr. J. Beck, seconded by Dr. D. Smart.

Discussion #08-114. CAMPBELL, James W., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. B. Cogburn, the Board unanimously voted that this physician should send a letter of apology to the complainant and forward a copy of the letter to the Board.

19

Discussion #08-115. PATTON, William C., M.D. Information only. Motion by Dr. J. Beck and second by Dr. O. Atiq.

Discussion #08-116 & #08-117. HEJNA, Thomas, M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted to have this matter reviewed by an expert reviewer.

Discussion #08-118. PETERSON, Mark A., M.D. Information only. Motion by Dr. J. Beck and second by Mr. R. Harmon.

Discussion #08-119. SCHULTZ, Charles E., M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart.

Discussion #08-120. RAMIRO, Mark A., M.D. Information only. Motion by Dr. J. Beck and second by Dr. B. Cogburn. Dr. Atiq recused from this discussion and vote.

Discussion #08-121. LESLIE, Thomas S., M.D. Information only. Motion by Dr. J. Beck and second by Dr. P. Pettway.

Discussion #08-122. PAIT, Thomas G., M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart.

Discussion #08-123. BABER, James R., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board voted unanimously that an Emergency Order of Suspension and Notice of Hearing be issued to this physician. The Board further voted to give this physician the opportunity to enter into a Consent Order to resolve this matter.

Discussion #08-124. PENNINGTON, Kerry F., M.D. Upon a motion by Dr. J. Beck, seconded by Mr. R. Harmon, the Board voted unanimously that this physician be invited to the next meeting to discuss the details of this matter, specifically regarding his use of Provigil for himself.

Discussion #08-125. JENSEN, Joseph C., M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart. Dr. Atiq recused from this discussion and vote.

Discussion #08-126. CHESHIER, James L., M.D. Information only. Motion by Dr. J. Beck and second by Dr. Dr. B. Cogburn.

Discussion #08-127. CRANFORD, Russell L., II, M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart.

Discussion #08-128. BOIKE, David E., M.D. Upon a motion by Dr. D. Smart, seconded by Dr. J. Beck, the Board voted unanimously to request that this physician have Dr. Bissett provide a letter regarding this matter prior to the Board rendering a decision.

**ASMB 1968**

Discussion #08-129. HIXSON, Marcia L., M.D. Upon a motion by Dr. D. Smart, seconded by Dr. O. Atiq, the Board voted that the Board attorney should draft a letter to this physician advising her that as long as she remains compliant with her Arkansas Medical Foundation monitoring contract and authorizes them to notify the Board of any problems, the Board feels she can return to work. Dr. Beck recused from this discussion and vote.

Discussion #08-130. VARELA, Charles D., M.D. Upon a motion by Dr. J. Beck, seconded by Mrs. A. Britton, the Board unanimously voted to have this case reviewed by an orthopedist and anesthesiologist.

Discussion #08-131. JOHNSON, Arthur M., M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart.

Discussion #08-132. ABEL, Lee C., M.D. Information only. Motion by Dr. J. Beck and second by Mrs. A. Britton.

Discussion #08-133. CAGLE, Roger E., M.D. Upon a motion by Dr. B. Cogburn, seconded by Dr. W. Dudding, the Board unanimously voted to forward the investigative report to the Pain Management Review Committee for review, notify Dr. Cagle that using a signature stamp on prescriptions is not legal and communicate to the Arkansas State Board of Nursing that the advanced nurse practitioner working for Dr. Cagle was using his signature stamp for her prescriptions.

Discussion #08-134. SPRINGER, Dan J., M.D. Upon a motion by Dr. P. Pettway, seconded by Dr. J. Beck, the Board voted unanimously to forward this investigative report to the Pain Management Review Committee for review.

Discussion #08-135. WOODS, Elizabeth A., M.D., BELT, Charles R., M.D., FOSSEY, Carol A., M.D., RABEN, Susan L., M.D. and SHARAF, Huda, M.D. Upon a motion by Dr. O. Atiq, seconded by Dr. J. Weiss, the Board unanimously approved the revised dispensing protocol for these physicians.

Discussion #08-136. SCHLESINGER, Scott M., M.D. Information only. Motion by Dr. J. Beck and second by Dr. D. Smart.

Discussion #08-137. BOWEN, William S., M.D. Information only. Motion by Dr. J. Beck and second by Dr. J. Citty.

Discussion #08-138. ROSS, Robin L., M.D. Information only. Motion by Dr. J. Beck and second by Mrs. A. Britton.

Discussion #08-139. FRIEDL, John C., D.O. Information only. Motion by Dr. W. Dudding and second by Dr. P. Pettway.

Discussion #08-140. DAVIS, Gary W., LRCP. Information only. Motion by Dr. J. Weiss and second by Dr. J. Citty.

**ASMB 1969**

Discussion #08-141. HOLLAND, Michael N., M.D. Upon a motion by Dr. J. Beck, seconded by Dr. J. Weiss, the Board unanimously voted that this physician must appear before the Arkansas State Medical Board prior to resuming the practice of medicine in this state.

Discussion #08-142. ARENDALL, Clarence J., M.D. Upon a motion by Dr. D. Smart, seconded by Mrs. A. Britton, the Board unanimously voted to accept from Dr. Arendall the address to provide to his patients that are seeking copies of their medical records.

Upon a motion by Mrs. A. Britton, seconded by Dr. J. Citty, the Board voted unanimously to authorize a stipend of two additional days for file review and preparation for those members attending this meeting.

Upon a motion by Dr. J. Beck, seconded by Dr. J. Weiss, the Board voted unanimously to pay travel expense and compensate the four Board members who attended the Physician Assistant Advisory Committee meeting on June 4, 2008 each with a stipend of $100.00 for the cost of their reviews and physician assistant interviews.

There being no further business, the meeting was adjourned.

Trent P. Pierce, M.D.
Chairman

ATTEST:

Peggy Pryor Cryer
Executive Secretary

22

**ASMB 1970**

**EXHIBIT E**



State of California
Medical Board of California
2005 Evergreen Street, Suite 1200
Sacramento, Ca 95815
www.mbc.ca.gov

# Memorandum

Date:      January 4, 2010

To:        Gary Gitnick, M.D., Member
           Reginald Low, M.D., Member

From:      Debbie Pellegrini, Chief
           Licensing Program

Subject:   International Medical School Decisions - Update

---

Attached is a list of the Board's decisions to either disapprove or recognize certain international medical schools since April 2, 2002.

The attached memorandum dated April 2, 2002, was circulated to the Division of Licensing members at their May 10, 2002 meeting. The memo summarized the history of the Division's actions to date regarding for-profit international medical schools.

The April 2, 2002 memo accompanied a draft of the Division's proposed International Medical School regulations, which the members reviewed for the first time on May 10, 2002. The regulations were intended to codify the process that the Division used to review the schools discussed in the memo. The final regulations were later approved, effective December 13, 2003.

This memorandum briefly updates the Board's decisions since April 2, 2002. The following list indicates 11 schools or programs to which the Board granted recognition and two schools that the Board disapproved between 2002 and 2009. Two of the 11 medical schools received site inspections.

For your reference, attached are copies of the Saba University and St. Matthew's University site inspection teams' reports to the Division.

**School Name**                                    **Decision Date**

**International Medical School Granted Recognition    (Site Visit Required)**

Saba University (Saba, Netherlands Antilles)          November 5, 2004

**English Programs  Granted Recognition    (No Site Visit Required)**

Semmelweis University  (Hungary)                     May 30, 2002

Szeged University   (Hungary)                         September 22, 2003

Charles Univ. First Faculty of Medicine              December 29, 2003
(Czech. Republic)

Debrecen Univ.  (Hungary)                             April 28, 2005

Pecs Univ.  (Hungary)                                 May 3, 2005

Jagiellonian   (Poland)                               July 27, 2007

Lublin   (Poland)                                     July 25, 2008

Poznan   (Poland)                                     July 25, 2008

**International Schools Granted Recognition    (No Site Visit Required)**

ELAM   (Cuba)                                         July 25, 2008
(Program restricted to non-citizens)

St. George's - U.K. branch campus                    July 24, 2009
(First-year basic sciences only)

**International Medical School Disapproved    (Site Visit Required)**

St. Matthew's University, Grand Cayman               February 18, 2005

**International Medical School Disapproved    (No Site Visit Required)**

Kigezi International, England and Uganda*             November 2, 2007

*The Board disapproved this medical school as an administrative action after the school
closed.  School officials had not submitted a Self Assessment Report.

**CALIFORNIA 0011**

State of California

Department of Consumer Affairs
Medical Board of California

# Memorandum

To      :   Members, Division of Licensing                    Date: 4/2/02

From    :   Pat Park, Associate Analyst, Licensing Program

Subject :   **HISTORY OF THE DIVISION OF LICENSING'S PAST APPROVALS AND
            DISAPPROVALS OF INTERNATIONAL MEDICAL SCHOOLS**

This memorandum is a complement to the proposed regulations that legal counsel has
drafted governing the Division of Licensing's process for reviewing and recognizing
international medical schools.

Over the past 20 years, the Division has reviewed 12 medical schools in the Caribbean
and Dominican Republic for their compliance with the minimum requirements in
Sections 2089 and 2089.5 of the Business and Professions (B&P) Code. The Division
followed a fairly standard process in conducting its review of these schools. However,
the process has not been adopted in regulations. During recent meetings, the Division
members and legal counsel have discussed the wisdom of adopting the Division's
review process in regulation. To assist in this process, staff was asked to summarize
the historical background to the Division's review of international medical schools. This
memo summarizes the Division's activities in this regard over the last 20 years.

## BACKGROUND

Section 2084 of the B&P Code authorizes the Division of Licensing to approve medical
schools that comply with the medical education requirements in Sections 2089 and
2089.5 of the Code. Medical schools located in the United States, Canada and Puerto
Rico are deemed approved by the Division of Licensing through their accreditation by
the Liaison Committee on Medical Education, LCME (pursuant to Section 1314 of Title
16, California Code of Regulations). All other medical schools are subject to the
Division's individual review and approval, and must demonstrate that they offer a
resident course of professional instruction that is equivalent, not necessarily identical, to
that provided in LCME-accredited medical schools. The law further provides that only
students from "approved" medical schools may complete clinical clerkship training in
California facilities, and only graduates of "approved" medical schools may qualify for
licensure or complete postgraduate training in California.

*100*

Prior to 1985, Division staff conducted no reviews of international medical schools. If an applicant graduated from a new medical school that was listed in the World Health Organization's "Directory of Medical Schools," staff issued the school a "school code" and processed the application routinely. WHO listing was not required in statute or regulation. The WHO Directory merely lists the names and addresses of medical schools without conducting any quality review of the schools. In addition, for political reasons, the Directory excludes all Taiwanese medical schools. Therefore, the WHO Directory is not a practical tool for evaluating international medical schools. No other international organization exists that evaluates or accredits the world's 1000+ medical schools for compliance with some educational standard.

Almost all international medical schools are founded to train physicians to address the medical needs of their country's population. In the late 1970s, entrepreneurs began to develop for-profit, English-language medical schools in the Caribbean and Dominican Republic aimed at attracting Americans who were unable to enter U.S. medical schools. Staff issued school codes to these schools as their graduates began to apply here in the early 1980s.

In the spring of 1983, the U.S. Postal Service uncovered a scandal involving the widespread production of fraudulent medical diplomas and other unethical practices on the part of officials at CETEC and CIFAS Universities in the Dominican Republic and their U.S. agents. During the course of their investigation, other medical schools in the Dominican Republic and Caribbean were implicated. Thousands of individuals - many of them nurses, physician assistants, pharmacists, chiropractors, podiatrists - bought fraudulent transcripts and diplomas for prices ranging from $8,000 to $50,000. They spent little or no time attending the school listed on their diploma. As a result of the postal investigators' findings, licensing boards across the United States were forced to investigate the backgrounds of thousands of applicants and licensees who had attended the implicated schools. Individuals who were found to have submitted false documentation had their licenses revoked or were dismissed from training programs. Dominican authorities closed two schools, CETEC and CIFAS, and jailed several administrators who were involved in document forgery schemes.

As a result of the above scandal, the Division of Licensing disapproved CETEC on May 19, 1983. With investigators from the Enforcement Division, the Division formed a License Investigation Task Force (LIFT) to investigate the extent of fraudulent documentation among graduates of offshore schools with pending licensure applications in California. In addition to confirming unethical practices involving bogus documents and transfer credit, LIFT investigators uncovered widespread violations of Section 1327 of Title 16, California Code of Regulations; at least 15 hospitals in California were unlawfully training offshore students in clinical clerkships. In many cases, students received little or no supervision or evaluation. In some instances, offshore schools granted students clinical credit for clerkships that had included no hands-on clinical training.

*101*

CALIFORNIA 0013

-3-

In an emergency session held on October 11, 1984, the Division voted to temporarily disapprove six schools: American University of the Caribbean (AUC), CIFAS University, Ross University, St. George's University, Spartan Health Sciences University and UTESA School of Medicine. The disapproval order offered each school the opportunity to show cause why the Division should not make the disapproval permanent. On November 16, 1984 following a Show Cause hearing held the previous day, the Division permanently disapproved Ross and CIFAS.

During the summer of 1984, AUC, Ross and St. George's universities sued the Division. The litigation with AUC and St. George's was resolved on November 14, 1984 when both schools signed stipulated agreements with the Division. The litigation with Ross University was resolved on December 14, 1984 when the university signed a stipulated agreement with the Division whereby Ross University received probationary approval for five years. All stipulated agreements imposed terms and conditions on the schools requiring them to bring their educational programs into compliance with California law and included a requirement that the schools were to finance site visits by the Division to the schools' campuses and hospitals where their students receive clinical training.

Specific followup actions involving AUC, Ross, St. George's and other medical schools are described below.

### CETEC & CIFAS Universities                    [Dominican Republic]

These universities opened medical schools in 1979 and 1980, respectively, heavily targeting U.S. citizens. After launching their own investigation into the U.S. Postal Services' findings and confirming their validity, Dominican Republic government officials closed CETEC and CIFAS in 1984. Therefore, the Division did not conduct site inspections to these two schools. The Division disapproved CETEC on May 19, 1983 and CIFAS on November 16, 1984.

### American University of the Caribbean (AUC)
[Montserrat, West Indies; founded in 1978; moved to St. Maarten in 1995]

As a consequence of the stipulated agreement between the Division and AUC, the Division conducted site visits to AUC's campus on Montserrat in April 1985 and April 1986. During the April 1986 followup visit, the team also inspected St. Croix and St. Thomas Hospitals; the Division approved these two hospitals as core clinical training sites. On June 30-July 1, 1986, separate site visits were conducted to two hospitals in Chicago, Norwegian-American Hospital and Martha Washington Hospital, where AUC students were receiving clinical training. In September 1989, the Division conducted site visits to Rancho Los Amigos Medical Center in Downey and Camarillo State Hospital; these facilities were found to be providing training in compliance with California law. Based on AUC's compliance with the terms of the original stipulation,

*102*

CALIFORNIA 0014

the Division removed AUC's provisional status on September 15, 1989. In 1995, volcanic eruptions forced AUC to temporarily relocate to Belize and the island of St. Maarten. The Division began reevaluating the school's program. The Division conducted a site inspection of AUC's new, permanent campus on St. Maarten in March 1998. On May 8, 1998, the Division members voted to continue recognizing AUC.

Ross University                              [Roseau, Dominica; founded in 1979]

The Division conducted site visits to Ross University's campus on Dominica in April 1985 and April 1986. In November 1986, separate site visits were conducted to A.N. France Hospital in St. Kitts and Princess Margaret Hospital on Dominica; the Division approved these hospitals for a limited number of clinical clerkships.

Ross's provisional status was due to expire on December 14, 1989 but was extended until June 30, 1990 to allow the school additional time to submit required documents. In September 1989, the Division conducted site visits to Rancho Los Amigos Medical Center in Downey and Camarillo State Hospital where Ross students were receiving training; these facilities were found to be offering training in compliance with California law. In May of 1990, the Division conducted site visits to three other clinical training sites: Norwegian-American Hospital in Chicago, Horacio Oduber in Aruba, and Princess Margaret in Dominica; the Division approved each hospital to provide certain core and elective clerkships. The Division removed Ross University's provisional status effective June 30, 1990, and the school remains in approved status.

St. George's University                      [Grenada; founded in 1977]

As part of resolving outstanding litigation, the Division conducted site visits to St. George's campus on Grenada in April 1985 and April 1986. A separate site visit was conducted to St. Joseph's Hospital in Orange, California where a St. George's student had trained. The hospital was found acceptable to provide clinical training in compliance with California law. The Division removed St. George's probationary status during their September 15, 1989 meeting, and the school remains in approved status.

Spartan Health Sciences University           [St. Lucia; founded in 1980]

The Division initially recognized this for-profit medical school. After the Division's investigation revealed widespread document fraud and training violations at this school, the Division temporarily disapproved the school on October 11, 1984. A site visit to the school's St. Lucia campus on April 21, 1985 found inadequate facilities and curriculum, and the Division issued a permanent disapproval order on June 13, 1985. Spartan officials responded by suing the Board in Sacramento County Superior Court. The court dismissed the school's lawsuit with prejudice on December 2, 1986. Spartan and

*103*

CALIFORNIA 0015

the Board entered into a Stipulation that acknowledges Spartan's right to petition the Division to modify or terminate its disapproved status. The school has never petitioned for reconsideration. The Division's June 13, 1985 disapproval order remains in effect.

UTESA School of Medicine    [Dominican Republic; founded in 1981]

UTESA is a private for-profit university offering instruction in Spanish or English. The Division temporarily disapproved UTESA on October 11, 1984 based on evidence that UTESA and CIFAS had colluded in fraudulent activities. After conducting a site visit to UTESA School of Medicine on April 12-14, 1985, the Division made its disapproval order permanent effective July 12, 1985. On May 29, 1986 after considering a petition for reconsideration from UTESA officials, the Division adopted a Stipulation and Order whereby UTESA would submit a plan to correct the deficiencies identified by the Division's site team. The plan that the university submitted did not meet the Division's criteria, and at their November 1986 meeting the Division reinstated the July 12, 1985 Order of Disapproval.

While planning the June 1996 site inspection to INTEC and UNIREMHOS, staff invited UTESA officials to participate in the review process. UTESA officials agreed to undergo a new site inspection. Unfortunately, the inspection team found that UTESA had not substantially corrected its previously-identified deficiencies. The Division disapproved UTESA again on February 7, 1997.

Universidad Mundial Dominicana (World University)
[Dominican Republic; founded in 1978]

This private, for-profit school opened in 1980 and offered instruction in English. In 1987, the Division received a few applications from graduates of World University. When staff requested World University officials to complete a detailed questionnaire regarding its facilities and curriculum, school officials declined to provide the requested information and stated that their curriculum did not meet California's requirements. Through other channels, staff learned that various factions within the university were involved in a lawsuit to decide who would control the school. At its meeting on December 1, 1989, the Division disapproved World University. World University closed in February 1991.

Instituto Tecnologico de Santo Domingo (INTEC)
[Dominican Republic; founded in 1972]

This private non-profit university, offering instruction only in Spanish, applied for recognition after three U.S. residents graduated from its program. The Division visited the school in May/June 1996 in conjunction with the inspections of UNIREMHOS and UTESA. The Division approved the medical school on July 26, 1996.

*104*

### Universidad Eugenio Maria de Hostos (UNIREMHOS)
[Dominican Republic; founded in 1981]

UNIREMHOS was a private, for-profit university that offered instruction in English. After a few of its graduates applied for licensure in California, the school applied for recognition. The Division visited the school in May/June 1996 in conjunction with the inspections of INTEC and UTESA. The Division disapproved the school on July 26, 1996. School officials requested reconsideration of the disapproval; the Division upheld its disapproval on November 1, 1996. Staff learned later that Dominican government officials at CONES, the Consejo Nacional de Educacion Superior, closed UNIREMHOS on February 13, 1998 citing "grave academic deficiencies and a lack of academic order."

### University of Health Sciences Antigua     [St. John's, Antigua; founded in 1983]

Only one graduate of this private, for-profit school ever applied for licensure in California. After several unsuccessful attempts to have the school complete and submit the Medical School Questionnaire, the Division disapproved the school on July 28, 1995. Since that time, the school has developed an internet-based program that targets healing arts practitioners such as chiropractors, nurses, physician assistants, podiatrists, pharmacists, etc. Students are granted advanced credit for their prior basic sciences education and receive minimal online instruction before commencing clinical clerkships.

### Universidad Federico Henriquez y Carvajal (UFHEC)
[Dominican Republic; founded in 1991]

To resolve the lawsuit among principals of World University (see above), the Dominican court allowed World University to close and reopen with new management under the name UFHEC. In late 1994, an UFHEC official contacted staff to inquire about California's licensing requirements. Staff mailed the official a Medical School Questionnaire to complete but had no further contact from UFHEC. Later staff learned that CONES closed UFHEC on February 13, 1998 due to "grave academic deficiencies." The U.S. General Accounting Office also published allegations that an UFHEC administrator was involved in fraudulent diploma issuance practices. To forestall legal complications caused by former UFHEC students and graduates who might apply in California, the Division disapproved UFHEC on July 31, 1998.

### Site Inspections to Medical Schools outside the Caribbean

On two occasions, the Division conducted site inspections to non-Caribbean international medical schools for reasons unrelated to approving new medical schools. In 1986, Assembly Bill 1859 mandated the Division to visit medical schools on three

*105*

continents and review their medical accrediting systems, if such existed. The Legislature authorized funds for the visits. The Division visited schools in England in October 1986, the Philippines in March 1987 and Mexico in November 1987. The · Division selected the countries from which the greatest number of graduates apply for California licensure. India was and still is the top country from which California receives applications; however, Indian authorities were cool to the idea of undergoing inspections, and England was substituted for India.

In November 1997, the Division members endorsed the concept of revisiting medical schools in the international countries from which the board receives the largest number of applications. As a result, in January 1999 the Division expended its own funds to conduct site inspections to four Philippine medical schools. All schools were found to satisfy California's minimum statutory requirements. However, no further visits were planned due to the strain on the Board's budget.

### Review of Pending Medical School Applications

In 2000 and 2001, respectively, the Division received applications from St. Matthew's University located on Ambergris Caye, an island off the coast of Belize, and Saba University located on Saba, an island in the Netherlands Antilles. Review of their applications is ongoing. These two medical schools are examples of the more desirable process wherein a new medical school applies for the Division's recognition in order to enable its students to train in and become licensed in California. In this way, the Division has a chance to evaluate and approve the schools' educational program before the schools' students and graduates are accepted into clinical clerkship and postgraduate training programs in California.

### SUMMARY

In the aftermath of a fraudulent diploma scandal in the Caribbean nearly 20 years ago, the Division realized the need to take proactive steps to protect California's patients from being treated by students and graduates of medical schools that do not meet the minimum requirements of law. The Division's first act was to disapprove the six propriety schools that were either implicated in the scandal or were violating California law. Subsequently, the Division conducted onsite inspections to those medical schools and developed an orderly process for evaluating new proprietary international schools that attract U.S. citizens. Of the 12 schools that the Division reviewed in the Caribbean and Dominican Republic, four were recognized and three were disapproved following a site inspection. The Division disapproved five schools after they either failed to cooperate in the Division's information-gathering process or were closed by their governments for malfeasance. In each instance where a school challenged its disapproval, the courts have affirmed the Division's authority.

*106*

While the late 1980s saw dwindling enrollments and school closures in the offshore medical school industry, the 1990s saw an expansion in the development of new proprietary medical schools. In addition to seven Caribbean medical schools that · survived into the 1990s, 10 new Caribbean schools have opened or plan to open. In fact, the "offshore school" model has spread beyond the Caribbean. Five new proprietary schools have opened in the South Pacific located in the Cook Islands, Micronesia and Samoa. Three schools opened in Africa, two of which operate from rented facilities in the United Kingdom. Some of these proprietary schools were opened by American entrepreneurs and former students or graduates of other offshore schools. All target U.S. citizens, and almost all promise clinical clerkship training in the United States.

In a new development, many existing Eastern European medical schools have opened "English-language programs" that promise to prepare students to pass the USMLE and practice medicine in the United States. The countries involved are Hungary, Poland, Czechoslovakia, Slovakia, Russia and Armenia. Like the popular Autonomous University of Guadalajara in Mexico, their approach is that students will receive their basic sciences education in English while simultaneously learning the native language to prepare them to interact with patients during their clinical clerkships. Staff is working with several of these schools in an attempt to ascertain the structure, governance and resources available to U.S. citizens in these new programs.

As world population expands, many countries have built new medical schools to meet their citizens' expanding health care needs. Legal counsel crafted the attached regulations to exempt these schools from the requirement for the Division's individual review. This will focus the Division's resources on evaluating free-standing proprietary medical schools whose ability to satisfy minimal quality standards is more likely to be subject to question.

If you have any questions concerning this memorandum, please telephone me at (916) 263-2367.

*107*

CALIFORNIA 0019

**EXHIBIT F**

## MEDICAL BOARD OF CALIFORNIA
## DEPARTMENT OF CONSUMER AFFAIRS

## INITIAL STATEMENT OF REASONS

**Hearing Date:**     Friday, May 9, 2003

**Subject Matter of Proposed Regulations:**     Standards and Methodology for the Review
of International Medical Schools

**Sections Affected:**     Title 16, Sections 1300.4 and 1314

### Specific Purpose of each adoption, amendment, or repeal:

The specific purpose of amending Section 1300.4 is to add definitions for the terms that will be utilized in the regulatory language relating to the medical school review process. The purpose of adopting Section 1314.1 is to outline the standards and methodology that the Division of Licensing uses to review international medical schools in order to determine their compliance with Sections 2089 and 2089.5 of the Business and Professions Code.

### Factual Basis

Section 2084 of the Business and Professions Code authorizes the Division of Licensing (hereinafter referred to as the Division) to approve medical schools that comply with the medical education requirements in Sections 2089 of the Code. Section 2089 requires medical schools to provide a curriculum of a certain length that includes training in the basic sciences and clinical sciences course areas listed in the section. Section 2089.5 further specifies the minimum length and content of the required clinical training and the types of facilities approved to provide the clinical training. Subsection (d)(10) of Section 2089.5 provides that the medical school shall bear the cost of any site inspection that the Division finds necessary to determine if the school's clinical training program complies with this subdivision.

In reference to the Division's authority to approve medical schools, Section 1314 of Title 16 of the California Code of Regulations provides that those medical schools accredited by the Liaison Committee on Medical Education (LCME) are deemed to be approved by the Division. The LCME accredits medical schools located in the United States and Canada. No agency accredits international medical schools worldwide. Therefore, the Division's approval efforts apply to medical schools located outside the United States and Canada.

Many of the developed world's medical schools were founded hundreds of years ago. Their mission, and the mission of most international medical schools, is to train physicians to address the medical needs of their country's population. Before 1986, when a graduate of a new or unfamiliar medical school applied for licensure, the Division of Licensing relied on the information provided on an applicant's medical school transcript and the Board's "Certificate of Medical Education" form, signed and sealed by the medical school's dean, to determine whether the medical school was providing an education that complied with the requirements in Section 2089.

In the late 1970s, a new type of medical school developed in the Caribbean area. Entrepreneurs began to open for-profit, proprietary medical schools in the Caribbean and Dominican Republic aimed at attracting American citizens who were unable to gain acceptance into U.S. medical schools. These medical schools were popularly referred to as "offshore" schools. Previously, most American citizens who had been rejected by U.S. medical schools would attend established medical schools in Mexico, Europe and elsewhere where it may take five, six or seven years to complete the curriculum, and it was necessary to learn a foreign language. The offshore schools offer English-language instruction in a four-year format or less. Students complete basic sciences coursework on the island. Because most islands have no teaching hospitals, the students then complete their clinical training in hospitals located in other countries.

In the spring of 1983, U.S. Postal Service investigators uncovered evidence of the widespread production of fraudulent medical diplomas and other unethical practices on the part of officials at two medical schools in the Dominican Republic that catered to U.S. citizens. These schools were known as CETEC University and CIFAS University. During the course of their investigation, other medical schools in the Dominican Republic and Caribbean were implicated. The Medical Board of California formed a task force to investigate the extent of fraudulent documentation that graduates of offshore schools may have submitted to the Board. The Board's investigators confirmed that offshore school officials had submitted bogus documents to this Board on behalf of their graduates and had violated Section 1327 of Title 16 of the regulations. At least 15 hospitals in California were unlawfully training offshore students in clinical clerkships. In many cases, students received little or no supervision or evaluation. Most of the participating hospitals were small community hospitals that lacked the trained faculty, broad patient census and other resources needed to support a clinical training program for medical students. It was clear that the medical education being provided unlawfully in these hospitals did not comply with statute.

As a result of the U.S. Postal Service's investigation, the Division of Licensing disapproved CETEC University on May 19, 1983. Effective October 11, 1984, the Division temporarily disapproved six other medical schools in the region, including CIFAS University. Pursuant to the authority in Sections 2084 and 2089, the Division began to individually review new medical schools in the Caribbean to determine if they had the resources to effectively provide the curriculum required in statute. In conducting these reviews, the Division members followed general LCME guidelines and used the assistance of expert medical educators from California medical schools. The Division identified many deficiencies in the curriculums, resources and facilities. The schools' problems were exacerbated by the fact that student tuition is their only source of revenue. Some typical deficiencies included frequent turnover of faculty, inadequate numbers of qualified, experienced faculty, poor to non-existent laboratory and library resources, lack of research opportunities for students and faculty, lack of coordination between basic sciences and clinical sciences faculty, who were often in separate countries, loose admissions standards, and inadequate student support services. The Division disapproved the most severely deficient schools and directed schools with less serious deficiencies to bring their programs into compliance with reasonable standards. To address the problem of the geographical separation of clinical facilities from the schools' campus, the Division also sponsored legislation (Section 2089.5 in the Statutes of 1985, Chapter 1178) to strengthen the clinical training requirements. These amendments were intended to protect the interests of medical students and the patients they will treat during their clinical training.

CALIFORNIA 0225

For reference purposes, included in the Underlying Data is a copy of a July 1996 report prepared after the Division conducted site inspections of three medical schools in the Dominican Republic, known as UTESA, UNIREMHOS and INTEC. Following the Division's consideration of this report, the Division voted to grant recognition to INTEC and disapprove UTESA and UNIREMHOS. The report illustrates how the Division applied the more universal elements of LCME's standards to the review of these Dominican schools while allowing for cultural factors unique to the country.

Over the past 20 years, the Division has conducted individual reviews of several international medical schools to determine their compliance with the minimum requirements in Sections 2089 and 2089.5 of the Business and Professions (B&P) Code. The Division has followed a standard process in reviewing these schools. However, the review process has not been adopted in regulations. Adoption of the draft regulations will rectify this deficiency and allow the Division to notify consumers and international medical school administrators of the minimum standards expected of medical schools whose graduates wish to apply for licensure in California. In the attached regulatory amendments, the Division proposes to add additional definitions to Section 1300.4, such as "curriculum" and "semester unit." This will ensure that the Division and medical educators are interpreting these terms consistently.

To augment Section 1314 of the regulations, the Division proposes to add a new section, 1314.1, to outline its process and standards for reviewing international medical schools.

Subsection (a) of Section 1314.1 will explain which types of medical schools are subject to the Division's intensive review process. There are over 1,000 medical schools in 157 countries around the world. The vast majority satisfy the criteria in subsection (a)(1) and will not be subject to the review process outlined in subsection (b). However, subsection (h) will allow the Division to reevaluate any institution in subsection (a)(1) if the Division receives credible information suggesting that the institution may no longer be in compliance with statute. Specific events that might trigger a reevaluation would include reports of medical schools closed, destroyed or relocated due to cataclysmic natural disasters or war.

Medical schools that do not satisfy the criteria in subsection (a)(1) of Section 1314.1 will need to demonstrate that they meet the standards in subsection (b). Subsection (b) will require the institution to have a clearly-stated written mission and objectives that are consistent with preparing graduates to provide competent medical care. In reviewing medical schools, the Division will use these as a reference point for determining if schools have adequate resources to provide the medical education program required in Section 2089 as well as carry out their stated mission and objectives. The other elements that the Division will scrutinize during its review are the institution's organizational structure, curriculum, governance, faculty, admission and promotion standards, financial resources, facilities, quality assurance system and record-keeping system. All of these elements reflect the LCME's standards for medical school accreditation and have proved to be important elements in the Division's prior medical school reviews. Subsections (b)(2) through (b)(10) will delineate the Division's expectations in these areas. The proposed regulations do not rigidly quantify each standard (for example, by establishing a minimum faculty-to-student ratio) because medical schools differ from country to country in their size, enrollment and technological resources. However, the standard that the Division will apply is whether the medical schools are complying with their stated mission and objectives. The final subsection (b)(11) requires a level of institutional oversight between the main campus and any branch campus that it operates. This will protect the interests of students who are training outside the institution's main campus.

CALIFORNIA 0226

Subsection (c) grants the Division the discretion to determine if a site inspection is necessary to determine if the medical education program is in compliance with regulation. As stated above, the Division does not intend to evaluate and visit every medical school in the world but will identify those schools that meet the criteria for review. Generally, those will be schools that do not satisfy the criteria in subsection (a)(1) of Section 1314.1 and are structured similarly to schools that the Division has found to be non-compliant in the past.

Subsection (d) confirms that the Division has the authority to disapprove a medical school that fails to provide requested data regarding its educational program or cooperate with a site team. The Division has exercised this authority twice to disapprove uncooperative medical schools that sought to block the Division's review of their program by refusing to release detailed information regarding their facilities and resources. The Division provided both schools with due process prior to and after the disapproval action.

Subsection (e) outlines the process for conducting site inspections to international medical schools. This process reflects the Division's past experiences, codifies past practices, and provides adequate time and opportunity for the medical school to respond to the site inspection team's report and correct any errors of fact before the Division reviews and acts upon the report.

Subsection (f) will require international schools to notify the Division of any change in their location, mission, name, curriculum or a shift in control that would affect their compliance with statute. At the Division members' request, this subsection includes a provision requiring previously-recognized medical schools to be reevaluated every seven years to determine their continued compliance with statute.

Subsection (g) will require the Division or its designee to review the documentation that certain medical schools may be required to submit every seven years and determine whether the medical school remains in compliance with Sections 2089 and 2089.5 of the code.

If the Division finds it necessary to withdraw a medical school's recognition because the institution no longer complies with statute, subsection (h) will require the Division to notify the institution in writing of its intent to withdraw its recognition and the deficiencies on which the action is based. The institution will have 120 days from the date of the notice to respond to the Division's allegations.

As stated previously, subsection (i) will grant the Division the discretion to evaluate any institution identified in subsection (a)(1) if the Division has reason to believe that the institution - may no longer be in compliance with statute. The Division's evaluation might be triggered by news of major changes in a school's curriculum or a medical school's destruction or relocation due to a natural disaster or war. This provision will balance the Division's focus on institutions that need to be reviewed under subsection (b).

## Underlying Data

The Division of Licensing's process for reviewing international medical schools is based on the process and standards employed by the Liaison Committee on Medical Education (LCME) to review U.S. and Canadian medical schools. The LCME's publication, "Functions and Structure of a Medical School," describes the LCME's standards for accrediting medical education programs. This publication is available on the LCME's web site at: www.lcme.org.

CALIFORNIA 0227

In drafting the proposed regulations, legal counsel relied on hands-on experience gained during prior site inspections of international medical schools. The Division invited input from affected parties and took testimony from the public during several public meetings. The Board mailed meeting agendas to all persons on the Board's mailing list and noticed the meetings on the Medical Board's web site.

The first draft of the proposed regulations was made public during the Division's May 2002 Division meeting. On July 16, 2002, the Division invited all interested parties to participate in a workshop in Sacramento. Participants included attorneys for three Caribbean medical schools that the Division has visited several times. The regulations were amended and presented to the Division and the public again at meetings held on July 24, 2002, November 7, 2002, January 30, 2003 and January 31, 2003. For reference, the minutes from these meetings were used as part of the underlying data. Copies of the minutes are in the rulemaking file. The current draft of the regulations represents testimony obtained during these six public meetings. All relevant testimony and suggested amendments have been considered. Legal counsel eliminated suggested amendments that would not be compatible with California's regulatory scheme and incorporated the most relevant suggestions into the proposed draft regulations.

Also used as part of the underlying data was the July 1998 report following the Division's site inspection of three medical schools in the Dominican Republic. This report is available in the rulemaking file.

## Business Impact

This regulation will not have a significant adverse economic impact on businesses.

## Specific Technologies or Equipment

This regulation does not mandate the use of specific technologies or equipment.

## Consideration of Alternatives

No reasonable alternative which was considered or that has otherwise been identified and brought to the attention of the board/bureau/commission/program would be either more effective in carrying out the purpose for which the action is proposed or would be as effective and less burdensome to affected private persons than the proposed regulation.

Set forth below are the alternatives which were considered and the reasons each alternative was rejected:

The alternative to this proposal is to not adopt regulations; that is, for the Division to continue reviewing international medical schools using its existing methodology, which has proved successful in separating adequate from inadequate schools. However, this would leave the Division vulnerable if an international medical school were to challenge its disapproval in court. School officials could charge that the Division enforces unpublished standards that constitute "underground regulations" and/or that the Division abuses its authority by inconsistently applying unpublished standards from school to school.

  CALIFORNIA 0228

# EXHIBIT G



# U.S. Citizens Who Graduated from Medical Schools Outside the United States and Canada and Received Certification from the Educational Commission for Foreign Medical Graduates, 1983–2002

Mary B. McAvinue, John R. Boulet, PhD, William C. Kelly, MS, Stephen S. Seeling, JD, and Amy Opalek

## Abstract

**Purpose**

To provide a descriptive overview of international medical school graduates (IMGs), U.S. and non-U.S. citizens, who obtained their medical degrees outside of the United States and Canada, with a focus on where U.S. citizens received their medical education and how this choice has changed over time.

**Method**

The study group included all IMGs (n = 143,926) certified by the Educational Commission for Foreign Medical Graduates (ECFMG) from 1983–2002. Descriptive statistics were calculated, including historical certification rates for

non-U.S. citizen and U.S. citizen IMGs. For IMGs who were U.S. citizens (n = 18,762), the data were summarized by medical school and country of medical school.

**Results**

U.S. citizens who attended medical schools abroad were more likely to attend schools in Central America and the Caribbean than in any other geographic region. There was a steady decrease in the number of U.S. citizens graduating from European medical schools. Conversely, the number graduating from medical schools in India and Israel rose. Over the period studied, the regions of Africa, Oceania, and South America graduated relatively few U.S. citizens.

**Conclusions**

From 1983–2002, U.S. citizens graduated from medical schools in Central America and the Caribbean more than any other geographic region. Studying the characteristics of medical schools in this region and their similarities to U.S. medical schools, such as a four-year curriculum, may explain why U.S. citizens are attracted to this region in large numbers. Additional studies focusing on the characteristics of medical schools that train IMGs, the performance of the graduates, and their posttraining practice patterns are warranted.

*Acad Med. 2005; 80:473–478.*

International medical graduates (IMGs) play a significant role in the U.S. health care system. The Educational Commission for Foreign Medical Graduates (ECFMG®) defines an IMG as

**Ms. McAvinue** is manager, Registration and Credentials Services, Educational Commission for Foreign Medical Graduates, Philadelphia, Pennsylvania.

**Dr. Boulet** is director, Tracking and Research, Foundation for Advancement of International Medical Education and Research, Philadelphia, Pennsylvania.

**Mr. Kelly** is director, Credentialing and Record Services, Educational Commission for Foreign Medical Graduates, Philadelphia, Pennsylvania

**Mr. Seeling** is vice president, Operations, Educational Commission for Foreign Medical Graduates, Philadelphia, Pennsylvania.

**Ms. Opalek** is senior business analyst, Applications Development, Educational Commission for Foreign Medical Graduates, Philadelphia, Pennsylvania

Correspondence should be addressed to Ms. McAvinue, Manager, Registration and Credentials Services, Educational Commission for Foreign Medical Graduates, 3624 Market Street, Philadelphia, PA 19104-2685, telephone: (215) 823-2194; fax: (215) 386-6327; e-mail: (mmcavinue@ecfmg.org).

a physician who received his or her basic medical degree or qualification from a medical school located outside the United States and Canada. To be eligible for ECFMG certification, the physician's medical school and graduation year must be listed in the *International Medical Education Directory* of the Foundation for Advancement of International Medical Education and Research. U.S. citizens who have completed their medical education in medical schools outside of the United States and Canada are considered IMGs; non-U.S. citizens who have graduated from medical schools in the United States and Canada are not considered IMGs.

Currently, approximately 25% of all residents and 25% of practicing physicians in the United States obtained their medical degrees outside the United States or Canada.[1,2] Translated into patient encounters, the over 150,000 internationally trained physicians who currently actively practice medicine in the United States provide a significant

amount of the total patient care for U.S. citizens. Historically, many of these physicians were citizens of India, Pakistan, or the Philippines prior to emigrating from their home country. However, between 1983 and 2002, a sizeable group of U.S. citizens chose to attend medical school outside of Canada or the United States. Because of their relatively large numbers and their unique characteristics within the population of internationally trained physicians, these individuals, henceforth referred to as U.S. international medical graduates (USIMGs), are an important cohort when studying issues such as physician supply, international migration, and health care needs for populations in underserved areas.

Unlike the situation in many other countries, medical school graduates in the United States must successfully complete graduate medical education as one of the requirements for obtaining an unrestricted license to practice medicine in the United States. IMGs, regardless of

citizenship, must be certified by the ECFMG to be eligible to enter accredited graduate medical education programs in the United States. U.S. residency programs are accredited by the Accreditation Council on Graduate Medical Education (ACGME).

To be certified, IMGs must meet a number of educational and examination requirements. Most of these requirements are also necessary as part of the licensure process for students who graduate from medical schools in Canada or the United States. ECFMG certification assures directors of ACGME-accredited residency and fellowship programs, and the people of the United States, that IMGs have met minimum standards of eligibility required to enter such programs. ECFMG certification does not, however, guarantee that IMGs will be accepted into programs since the number of applicants frequently exceeds the number of available positions. Additionally, ECFMG certification is one of the eligibility requirements to take Step 3 of the three-step United States Medical Licensing Examination (USMLE™). All state medical licensing authorities in the United States call for ECFMG certification, among other requirements, to issue an unrestricted license to practice medicine.

*The American Medical Association defines the Fifth Pathway program as follows: "A pathway for entrance to approved programs of graduate medical education, other than those existing under previous policies, became available as of July 1, 1971, for students who have fulfilled the following conditions:

a. Have completed, in an accredited American college or university, undergraduate premedical work of the quality acceptable for matriculation in an accredited United States medical school, evaluated by measures such as college grade point average and scores on the Medical College Admission Test (MCAT).

b. Have studied medicine at a medical school located outside the United States, Puerto Rico, and Canada that is listed in the *World Directory of Medical Schools*, published by the World Health Organization. [Note: This publication has been replaced by the *International Medical Education Directory* of the Foundation for Advancement of International Medical Education and Research; see (www.ecfmg.org) for more information.]

c. Have completed all of the formal requirements of the foreign medical school except internship and/or social service. Those who have completed all of the requirements, including internship and/or social service, and are, consequently, eligible to apply for ECFMG certification, are not eligible for the Fifth Pathway."

Source: American Medical Association GMED Companion An Insider's Guide to Selecting a Residency Program, 2004/2005. Chicago: AMA, 2004:334–5. This source also includes additional information on the Fifth Pathway program.

Assessing the readiness of IMGs to enter graduate medical education in the United States has been a primary mission of ECFMG since its founding in 1956.[5] In the process of assessing the readiness of IMGs to enter graduate medical education programs, ECFMG gathers important data on the medical education credentials of all certification applicants, including U.S. citizens. Since the majority of USIMGs return to the United States after graduation to practice medicine,[1,4,5] there is a particular interest in knowing more about these individuals, including where they go for schooling and how their choice of schools has changed over time. ECFMG, by virtue of its certification role, is uniquely qualified to provide information on the number of U.S. citizens educated in medical schools abroad and on the countries providing educational opportunities for these individuals. During the certification process, ECFMG also gathers detailed demographic data, performance statistics, and details about medical schools located outside of the United States and Canada. Combined, this information can be used to describe the characteristics and better understand the health care role of U.S.-citizen physicians who obtained their undergraduate medical degrees outside of Canada or the United States

In this report, we provide a general descriptive overview of U.S. citizens who obtained their medical degrees outside of the United States and Canada.

## Method

### Sample

The study group included all IMGs certified by ECFMG in the 20 calendar years 1983–2002 (n = 143,926). We used certification year because the date of certification is the point at which an IMG becomes eligible to enter a graduate medical education program in the United States. Over 18,700 of these ECFMG certified physicians, or 13% of the total, were U.S. citizens at the time of their entry into medical school. We did not include in our study the 2,622 U.S. citizens who successfully completed a Fifth Pathway program.* We recommend a separate study about Fifth Pathway physicians when specific data are available.

The majority of U.S. citizens who graduate from medical schools outside of the United States or Canada ultimately

return to the United States for graduate medical education and eventual practice. Since ECFMG certification is a requisite for graduate medical education, the number of certificates issued to U.S. citizens is a reasonable proxy, albeit somewhat lagged, of the total number of U.S. students who graduated from medical school outside of Canada or the United States. Therefore, for the USIMG cohort, certification statistics provide a reasonable gauge of the flow of U.S. citizens who study medicine abroad. Combining these data with demographic information, including a medical school's location, provides a historical perspective of where IMGs trained.

### Analysis

We calculated descriptive statistics, including historical certification rates for the non-USIMG and USIMG cohorts. For USIMGs, we calculated the number of certificates issued by geographical region, country of medical school, and medical school.

## Results

Figure 1 shows summary data on the 143,926 IMGs certified from 1983–2002, stratified by citizenship at the time of entry into medical school. Clearly, non-U.S. citizens (non-USIMGs) make up the greatest proportion of ECFMG certificate holders. A review of Table 1 shows that from 1992–1998, the number of foreign nationals who received certificates was significantly higher than it was at any other time during the period studied. However, starting in 1999, USIMGs, as a percentage of the total certificant population, became a much larger cohort, representing approximately 25% of all certificates issued in this four-year period.

Although USIMGs could potentially attend one of over 1,600 medical schools located outside of Canada or the United States, they tend to concentrate in certain geographic regions. Certificates issued to USIMGs, by geographic region and time (five-year blocks), are shown in Table 2.

Medical schools graduating USIMGs were located in all geographic regions: Africa, Asia, Central America and the Caribbean, Europe, the Middle East, Oceania and the Pacific Islands, and South America. For this study, we considered Mexico to be part of Central America and the Caribbean. From 1983–



**Figure 1** The number of certificates (*n* = 143,926) issued by the Educational Commission for Foreign Medical Graduates to foreign nationals and U.S. citizens who graduated from medical schools outside the United States and Canada, 1983–2002.

2002, 164 countries had medical schools listed in either the *International Medical Education Directory*[6] or the *World Directory of Medical Schools*.[7] USIMGs graduated from medical schools in 106 (64.6%) of these countries. From a regional perspective, USIMGs attended medical schools in 14 of 41 countries in Africa, 16 of 30 countries in Asia, four of eight countries in Oceania and the Pacific Islands, ten of 13 countries in the Middle East, 31 of 39 countries in Europe, 20 of 22 countries in Central America and the Caribbean, and 11 of 12 countries in South America.

As Table 2 shows, three geographic regions, Africa, Oceania and the Pacific Islands, and South America, consistently graduated relatively few U.S. citizens. Combined over the 20-year period, only 3.9% (no. = 733) of all USIMGs graduated from medical schools in these regions. In contrast, from 1983–2002, over 12,000 USIMGs (64.9%) graduated from medical schools in Central America and the Caribbean. However, even within Central America and the Caribbean, there was some longitudinal variation. From 1983–1987, just over 64% (no. = 3,655) of the ECFMG certificates issued to U.S. citizens were based on graduation from medical schools in this region. From 1998–2002, almost 73% (no. = 4,837) of the USIMG cohort attended medical schools in this region.

Interestingly, there has been a gradual decline in the number of U.S. citizens graduating from medical schools in Europe. Between 1983 and 1987, over 22% of the USIMGs graduated from medical schools in Europe.

This number decreased to 7% in 1998–2002. In contrast, Asia has seen a gradual increase in USIMG certificate holders, going from 391 (6.9%) in 1983–1987 to 668 (10.1%) in 1998–2002.

### Table 1

**Certificates Issued by the Educational Commission for Foreign Medical Graduates to U.S. Citizens and Foreign Nationals, 1983–2002**

| | | | |
|---|---|---|---|
| 1983 | 1,491 (20.3) | 5,871 (79.7) | 7,362 |
| 1984 | 1,576 (20.2) | 6,235 (79.8) | 7,811 |
| 1985 | 1,105 (23.3) | 3,636 (76.6) | 4,741 |
| 1986 | 733 (18.9) | 3,152 (81.1) | 3,885 |
| 1987 | 803 (20.4) | 3,134 (79.6) | 3,937 |
| 1988 | 830 (19.8) | 3,369 (80.2) | 4,199 |
| 1989 | 605 (13.9) | 3,732 (86.1) | 4,337 |
| 1990 | 581 (11.7) | 4,401 (88.3) | 4,982 |
| 1991 | 448 (9.1) | 4,499 (90.9) | 4,947 |
| 1992 | 810 (6.6) | 11,436 (93.4) | 12,246 |
| 1993 | 525 (4.8) | 10,332 (95.2) | 10,857 |
| 1994 | 427 (4.9) | 8,281 (95.1) | 8,708 |
| 1995 | 528 (5.5) | 8,997 (94.5) | 9,525 |
| 1996 | 750 (6.2) | 11,378 (93.8) | 12,128 |
| 1997 | 907 (8.8) | 9,390 (91.2) | 10,297 |
| 1998 | 1,060 (9.0) | 10,755 (91.0) | 11,815 |
| 1999 | 1,234 (21.8) | 4,419 (78.2) | 5,653 |
| 2000 | 1,388 (27.0) | 3,745 (73.0) | 5,133 |
| 2001 | 1,522 (25.7) | 4,412 (74.3) | 5,934 |
| 2002 | 1,439 (26.5) | 3,990 (73.5) | 5,429 |

## Table 2

**Analysis of Certificates Issued by the Educational Commission for Foreign Medical Graduates to U.S. Citizens, by Region of Medical School and Five-Year Block, 1983–2002**

| Region | No. (%) of certificates issued in: | | | | No. (%) total certificates issued (1983–2002) |
|---|---|---|---|---|---|
| | 1983–1987 | 1988–1992 | 1993–1997 | 1998–2002 | |
| Africa | 65 (1.1) | 44 (1.3) | 66 (2.1) | 74 (1.1) | 249 (1.3) |
| Asia | 391 (6.9) | 461 (14.1) | 388 (12.4) | 668 (10.1) | 1,908 (10.2) |
| Central America and the Caribbean | 3,655 (64.0) | 1,829 (55.9) | 1,851 (59.0) | 4,837 (72.8) | 12,172 (64.9) |
| Europe | 1,287 (22.5) | 580 (17.7) | 407 (13.0) | 465 (7.0) | 2,739 (14.6) |
| Middle East | 208 (3.6) | 241 (7.4) | 314 (10.0) | 447 (6.7) | 1,210 (6.4) |
| Oceania and the Pacific Islands | 15 (0.3) | 14 (0.4) | 14 (0.4) | 46 (0.7) | 89 (0.5) |
| South America | 87 (1.5) | 105 (3.2) | 97 (3.1) | 106 (1.6) | 395 (2.1) |
| Total | 5,708 (100) | 3,274 (100) | 3,137 (100) | 6,643 (100) | 18,762 (100) |

From 1983–2002, 1,000 or more USIMGs who received certificates graduated from schools in each of the following countries: Grenada, Dominica, the Dominican Republic, the Netherlands Antilles, Israel, Montserrat, Mexico, and the Philippines. Summary data for USIMG certificate recipients by top-ten countries of medical school and five-year blocks are shown in Table 3. Within Central America and the Caribbean, the number of U.S. citizens graduating from medical schools in Grenada increased substantially, rising from 652 (11.4%) in 1983–1987 to 1,521 (22.9%) in 1998–2002. Similar increases, most notably in 1998–2002, were evidenced for Dominica and the Netherlands Antilles. In contrast, the number of certificates issued to

USIMGs who graduated from medical schools in the Dominican Republic and Mexico decreased. From 1998–2002, only 239 certificates (3.6% of the total) were issued to U.S. citizens who graduated from medical schools in the Dominican Republic. Likewise, for 1998–2002, only 89 certificates were issued to U.S. citizens who graduated from medical schools in Mexico. It is worth noting that the total number of certificates issued to U.S. citizens who graduated from medical schools in Israel exceeds the totals for several countries, such as Mexico and Montserrat, in the otherwise dominant region of Central America and the Caribbean. U.S. citizens also graduated from medical schools in Italy and India, with more than 1,200 receiving

certificates in 1983–2002. In 1998–2002, the number of certificates issued to USIMGs attending medical schools in Italy was negligible, representing less than 1% of the total. In contrast, the number of U.S. citizens attending medical schools in India rose, representing 4.4% of the total for 1998–2002.

The 25 medical schools with the highest total number of U.S. citizens who received certificates from 1983–2002 are shown in Table 4. Again, Central America and the Caribbean dominate with 16 of the top 25 medical schools. Of the 18,762 USIMGs who received certificates, 7,867 (42%) attended one of three medical schools: St. George's University, Ross

## Table 3

**U.S. Citizens Who Received Certificates from the Educational Commission for Foreign Medical Graduates, by Top 10 Countries of Medical Schools and Five-Year Block, 1983–2002**

| Country | No. (%) of certificates received in: | | | | No. (%) Total Certificates Received (1983–2002) |
|---|---|---|---|---|---|
| | 1983–1987 | 1988–1992 | 1993–1997 | 1998–2002 | |
| Grenada | 652 (11.4) | 444 (13.6) | 679 (21.6) | 1,521 (22.9) | 3,296 (17.6) |
| Dominica | 422 (7.4) | 238 (7.3) | 360 (11.5) | 1,543 (23.2) | 2,563 (13.7) |
| Dominican Republic | 1,253 (22.0) | 501 (15.3) | 248 (7.9) | 239 (3.6) | 2,241 (11.9) |
| Netherlands Antilles* | 0 (0.0) | 0 (0.0) | 170 (5.4) | 1,132 (17.0) | 1,302 (6.9) |
| Israel | 195 (3.4) | 223 (6.8) | 273 (8.7) | 419 (6.3) | 1,110 (5.9) |
| Montserrat* | 574 (10.1) | 364 (11.1) | 148 (4.7) | 11 (0.2) | 1,097 (5.8) |
| Mexico | 614 (10.8) | 199 (6.1) | 139 (4.4) | 89 (1.3) | 1,041 (5.6) |
| Philippines | 295 (5.2) | 269 (8.2) | 195 (6.2) | 249 (3.7) | 1,008 (5.4) |
| Italy | 429 (7.5) | 165 (5.0) | 88 (2.8) | 24 (0.4) | 706 (3.8) |
| India | 40 (0.7) | 96 (2.9) | 114 (3.6) | 291 (4.4) | 541 (2.9) |

* In 1995 the American University of the Caribbean, the only medical school in Montserrat during the period studied, relocated to St. Maarten in the Netherlands Antilles due to volcanic activity on Montserrat.

ECFMG/AUA - 0175

## Table 4

**U.S. Citizens Who Received Certificates from the Educational Commission for Foreign Medical Graduates, by Top 25 Medical Schools, 1983–2002**



| Medical school | Country | |
| --- | --- | --- |
| St. George's University | Grenada | 3,296 |
| Ross University | Dominica | 2,563 |
| American University of the Caribbean | Netherlands Antilles* | 2,008 |
| Sackler School of Medicine | Israel | 911 |
| Universidad Central del Este | Dominican Republic | 840 |
| Universidad C.E.T.E.C.† | Dominican Republic | 376 |
| Universidad Tecnologica de Santiago, Santo Domingo Campus | Dominican Republic | 362 |
| Saba University School of Medicine | Netherlands Antilles | 343 |
| Universidad Autonoma de Guadalajara | Mexico | 336 |
| Spartan Health Sciences University | Saint Lucia | 280 |
| Universidad Autonoma de Ciudad Juarez | Mexico | 226 |
| Universita di Roma La Sapienza | Italy | 225 |
| University of the East, Ramon Magsaysay Memorial Medical Center | Philippines | 205 |
| University of Santo Tomas | Philippines | 180 |
| Universita degli Studi di Bologna | Italy | 167 |
| Far Eastern University, Nicanor Reyes Medical Foundation | Philippines | 150 |
| Royal College of Surgeons in Ireland | Ireland | 133 |
| Technion Israel Institute of Technology | Israel | 126 |
| Universidad Iberoamericana, Santo Domingo | Dominican Republic | 124 |
| Kasturba Medical College Manipal | India | 110 |
| Pontificia Universidad Catolica Madre y Maestra | Dominican Republic | 108 |
| Universidad Autonoma de Nuevo Leon | Mexico | 106 |
| Universidad Nacional Pedro Henriquez Urena | Dominican Republic | 97 |
| Escuela Autonoma de Ciencias Medicas de Centro America | Costa Rica | 80 |
| Universidad Mundial Dominicana‡ | Dominican Republic | 75 |

* The American University of the Caribbean was located in Montserrat until 1995 when the school was forced to relocate to the Netherlands Antilles due to volcanic activity on Montserrat.
† Universidad C.E.T.E.C. was closed in 1984
‡ Universidad Mundial Dominicana was closed in 1991

University, or American University of the Caribbean.

## Discussion

IMGs play an important role in the U.S. health care system. Although they represent numerous nationalities, a significant number of IMGs are U.S. citizens when they enter medical school overseas. U.S. citizens received over 13% of the ECFMG certificates issued between 1983 and 2002. More importantly, from 1992–2002 the number of certificates issued to USIMGs grew appreciably,

representing over 25% of the total number of certificates granted. Since most of these individuals return to the United States for graduate medical education, and eventual practice, it is important to know more about them, including where they go to school and how their choice of schools has changed over time.

As part of an extensive study of ECFMG certification from 1969–1982, ECFMG reported that medical schools in Central America and the Caribbean, specifically Mexico and the Dominican Republic,

provided medical education to over 50% of all U.S. citizens who attended overseas medical schools.[8] Analysis of the data for our study shows that, between 1983 and 2002, medical schools in Central America and the Caribbean, most notably in Grenada and Dominica, provided medical education to almost 60% of all U.S. citizens who studied abroad.

Our results also show that even though U.S. citizens elected to pursue their medical education in 106 different countries, more than half of all U.S. citizens certified from 1983–2002 graduated from medical schools in four of the 20 Caribbean countries: Grenada, Dominica, the Dominican Republic, and the Netherlands Antilles. Interestingly, the overall number of certificates issued to USIMGs who attended Caribbean schools increased dramatically, especially for schools located in Grenada and Dominica. While this may be a function of students' choice, it likely reflects an increase in the medical education, training, and practice opportunities for U.S. citizens who do not attend medical schools in the United States or Canada. A notable exception is the Dominican Republic, where the decrease in the number of U.S. students can likely be attributed to the closure of a number of schools. The government of the Dominican Republic closed two medical schools, the Universidad C.E.T.E.C. and the Universidad C.I.F.A.S., in 1984 and three additional schools in the 1990s.

Although from 1998–2002 over 70% of the USIMGs graduated from schools in Central America and the Caribbean, from 1983–2002, U.S. citizens who received ECFMG certificates attended medical schools in 86 countries located outside this region. For medical schools in some countries (e.g., Israel, India) the number of U.S. citizens being educated increased over time; for others (e.g., Italy), the numbers decreased. Given the historically large numbers of IMGs coming from medical schools in India to train and practice in the United States, the increase in the number of U.S. students going to India may reflect second-generation immigration patterns. The U.S. citizens going to India for medical training may be the children of Indian immigrants. This hypothesis could be tested by a more in-depth analysis of the demographic characteristics, including ethnic identity, of all USIMGs. In Israel, the Sackler

School of Medicine enrolls approximately 300 U.S. students in a four-year MD program with a curriculum patterned after that of U.S. medical schools.[9] This likely explains recent increases in U.S. students graduating from medical schools there.

Why U.S. citizens choose to enroll in medical schools outside the United States and Canada certainly requires further study. However, given that Central America and the Caribbean ranked first in all three categories of the data analysis (certificates issued by region, country, and medical schools), a closer inspection of some of the characteristics of the medical schools in this region is worthwhile and may also shed some light on why students choose to study there. First, it is not unreasonable to think that travel distance is a factor that is considered when selecting a school. The Caribbean is geographically very close to the United States. Second, for the vast majority of the countries in this region, English is the language of instruction in the medical schools. U.S. citizens attending these schools would not have to learn another language. Finally, many of the schools operating in the Caribbean model their programs after U.S. medical schools and have a four-year curriculum. Also, like U.S. medical schools, the title of the medical degree awarded is Doctor of Medicine. These characteristics and similarities may explain why U.S. citizens

are attracted in such large numbers to Central America and the Caribbean to complete their medical education.

While this descriptive investigation shows that there is much diversity in the educational pursuits of USIMGs, both geographically and over time, additional studies are certainly warranted. First, a more detailed analysis of the demographic characteristics of USIMGs is necessary. This information, in combination with performance data on certification and licensure examinations, would be useful to better understand factors associated with medical school choice. Second, although detailed information, including curricula, is available for medical schools in the United States and Canada,[10] relatively little is known about many international programs. Efforts are being made to obtain this information because additional medical school data (e.g., annual enrollment, faculty, curricula) would be helpful to better understand the educational process for USIMGs. For purposes of research related to physician work force issues, it is important to know that a large number of U.S. citizens study medicine abroad and return to the United States for graduate medical education and medical practice. It would also be valuable to analyze the medical specialties and location of practice of USIMGs because they play a significant role in the U.S. health care system.

**References**

1 Brotherton SE, Rockey PH, Etzel SI. US graduate medical education, 2002-2003. JAMA. 2003;290:1197–202.

2 Whelan GP, Gary NE, Kostis J, Boulet JR, Hallock JA. The changing pool of international medical graduates seeking certification training in US graduate medical education programs. JAMA. 2002;288:1079–84.

3 Educational Commission for Foreign Medical Graduates. A History: 1956-2000. Philadelphia: ECFMG, 2000.

4 Salsberg E, Nolan J. The posttraining plans of international medical graduates and US medical graduates in New York State. JAMA. 2000;283:1749–50.

5 Mullan F, Politzer RM, Davis CH. Medical migration and the physician workforce. International medical graduates and American medicine. JAMA. 1995;273:1521–7.

6 Foundation for Advancement of Medical Education and Research (FAIMER). International Medical Education Directory (IMED). Philadelphia: FAIMER, 2004.

7 World Health Organization (WHO). World Directory of Medical Schools. Geneva, Switzerland, WHO, 1997.

8 A study of candidates for ECFMG certification 1969-1982. Dublin T, Oesterling SF (eds). Philadelphia: Educational Commission for Foreign Medical Graduates, 1987.

9 Tel Aviv University, Faculty of Medicine. About Sackler. 2004. Sackler Faculty of Medicine. Tel Aviv, Israel.

10 Association of American Medical Colleges. Curriculum Directory, 2004 〈http://services.aamc.org/currdir/start.cfm〉. Accessed 26 January 2005. Washington, DC, AAMC.

# EXHIBIT H

# Flexner's Global Influence: Medical Education Accreditation in Countries That Train Physicians Who Pursue Residency in the United States

Marta van Zanten, MEd, John R. Boulet, PhD, and Frank A. Simon, MD

## Abstract

**Background**

Abraham Flexner's report on medical education, published 100 years ago, remains influential in the United States today, although its international impact is unclear. In addition to global variability in content and delivery of medical education programs, systems of quality assurance oversight are not universal, and there are variations in the scope of the reviews, protocols, and standards used.

**Method**

The authors used the process and elements of medical school evaluation that Flexner regarded as important for ensuring quality to create a framework for describing aspects of the

accreditation systems used in the 10 countries that supply the greatest numbers of international medical graduates (IMGs) to the United States.

**Results**

Of these 10 countries, most have an accreditation system, although the review in some is voluntary. Globally, there is variability in the use of Flexner's system. Prerequisite entrance requirements vary according to the degree offered. Faculty involvement in research is frequently encouraged but seldom required. Almost all standards mention the need for adequate facilities for experiential learning in the basic sciences. Three accrediting organizations require that clinical facilities be under the

direct control of the medical school, and seven indicate that affiliation agreements are acceptable. All accreditation plans use predetermined standards and external evaluation.

**Conclusions**

Data describing accreditation of the medical education programs of IMGs currently seeking to enter graduate training in the United States contribute to a better understanding of medical education practices around the world and can supplement other information available to graduate medical education program directors who select IMGs for their training programs.

Acad Med. 2010; 85:324–332.

**M**edicine is becoming increasingly globalized, as manifested by the worldwide growth in the number of medical schools[1] and the rise in the numbers of physicians who migrate from their native countries to other parts of the world for medical education and graduate training opportunities.[2] In the United States, graduates of international medical schools, who are known as international medical graduates (IMGs), constitute approximately 25% of all physicians in graduate training and in practice.[3] These physicians are educated

**Ms. van Zanten** is research associate, Research and Data Resources, Foundation for Advancement of International Medical Education and Research (FAIMER), Philadelphia, Pennsylvania, and a PhD candidate, Health Studies Program, Temple University, Philadelphia, Pennsylvania

**Dr. Boulet** is associate vice president, Research and Data Resources, FAIMER, Philadelphia, Pennsylvania

**Dr. Simon** is senior scholar, FAIMER, Philadelphia, Pennsylvania.

Correspondence should be addressed to Ms. van Zanten, FAIMER, 3624 Market Street, Philadelphia, PA 19104; telephone (215) 823-2226; fax: (215) 396-3309; e-mail: mvanzanten@faimer.org.

in countries with diverse educational systems, including variations in teaching traditions, curricular models, instructional methods, clinical opportunities, assessment principles, and available resources.[4] In addition, approximately one-third of countries with medical schools do not have a system of accreditation or other quality assurance oversight of medical education programs that is conducted by an independent or governmental body.[5] Where accreditation systems are employed, there is variability in agency governance, responsibilities, level of enforcement, and the specific standards and protocols employed in implementing quality assurance reviews.

In the United States, Abraham Flexner's work describing medical education programs in the early 20th century resembled an accreditation survey.[6] The Flexner Report presented conceptual arguments and a model for education and then compared the existing medical schools' characteristics against these standards.[7] While Flexner's methodology has been well recognized as a catalyst for

change, other initiatives that also facilitated reform were evolving simultaneously.[8] For example, in the early part of the 20th century, state licensing boards initiated requirements that a physician graduate from a medical school that was rated as acceptable by the Council of Medical Education of the American Medical Association (AMA) or rated as eligible for licensure by the Association of American Medical Colleges (AAMC). The standards employed by the AMA and AAMC to evaluate medical schools were influenced in part by Flexner's new model of medical education.[6] In 1942, the AMA and AAMC consolidated their efforts of evaluation of medical education and formed the Liaison Committee on Medical Education (LCME),[9] the organization currently responsible for accrediting medical education programs in the United States and Canada.

Whereas Flexner's efforts in the early 20th century and the current policies of the LCME ensure a level of uniformity in the education offered by U.S. institutions, assessing the quality of medical education

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

ECFMG/AUA - 0217

has also been recognized as an important need outside North America. Numerous organizations promote accreditation efforts and quality assurance methodology around the world. The World Federation for Medical Education (WFME) is a global association dedicated to enhancing the quality of education and training of medical doctors around the world. The WFME is not an accrediting body, but, through its creation of a tripartite document of global standards (standards for basic medical education, postgraduate medical education, and continuing professional development for medical doctors), it promotes the establishment of accreditation systems (www.wfme.org). In the United States, the National Committee on Foreign Medical Education and Accreditation (NCFMEA) voluntarily reviews the accreditation systems used by accrediting bodies around the world to determine whether those systems are comparable to LCME standards. If it is determined that a country has a comparable system, students at accredited medical schools in that country may be eligible to apply to participate in the Federal Family Educational Loan program (http://www.ed.gov/about/bdscomm/list/ncfmea.html). While WFME and NCFMEA and other, regional organizations are involved with accreditation efforts around the world, no unified process or quality assurance standards have been universally adopted.

By using Flexner's methodology and criteria for evaluating medical education as a framework, we conducted this qualitative descriptive study to illustrate and compare the accreditation practices (if present) in the 10 countries outside of the United States and Canada that educate the greatest numbers of physicians who pursue graduate training opportunities in the United States. Our findings can be useful in increasing our understanding of medical education and quality oversight practices around the world. In addition, because many of the physicians seeking to enter graduate training programs in the United States were educated in environments different from the system of medical education in the United States, the results of this study can supplement the information available to program directors who select IMGs for their training programs.

## Method

Before entering graduate training, IMGs must be certified by the Educational Commission for Foreign Medical Graduates (ECFMG). Requirements for ECFMG certification include verification of graduation from a medical school listed in the International Medical Education Directory (IMED).[1] A medical school is listed in IMED after the Foundation for Advancement of International Medical Education and Research (FAIMER) receives confirmation from the Ministry of Health or another appropriate agency in the country where the medical school is located that the school is recognized by that authority. Recognition in this context refers to the authority of an institution to deliver an educational program and to grant a degree. A designation of accreditation, defined as a quality assessment conducted by an authorized body such as a domestic or international agency, is not an independent requirement for a school to be included in IMED. Although systems of recognition and accreditation are explicitly joined in many countries, a linkage of the authority to grant a degree to mandatory quality assurance review is not universal. FAIMER is not an accrediting body and does not independently verify the quality of the medical education provided at schools listed in IMED.

### Structure of the study

To conduct our comparisons, we obtained copies of the documents detailing the specific standards used to accredit medical schools in the 10 countries educating the greatest numbers of physicians who achieved ECFMG certification in 2007; we describe here the accreditation system extant in each of those countries. In some countries, more than one accreditation body has the authority to review medical education programs. We also include in the comparison the LCME accreditation system for U.S. and Canadian allopathic medical schools, and we provide data on the process of accreditation review and on the governance and scope of authority of the accreditation organizations.

### Flexner's elements

We used Flexner's processes and criteria (here called "elements") for evaluating medical education as a framework within which to further illustrate similarities and differences among the accreditation systems. For the purposes of the global comparison in this study, we chose five specific aspects of these elements that Flexner emphasized as being especially important for the delivery of effective medical education.

The first of our selected elements that Flexner used to evaluate medical schools was "entrance requirements." In his report, he presented a case for requiring entering students to have a minimum of two years of college training and for that training to include a strong science background. He specifically emphasized the need for competent knowledge of chemistry, biology, and physics. The second element addressed by Flexner was "teaching staff." Under this element, he determined the size of the faculty that was needed and evaluated the faculty's qualifications and roles. Flexner argued that, for the curriculum's subject matter and delivery of the content to remain relevant, it was imperative that most of the faculty be engaged in scientific research in addition to teaching. Flexner focused on the third element, "resources available for maintenance," to obtain information on fiscal matters and school affiliations. Flexner asserted that to ensure the accessibility of adequate resources, it was necessary that schools of medicine be associated with universities. Flexner's fourth element, "laboratory facilities," had to do with the presence or absence of adequate facilities and resources for experiential student learning in the basic science phase of the curriculum. He felt strongly that an education based on traditional lectures was not sufficient for modern medical instruction and that there needed to be an emphasis not just on learning but on learning how. The fifth element was "clinical facilities," which was his category for the resources available for the students' clinical teaching opportunities. Because of the importance of this phase of medical education, and the difficulty in ensuring adequate patient contact opportunities for students, Flexner argued that clinical facilities for teaching should be under the direct control of the medical school.

Flexner's process of evaluation of medical education programs was based on predetermined standards and external review. In the first decade of the 20th century, Flexner spent 18 months visiting each of the 155 medical schools in the

ECFMG/AUA - 0218

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

United States and Canada. During these site visits, he gathered data and reviewed the facilities in relation to the elements he deemed essential for successful medical education. He then created his report on the basis of his evaluation of the various education programs against these standards. The current study uses Flexner's framework, including both process components and standards, to compare accreditation practices in countries around the world that train large numbers of physicians who pursue residency in the United States.

## Results

In 2007, standard ECFMG certificates were issued to 10,172 IMGs. The countries that provided medical training for the greatest numbers of these certified IMGs were (in descending order) India (2,687 IMGs; 26.4%), Pakistan (617 IMGs; 6.1%), Dominica (563 IMGs; 5.5%), Grenada (491 IMGs; 4.8%), the Philippines (380 IMGs; 3.7%), the Netherlands Antilles (372 IMGs; 3.7%), China (339 IMGs; 3.3%), Nigeria (211 IMGs; 2.1%), Colombia (206 IMGs; 2.0%), and Iran (189 IMGs; 1.9%). The 6,055 IMGs educated in these 10 countries received 59.5% of all certificates issued in 2007.

Table 1 provides information on these 10 countries. Data for each country include the number of medical schools currently open and listed in IMED, the accrediting organization (or organizations, if applicable), and the numbers of schools accredited by the various accrediting bodies. In addition, the table provides data indicating whether the pertinent accreditation standards address the aspects of Flexner's criteria that were chosen as a comparison framework for the current study. For reference, the table also includes LCME information, which is used to evaluate U.S. and Canadian medical schools.[10] In addition, an appendix containing the exact language of the specific standards referenced is available from the corresponding author.

## Country-level description of standards

India. The situation in India regarding medical school quality oversight is of great importance because of the large number of medical schools in the country, the recent increase in the number of new schools,[11] and the large proportion of graduates who achieve

ECFMG certification. There are 267 Indian medical schools currently listed in IMED, of which almost half are private institutions. Mandatory recognition and accreditation are conducted by the Medical Council of India (MCI), a governmental agency. The MCI prescribes minimum standards that are based on the size of the medical school; these standards focus mainly on infrastructure and human resources and less on the quality of education or outcomes.[12] The National Assessment and Accreditation Council (NAAC), an autonomous body established by the Indian agency University Grants Commission,[13] also accredits higher education institutions in India, although, as of the end of 2008, only seven medical schools had successfully achieved this voluntary marker of quality. The goals of the NAAC review are to make schools aware of their strengths, weaknesses, and opportunities and to encourage innovative methods.[11]

Medical education in India typically begins immediately after high school and lasts for six years, leading to a bachelor of medicine/bachelor of surgery (MBBS) degree; students are admitted primarily on the basis of entrance exam results. There is, therefore, little emphasis in the MCI or NAAC accreditation standards on entrance requirements or specific prerequisite courses. The involvement of faculty in research activities is encouraged in the NAAC standards but is not emphasized by the MCI. Although a variety of entities are permitted to develop medical schools, each school must be affiliated with a university. The MCI standards speak to the need for experiential learning in the basic science years by indicating, in great detail, the required laboratory facilities and associated equipment. The MCI standards also specify that clinical facilities be under the direct control of a medical school.

Pakistan. Pakistan's accreditation authority, the Pakistan Medical and Dental Council (PMDC), is a government-run entity that conducts mandatory recognition and accreditation processes.[14] The PMDC's authority encompasses the setting of minimum standards for basic qualifications in medicine, including prescribing and enforcing a set of uniform minimum standards for the content and duration of programs leading to medical degrees.

The structure of medical education in Pakistan is the same as in India (six-year duration leading to an MBBS), and the standards and procedures used by the PMDC are similar to those of the MCI. The PMDC requires that all medical schools be affiliated with a chartered Pakistani university.

Dominica. Dominica is a small English-speaking island in the Caribbean. The Medical Board of Dominica (MBD) is designated by the Dominican Ministry of Health and Social Security to conduct mandatory reviews of medical schools located in the country.[15] Two medical schools are located on Dominica; most of the students are from the United States and Canada. One school has been accredited by the MBD, and the other school is currently under review. The MBD assesses a school in terms of its stated objectives, governance, administration, faculty, educational program, admissions standards, and facilities and other resources.[15] The school that MBD has accredited has also received accreditation from the Caribbean Accreditation Authority for Education in Medicine and Other Health Professions (CAAM-HP).[16] The CAAM-HP is a voluntary, independently run organization established in 2004 under the auspices of the Caribbean Community, and it has jurisdiction over numerous countries in the region. CAAM-HP's activities were described in detail in a recently published report.[17]

The MBD and CAAM-HP standards have many similarities. The CAAM-HP standard regarding entrance requirements specifies an undergraduate degree or "adequate level" (a designation that is not explained in the standards) in the sciences. Both sets of standards indicate that teaching staff should be engaged in research, and both speak to the importance of adequate facilities for experiential learning. In addition, both contain language indicating that affiliation agreements are necessary and acceptable for clinical training sites separate from the medical school.

Grenada. There is only one medical school in Grenada, and it primarily educates students from the United States and Canada. The Grenada Ministry of Health and Social Security is responsible for mandatory review of this school, and the ministry works in conjunction with

ECFMG/AUA - 0219

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

## Table 1

**Data as of 2008 on the Medical School Accreditation Agencies, the Number of Accredited Medical Schools, and the Status With Regard to the Five Elements from the Flexner Report in the 10 Countries Supplying the Greatest Numbers of International Medical Graduates to the United States***

| Country; no. of schools in IMED | Accreditation organization(s) | No. of accredited schools in IMED | Entrance requirements (higher education science background) | Teaching staff (faculty involvement in research) | Resources available for maintaining an academic base (associated with a university[y]) | Clinical teaching | Clinical facilities (under direct control of the medical school) |
|---|---|---|---|---|---|---|---|
| India; 267 | Medical Council of India | 267 | NA | No | Yes | Yes | Yes |
| | National Assessment and Accreditation Council | | NA | Encouraged | No | Implied¹ | NA |
| Pakistan; 39 | Pakistan Medical and Dental Council | 39 | NA | No | Yes | Yes | Yes |
| Dominica, 2 | Medical Board of Dominica; Caribbean Accreditation Authority for Education in Medicine and Other Health Professions | 1 accredited, 1 under review | Implied¹ | Expected | Preferable | Yes | No* |
| Grenada, 1 | Grenada Ministry of Health and Social Security; Caribbean Accreditation Authority for Education in Medicine and Other Health Professions | 1 | Yes | Should | Should | Yes | No* |
| Philippines, 38 | Philippine Accrediting Association of Schools, Colleges and Universities | No schools accredited or candidates for accreditation | Implied¹ | Yes | No | Yes | Yes |
| Netherlands Antilles, 6 | Accreditation Commission on Colleges of Medicine | 2 | Yes | No | No | Implied¹ | No* |
| China, 168* | | | | | | | *(Table continues)* |

ECFMG/AUA - 0220

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

**Table 1**
*(Continued)*

|  |  |  | | Flexner's five elements | | | |
| Country; no. of schools in IMED | Accreditation organization(s) | No. of accredited schools in IMED | Entrance requirements (higher education science background) | Teaching staff (faculty involvement in research) | Resources available for maintenance (association with a university) | Laboratory facilities (adequate facilities for experiential learning in the basic sciences) | Clinical facilities (under direct control of the medical school) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Nigeria, 20 | Medical and Dental Council of Nigeria | 20 | NA | No | Yes | Yes | No |
|  | National Universities Commission | 20 | NA | No | Yes | Yes | No |
| Colombia; 38 | National Council of Accreditation | 31 schools accredited; the other 7 undergoing accreditation review | NA | Encouraged | No | Yes | No[a] |
| Iran, 52[b] |  |  |  |  |  |  |  |
| United States, 131 | Liaison Committee on Medical Education | 131 | Implied[c] | Should | Should | Yes | No[d] |

IMED indicates the International Medical Education Directory. The terms "Encouraged," "Expected,"
"Preferable," and "Should" are used in the standards cited.
[a] Indicated or suggested in the standards document, but not explicitly stated
[b] Affiliation agreements acceptable.
[c] No summative accreditation process.

---

the New York State Education Department (NYSED) to conduct the evaluation. The standards developed for evaluation of international schools seeking clerkship positions for their students in the state of New York were also used to evaluate the school for the purpose of accreditation in Grenada.[18] In addition, CAAM-HP has accredited the Grenadian medical school.

The NYSED standards specifically indicate admission requirements of 60 semester hours of college study, including various science courses. Faculty involvement in research is mentioned as desirable but not necessary. Association of the medical school with a university is not required. Experiential learning is not specifically mentioned, although adequate laboratories are deemed to be essential. Affiliation agreements with other institutions for clinical training sites are accepted.

**The Philippines.** The Philippine Accrediting Association of Schools, Colleges and Universities (PAASCU), a private, nonprofit corporation, voluntarily accredits educational institutions or programs in the country, including schools of medicine, that meet its discipline-specific standards of quality education.[19] To date, PAASCU has accredited only 3 of the 38 Philippine medical schools listed in IMED, but 3 additional schools are currently undergoing accreditation review.

The accreditation standards used by PAASCU in the Philippines do not specify the courses needed to meet entrance requirements, other than to indicate that those courses must be in harmony with government regulations. The standards indicate that faculty must be involved in research and must provide evidence of their scholarly activities. Affiliation of a medical school with a university is not a requirement. Experiential learning is emphasized, and medical schools must control the clinical teaching sites.

**The Netherlands Antilles.** The Netherlands Antilles is a country comprising five islands in the Caribbean: Bonaire, Curaçao, Saba, Sint Eustatius, and Sint Maarten. Six medical schools in the Netherlands Antilles provide undergraduate medical education, mainly to international students, including a

ECFMG/AUA - 0221

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

large number of U.S. and Canadian citizens. Currently, there is no nationally mandated accreditation of Antilles medical schools, although two of the schools have pursued accreditation by an outside, independently run organization, the Accreditation Commission on Colleges of Medicine (ACCM).[20]

The ACCM standards consist of evaluations of 11 elements: educational goals, corporate organization, college management, curriculum, student promotion and evaluation, admissions, resources, faculty, library, student services, and facilities. Entrance specifications indicate that a baccalaureate degree is preferred, and such a degree must include various college-level science courses. Faculty research is not specifically mentioned as an element of consideration, although the standards do indicate that an accredited institution shall foster an atmosphere of scholarly collaboration among the various faculty members. Resources for experiential learning are not specifically required. University affiliation and direct control over clinical teaching sites are also not mandated.

China. There are 168 IMED-listed medical schools in China. Currently, no national system of accreditation exists, although numerous pilot studies to develop such a system have been conducted by various groups, including the China Medical Board, the Institute for International Medical Education, and the Association of Medical Universities and Colleges of China. Chinese education and health authorities are considering endorsing a national accreditation process.[21]

Nigeria. In Nigeria, the 20 IMED-listed medical schools are accredited by both the Medical and Dental Council of Nigeria (MDCN)[22] and the National Universities Commission (NUC).[23] Each of these two authorities has its own focus, but they work in tandem. The MDCN concentrates on reviewing the adequacy of a school's infrastructure for clinical services, the quality of student selection, and the pass rates, institutional funding, and other issues. The MDCN grants partial accreditation when a school first opens and full accreditation after students are in clinical training. Both the MDCN and the NUC publish information regarding curriculum content, specifying what should be taught

in the various years of medical training. This curriculum content is not mandated, although most medical schools follow the suggestions. The NUC also reviews higher-education administrative issues.

Nigerian medical education has a six-year duration and leads to an MBBS. The MDCN standards indicate the secondary-school-level course prerequisites. Faculty research is not specified as a requirement by either the MDCN or the NUC. In Nigeria, all medical schools, both public and private, are legally required to be associated with universities. Both accrediting bodies require evidence of well-equipped laboratories to ensure adequate experiential learning. A variety of arrangements are possible for clinical training opportunities.

Colombia. There are 38 medical schools in Colombia listed in IMED. The government-run National Council of Accreditation (CNA) has established 15 "minimal quality conditions" that a program is required to meet before it can start functioning.[24] In addition, the CNA voluntarily accredits educational institutions in the country, including schools of medicine, once they have been in existence for a specified length of time. The law has recently changed and now mandates that all schools undergo this quality review. Currently, 31 medical schools are accredited by CNA, and the remaining 7 schools are undergoing the process. The Association of Colombian Faculties of Medicine supports the accreditation system.[25]

Students enter medical school in Colombia immediately after high school. Faculty members are not required to engage in research activities for accreditation purposes, although they are emphasized at some medical schools. University affiliation and control of clinical teaching facilities also are not mandated. Opportunities for students to engage in experiential learning and the existence of the appropriate associated laboratories are requirements for accreditation.

Iran. In Iran, the Ministry of Health and Medical Education is currently planning and pilot-testing various changes to medical education at the country's 52 IMED-listed medical schools.[26] The standard curriculum is under revision, and medical education accreditation

standards and procedures have been developed. A summative national system of accreditation, under the auspices of the Ministry of Health and Medical Education, is expected to be implemented in the near future.

## Comparison of accreditation processes

Flexner's methodology for evaluating medical education programs consisted of the following components: the development of assessment criteria deemed to be critical in evaluating medical school programs, the conducting of a site visit to the schools to observe and compare the facilities and aspects of the program against the criteria, and the creation of a report documenting findings of the evaluation. Of the eight countries discussed in the current study that have summative systems of accreditation of medical programs (or access to outside accreditors), all use processes very similar to the one implemented by Flexner. The accreditation organizations all have published documents detailing the standards used to evaluate medical schools. Some organizations, such as the MCI, PMDC, CAAM-HP, MDCN, CNA, and LCME, make their standards publicly available on their Web sites. All accrediting organizations require a site visit (or multiple site visits) by qualified individuals. Finally, the organizations discussed in the current study create a written report documenting the findings of the site visit (and other methods of inquiry) as part of their accreditation protocols.

## Discussion

Flexner's work from a century ago has had an important influence on medical education in the United States, yet a large number of physicians currently in graduate training and in practice in the United States attended medical school in other countries. Schools outside of the United States and Canada operate under diverse educational systems and with varied levels of quality oversight. The results of the current study indicate that there is variation among other countries in the governance and scope of authority over medical schools. Most of the accrediting organizations are governmental bodies, although exceptions include the independently run CAAM-HP in the Caribbean and PAASCU in the Philippines.

ECFMG/AUA - 0222

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

In some instances, governmental ministries allow accreditation activities to be conducted by independent agencies located in other countries, as occurs in the Netherlands Antilles. Accreditation authorities and policies also vary in their levels of enforcement and influence. For example, in the Netherlands Antilles and the Philippines, only a minority of the medical schools have undergone accreditation review. Other countries, such as China and Iran, do not currently have a summative national system of accreditation in place, but both countries are planning for implementation. In contrast, some medical schools have undergone quality assurance reviews conducted by more than one organization, including the small number of schools in India that are accredited by both the MCI and the NAAC and the school in Grenada that is accredited by both the Grenada Ministry of Health and Social Security and CAAM-HP.

**Flexner's elements**

The accreditation systems in the 10 countries that educate the greatest numbers of IMGs who achieve ECFMG certification all use processes and elements comparable to those of Flexner. This similarity is evidence of global agreement on the methodology that is considered to be most effective in ensuring the quality of educational programs. Nevertheless, although protocols were similar, accreditation systems varied in their use of standards that were equivalent to the five Flexner elements chosen for the comparison framework in the current study. Many accreditation systems do use some or most of the Flexner elements of focus, a practice that indicates general agreement on the educational fundamentals that are deemed necessary for ensuring quality.

**Entrance requirements.** Medical education in some countries, such as India, Pakistan, Nigeria, and Colombia, incorporates premedical science courses into the general five- or six-year curriculum. The emphasis on science prerequisites by accrediting bodies functioning in countries with a typical four-year curriculum varies, although most do specify a science background. For example, the Grenada Ministry of Health and Social Security, which accredits the single medical school in Grenada, requires 60 semester hours of college study, including courses in

general chemistry, organic chemistry, biology or zoology, and physics. The ACCM, which has accredited two of the six schools in the Netherlands Antilles, specifies three years of undergraduate education, including one year each of chemistry. CAAM-HP requires an undergraduate degree or "an adequate level" in the sciences. It is interesting that some accreditation standards, such as those used by the LCME, have recently implied that science may be overemphasized as a prerequisite by stating that students preparing to study medicine should acquire a broad education that also includes the humanities and social sciences.

**Teaching staff.** Flexner argued for the importance of the involvement of the medical school faculty in research activities. The standards used by about half of the accrediting bodies discussed here mention research as an important aspect of faculty qualifications, and some include language suggesting that medical schools should support staff scholarly activities. Standards used by PAASCU in the Philippines go beyond the simple encouragement of faculty research and clearly state that, for a program to receive the highest accreditation grade, faculty must engage in research, and appropriate evidence must be presented detailing these activities.

**Resources available for maintenance.** To ensure the accessibility of adequate resources, Flexner emphasized the importance of the association of a medical school with a university. Although the standards used by most of the accrediting organizations discussed here indicate that a medical school "should" be part of a university, it seems that a wide variety of types of institutions are permitted to provide medical education around the world. In India, a medical school must be associated with a university, although the MCI standards also allow schools to be established by an appropriate state government or union territory, a university, an autonomous body, a society, a public religious or charitable trust, or a company registered under the Company Act.

**Laboratory facilities.** Flexner argued for adequate facilities and resources for experiential student learning in the basic science curriculum, and he

operationalized this element of quality by including an evaluation of a medical school's laboratory facilities. This belief seems to be well adopted globally, as almost all accreditation standards documents examined in the current study included either language describing the need for hands-on learning as part of the basic science curriculum, information on the specific laboratories and equipment necessary to facilitate this aspect of instruction, or both. For example, the CAAM-HP standards state that the curriculum must allow students to acquire skills of critical judgment based on evidence and experience and that instruction within the basic sciences should include laboratory or other practical exercises that entail accurate observations of biomedical phenomena. In Nigeria, the MDCN standards mandate that, for every student, there should be at least two square meters of laboratory space, which should include a worktop and equipment cupboard space.

**Clinical facilities.** Flexner's model of medical education included two years of basic science teaching followed by two years of clinical instruction. Because of the importance of the clinical phase in preparing the student to adequately learn to care for a wide variety of patients with an assortment of clinical presentations, Flexner felt strongly that clinical teaching facilities must be under the direct control of the medical school. Otherwise, he argued, because of the competing priorities of hospitals and clinics in providing efficient patient care, and the possibility that clinical instructors who are not affiliated with a medical school may view teaching roles as a low priority, there could be no assurance that medical students would receive adequate clinical training.

Most of the standards used by the several accrediting bodies to evaluate medical schools around the world contain similar language emphasizing this need, although the emphasis varies. Some standards include statements that clinical training facilities must be under the direct control of the medical school, whereas other standards indicate that affiliation agreements with clinical sites are acceptable but that the education of the students must remain under the medical school's control. The standards used by the MDCN in Nigeria seem to be the most lenient in this regard, indicating

ECFMG/AUA - 0223

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

that a variety of arrangements between health care facilities and the medical school are adequate for clinical training.

## Conclusions

Before Flexner's work a century ago, no systematic process was in place for evaluating the quality of domestic medical education. There currently exists, in many countries around the world, a similar situation, in which medical education functions without a government- or professional-body-endorsed system of review or oversight. Some of the countries that lack a summative quality evaluation process, for example, China and Iran, are poised to implement review systems under the auspices of either governmental or independent agencies. In other countries, such as the Philippines, quality assurance systems are in place, but they lack the authority to mandate review for all medical schools. Much as was the case in Flexner's time, when accreditation of institutions began to be more closely linked to licensure of individuals, many of these voluntary accrediting authorities are making efforts to strengthen incentives for institutions to obtain a positive accreditation status.

Flexner's evaluations sought to improve doctors' knowledge and skills by focusing on ensuring the quality of the education provided at medical schools. Currently, LCME policies continue to provide assurance that institutions meet fundamental standards. For those physicians trained outside of the United States or Canada, the ECFMG certification process ensures the readiness of these individuals to enter graduate medical training, but it does not include an independent review of the quality of certificants' medical schools. In addition, most state medical boards in the United States do not include independent evaluations of institutions as part of their residency or licensure requirements for IMGs. Accreditation of educational programs, conducted by an appropriate body in the country of the applicant's medical school or another suitable agency, in addition to the system of certification of individuals, would augment the process that ensures that those internationally educated individuals who seek training opportunities in the United States are appropriately qualified.

Whereas the current study describes and compares the inclusion of standards used (or not used) by the various accrediting organizations, our analyses have several limitations. We compared only the existence of the element, not the interpretation and application of the standards. It is also possible that various accrediting bodies differ in their conceptualization and implementation of what seems to be the same or a similar accreditation standard. Words or phrases such as "should," "shall," or "it is expected that" could be interpreted differently, depending on the exact phrasing of the standard, the various cultural or institutional contexts, or the understanding of particular individuals. For example, in the case of the Philippines element describing faculty involvement in research, the specific standard reads, "Medical school faculty members must have training in research and [must] actively engage in research." This statement seems to require faculty scholarly activities, but it is possible that it could be interpreted as referring to some but not all faculty members.

Besides being aware of the potential variations in interpretations of written standards, readers of this paper should interpret the results of our study with caution, because our intent was to provide a framework for comparison across countries, not to suggest that particular organizational systems, methodologies, or elements are superior. Despite numerous instances of correspondence, it is also difficult to determine whether these international accrediting bodies intentionally embraced elements of Flexner's methodology or of another methodology, or whether the similarities observed are the result of widespread adoption of generic practices. Further research is necessary to evaluate the importance of these and other accreditation elements in contributing to the quality of medical practice. For example, studies aimed at determining the added value of accreditation fundamentals in relation to educational elements and the quality of graduates are warranted.

Moreover, medical education and quality assurance practices are not static. The LCME's current protocols do not include a strict interpretation of Flexner's original elements in accrediting domestic medical education programs, which indicates that

the standards deemed important for ensuring quality in medical education 100 years ago may no longer be fully appropriate or applicable today. Countries continually update and modify their educational programs and quality oversight systems, and new medical schools are under development around the world. Various regions of the world are undergoing political or organizational changes that will affect the education and training of physicians. For example, the Netherlands Antilles is scheduled to be dissolved in 2010, and this event will result in significant changes in the political recognition and subsequent accreditation of the Antillean medical schools.

Flexner's work 100 years ago describing the state of medical education continues to provide relevant insights today. Using elements that he felt were important for ensuring quality, we created a framework for describing quality assurance and accreditation of the medical education of IMG physicians currently seeking to enter graduate training in the United States. All accreditation systems included in this study incorporated Flexner's process components, and many of the accreditation systems embraced the standards and basic tenets of Flexner's report, which provides evidence of the validity of these criteria. The quality assurance data in this report can be useful to program directors who select IMGs for their training programs. Program directors may use the knowledge that a physician's medical school was determined to have met established accreditation standards as additional practical evidence of the quality of its educational program. This additional information is likely of great value in comparisons of candidates with diverse backgrounds, educational attainments, and clinical experiences. Flexner was a proponent of comparing medical education in the United States with that in Europe, and the global data provided here contribute to a better understanding of medical education practices around the world.

*Acknowledgments:* The authors thank the persons from the various accreditation organizations around the world who graciously sent the relevant standards documents to us. Special thanks and acknowledgment go to Professor Muuta Ibrahim, Bayero University, Kano, Nigeria; Dr. Bosede Afolabi, Lagos University, Lagos, Nigeria; and Dr. Ricardo Borda, Pontificia Universidad Javeriana, Bogotá, Colombia, for

ECFMG/AUA - 0224

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.

their valuable assistance in obtaining and interpreting documents.

*Funding/Support:* None.

*Other disclosures:* None.

*Ethical approval:* Not applicable.

### References

1 Boulet J, Bede C, McKinley D, Norcini J. An overview of the world's medical schools. Med Teach. 2007;29:20–26.

2 Hallock JA, McKinley D, Boulet J. Migration of doctors for undergraduate medical education. Med Teach. 2007;29:98–105.

3 Brotherton SE, Etzel SI. Graduate medical education. 2007–2008. JAMA. 2008;300:1228–1243.

4 Karle H. International trends in medical education: Diversification contra convergence. Med Teach. 2004;26:205–206.

5 van Zanten M, Norcini JJ, Boulet JR, Simon F. Overview of accreditation of undergraduate medical education programmes worldwide. Med Educ. 2008;42:930–937.

6 Barzansky B. Abraham Flexner: Lessons from the past with applications for the future. In: Barzansky B, Gevitz N, eds. Beyond Flexner: Medical Education in the Twentieth Century. Westport, Conn: Greenwood Press; 1992:189–201.

7 Flexner A. Medical Education in the United States and Canada: A Report to the Carnegie Foundation for the Advancement of Teaching. Bulletin No. 4. New York, NY: The Carnegie Foundation for the Advancement of Teaching; 1910.

8 Hudson RP. Abraham Flexner in historical perspective. In: Barzansky B, Gevitz N, eds. Beyond Flexner: Medical Education in the Twentieth Century. Westport, Conn: Greenwood Press; 1992:1–18.

9 Kassebaum DG. Origin of the LCME, the AAMC–AMA partnership for accreditation. Acad Med. 1992;67:85–87.

10 Liaison Committee on Medical Education. Functions and Structure of a Medical School: Standards for Accreditation of Medical Education Programs Leading to the M.D. Degree. Available at: http://www.lcme.org/functions2008jun.pdf. Accessed June 1, 2009.

11 Sood R. Medical education in India. Med Teach. 2008;30:585–591.

12 Medical Council of India. Minimum Standard Requirements for the Medical College. Available at: http://www.mciindia.org/publications/index.htm. Accessed June 1, 2009.

13 National Assessment and Accreditation Council. Institutional Accreditation: Manual for Self-Study for Health Science Institutions. Bangalore, India: Pentaplus Printers Private Ltd; 2008. Available at: http://naacindia.org/publications/Manual%20for%20Self-Study%20for%20Health%20Science%20Institutions.pdf. Accessed June 1, 2009.

14 Pakistan Medical & Dental Council. Pakistan Medical & Dental Council Regulations Governing the Requirements of Teaching Faculty and Number of Beds etc. in a Medical College and Attached Teaching Hospitals. Islamabad, Pakistan: Pakistan Medical & Dental Council; 2009. Available at: http://dev.plexushosting.com/PMDC/LinkClick.aspx?fileticket=TKu%2f8Az005U%3d&tabid=102&mid=584. Accessed June 1, 2009.

15 Dominican Medical Board. Standards and Procedures for Certification of Medical Education Programmes. Commonwealth of Dominica, Dominican Medical Board, Ministry of Health and Social Security; 2006.

16 Caribbean Accreditation Authority for Education in Medicine and Other Health Professions. Standards for the Accreditation of Medical Schools in the Caribbean (CARICOM) Community. Available at: http://www.caam-hp.org/documents/0-Standards_Accreditation_Med_Schools.pdf. Accessed June 1, 2009.

17 van Zanten M, Boulet JR. Accreditation of Undergraduate Medical Education in the Caribbean: Report on the Caribbean Accreditation Authority for Education in

Medicine and Other Health Professions (CAAM-HP). Acad Med. 2009;84:771–775.

18 New York State Education Department. A Guide for Unaccredited/Unregistered Medical Schools Seeking to Operate in New York State. Albany, NY: New York State Education Department; 2007.

19 Philippine Accrediting Association of Schools, Colleges and Universities (PAASCU). Survey Instrument for Accrediting Basic Medical Education Program. Quezon City, Philippines: PAASCU; 2003.

20 The Accreditation Commission on Colleges of Medicine. Elements of Accreditation for Colleges of Medicine. Wicklow, Ireland: The Accreditation Commission on Colleges of Medicine; 2008.

21 Field M, Geffen L, Walters T. Current perspectives on medical education in China. Med Educ. 2006;40:938–939.

22 Medical and Dental Council of Nigeria. Guideline on Minimum Standards of Medical and Dental Education in Nigeria. Available at: http://www.mdcnigeria.org/Downloads/Copy%20of%20Guideline%20on%20minimum%20standard-Red%20book.pdf. Accessed June 1, 2009.

23 National Universities Commission. Manual of Accreditation Procedures for Academic Programmes in Nigerian Universities. Abuja, Nigeria: National Universities Commission; 1999.

24 National Council of Accreditation (CNA). Lineamientos Para la Acreditación de Programas. Bogotá, Colombia: CNA; 2006. Available at: http://www.cna.gov.co/1741/articles-186359_lineamientos_2.pdf. Accessed June 1, 2009.

25 Asociación Colombiana de Facultades de Medicina (ASCOFAME). Características e Indicadores Para Los Programas de Medicina con Base en "Lineamientos Para La Acreditación de Programas." Bogotá, Colombia: ASCOFAME; 2005.

26 Tavakol M, Mohagheghi MA, Torabi S. The development of medical education in Iran. Clin Teach. 2008;5:125–128.

ECFMG/AUA - 0225

Copyright © by the Association of American Medical Colleges. Unauthorized reproduction of this article is prohibited.